# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BRADLEY C. REIFLER,<br><br>                     Debtor. | Case No. 17-35075 (CGM)<br><br>Chapter 7 |
| NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY,<br><br>                     Plaintiff,<br><br>-against-<br><br>BRADLEY C. REIFLER,<br><br>                     Defendant. | Adv. Pro. No. 17 -09016 (CGM) |

## SUBPOENA TO TESTIFY AT A DEPOSITION AND PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN ADVERSARY PROCEEDING

**To:**    Joel Schreiber
        Times Square Tower
        7 Times Square
        37th Floor
        New York, New York 10036
        212-696-2400

     **YOU ARE COMMANDED** to appear on October 31, 2017 at the offices of Squire Patton Boggs (US) LLP, 30 Rockefeller Plaza, 23rd Floor, New York, NY 10112, to testify at a deposition to be taken by counsel for North Carolina Mutual Life Insurance Company, the Plaintiff in the above-captioned adversary proceeding.

     The deposition will commence at 9:00 a.m. and will continue from day to day until completed. The deposition will be taken pursuant to the Federal Rules of Civil Procedure, as made applicable by the Federal Rules of Bankruptcy Procedure, before an officer authorized by

1

law to administer oaths.  The deposition will be recorded by stenographic means, recorded, and/or videotaped.

**YOU ARE FURTHER COMMANDED** to produce the documents set forth in **Exhibit A** by no later than October 4, 2017.   The documents must be produced to:  Norman N. Kinel, Esq., Squire Patton Boggs (US) LLP, 30 Rockefeller Plaza, 23rd Floor, New York, New York 10112.

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached—Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

The name, address, email address, and telephone number of the attorney representing North Carolina Mutual Life Insurance Company, who issues this subpoena, is: Norman N. Kinel, Esq., Squire Patton Boggs (US) LLP, 30 Rockefeller Plaza, 23rd Floor, New York, New York 10112, norman.kinel@squirepb.com, (212) 872-9800.

Dated:  New York, New York
         September 12, 2017

                              SQUIRE PATTON BOGGS (US) LLP


                              /s/ Norman N. Kinel
                              Norman N. Kinel
                              30 Rockefeller Plaza, 23rd Floor
                              New York, New York 10112
                              Telephone:  (212) 872-9800
                              Facsimile: (212) 872-9815
                              norman.kinel@squirepb.com

                              -and-

                              Aaron A. Boschee (admitted *pro hac vice*)
                              1801 California Street
                              Suite 4900
                              Denver, CO 80202
                              Telephone:  (303) 830-1776
                              Facsimile:  (303) 894-9239
                              aaron.boschee@squirepb.com

-and-

WILLIAMS MULLEN

M. Keith Kapp (admitted *pro hac vice*)
Holmes Harden (admitted *pro hac vice*)
Andrew O. Mathews (admitted *pro hac vice*)
301 Fayetteville Street, Suite 1700
Raleigh, North Carolina 27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300

*Counsel for North Carolina Mutual Life Insurance
Company*

3

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

 My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

        I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# **<u>EXHIBIT A</u>**

## EXHIBIT A

## DEFINITIONS

1.      "Coconut Beach, LLC" means Coconut Beach, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

2.      "Complaint" means the Complaint filed in this action by the Plaintiff on May 1, 2017, a copy of which is attached hereto as **Exhibit B**.

3.      "Defendant" means Bradley C. Reifler, his family members, current and former employees, agents, attorneys, accountants and anyone else acting on his behalf.

4.      "Document" should be interpreted as broadly as possible and encompasses all paper and electronic Documents, including but not limited to, the following: (a) memoranda, notes, statements, policies, correspondence, files, summaries, analyses, drawings, graphs, charts, spreadsheets, photographs, backup data and any and all writings and records of any kind whatsoever, whether in paper or electronic format; (b) electronic Documents, including, but not limited to e-mail messages (either sent or received, and including all attachments), instant messages, word processing, Power Point presentations, voicemail messages, video recordings, databases, calendar entries, computer drawings, screen prints, display comments, claims extract reports, or any other Documents or files created for work purposes; (c) magnetic, digital and VHS tapes, tape recordings, disks, diskettes, CDs, DVDs, USB drives, disk packs, microfilm, microfiche, back-up tapes, and zip drives; and (d) data stored on network file shares, laptops, PCs and other storage devices, including, but not limited to PDAs and home computers.

5.      "Fickes" means Steven W. Fickes, his family members, current and former employees, agents, attorneys, accountants and anyone else acting on his behalf.

1

6.    "Flatley" means Michael Flatley, his family members, current and former employees, agents, attorneys, accountants and anyone else acting on his behalf.

7.    "Forefront Capital" means Forefront Capital, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

8.    "Forefront Capital Advisors, LLC" means Forefront Capital Advisors, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

9.    "Forefront Capital Group" means Forefront Capital Group, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

10.    "Forefront Capital Holdings, LLC" means Forefront Capital Holdings, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

11.    "Forefront Capital Investments, LLC" means Forefront Capital Investments, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

12.    "Forefront Capital Management, LLC" means Forefront Capital Management, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

13.    "Forefront Capital Markets, LLC" means Forefront Capital Markets, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

14.    "Forefront Income Trust" means Forefront Income Trust, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

2

15.    "Forefront Partners, LLC" means Forefront Partners, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

16.    "Forefront Talking Capital Investment, LLC" means Forefront Talking Capital Investment, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

17.    "Fraudulent Investment Advisory Agreement" shall have the meaning ascribed to it in Paragraph 32 of the Complaint.

18.    "Fraudulent List of Signers" shall have the meaning ascribed to it in Paragraph 35 of the Complaint.

19.     "Investment Advisory Agreement" shall have the meaning ascribed to it in Paragraph 28 of the Complaint.

20.    "North Carolina Mutual" means North Carolina Mutual Life Insurance Company, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

21.    "Novation Agreement" shall have the meaning ascribed to it in Paragraph 15 of the Complaint.

22.    "Person" means any natural person (alive or dead) or business organization of any kind, including corporations, limited liability companies, partnerships, joint ventures, business associations, and governmental boards or agencies.

23.    "Port Royal - NCM, LLC" means Port Royal - NCM, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

3

24.     "Port Royal Reassurance Company SPC, Ltd." means Port Royal Reassurance Company SPC, Ltd., its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

25.     "Relating to" means concerning, pertaining to, referring to, describing, evidencing, or constituting.

26.     "Rudasill" means Meade Rudasill, Jr., his family members, current and former employees, agents, attorneys, accountants and anyone else acting on his behalf.

27.     "Spring Bridge 182 LLC" means Spring Bridge 182 LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

28.     "Stamford Brook" means Stamford Brook Capital, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

29.     "Summit" means Summit Trust Company, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

30.     "Syracuse Property Holdings, LLC" means Syracuse Property Holdings, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

31.     "Trust" means the Port Royal North Carolina Mutual Reassurance Trust, its current and former employees, agents, attorneys, accountants and anyone acting on its behalf.

32.     "Trust Account" shall have the meaning ascribed to it in Paragraph 18 of the Complaint.

33.     "Trust Agreement" shall have the meaning ascribed to it in Paragraph 17 of the Complaint.

4

34.    "Trust Assets" shall have the meaning ascribed to it in Paragraph 18 of the Complaint.

35.    "Wasitowski" means David Wasitowski, his family members, current and former employees, agents, attorneys, accountants and anyone else acting on his behalf.

36.    "Waterbridge Capital, LLC" means Waterbridge Capital, LLC, its current and former employees, agents, attorneys, accountants and anyone else acting on its behalf.

37.    "You" or "Yours" means Joel Schreiber, your family members, current and former employees, agents, attorneys, accountants and anyone else acting on your behalf.

## INSTRUCTIONS

1.    <u>Production Obligations</u>.   You are required to produce all responsive Documents that are in Your possession, custody, or control, including any responsive Document prepared, kept, or maintained for personal use, in Your personal files, or as the personal property of any of Your agents or representatives and any Documents in the possession, custody, or control of any other Person who previously acted on Your behalf (including Your attorneys or agents).

2.    <u>Electronically Stored Information</u>.   Please produce electronically stored information in the form in which it is ordinarily maintained (.DOC, .XLS, .PPT or .PST/.NSF for email) or in single page .TIFF files with searchable extracted metadata, including (a) for email, the Author, Recipient, CC/BCC, Date, Subject, attachment information and searchable full text, and (b) for other files, the Create Date, Document Author, and searchable text of the document. TIFF files and metadata should be provided in a format suitable for loading into Concordance or Summation.   All document productions, where feasible based on volume, should be sent by electronic mail to Norman N. Kinel, Esq., norman.kinel@squirepb.com.   Alternatively, copies of the requested Documents may be delivered on an external hard drive or other storage medium to Norman N. Kinel, Esq., Squire Patton Boggs (US) LLP, 30 Rockefeller Plaza, 23rd Floor, New York, New York 10112.

3.    <u>Drafts</u>.   This request for Documents includes all drafts, mark-ups, revisions, modifications, or amendments, and all non-identical copies of any Document.

4.    <u>Continuing Obligation</u>.   These requests are continuing.   If, after producing the requested Documents, You obtain any additional responsive Documents, You are required to produce such additional Documents.

5.      <u>Privilege</u>.  If you consider any Document or communication to be privileged, then in a separate privilege log with regard to each such Document or communication, describe the Document or communication generally, explain fully the basis for the claimed privilege, identify the author of the Document or Person making the communication and all signatories to the Document, and identify the custodian of the original and all copies of the Document.

6.      <u>Documents No Longer in Existence</u>.  If any Document requested to be identified was at one time in existence, but is no longer in existence, identify the Document, and for each Document so identified specify the nature of the Document, the type of information contained therein, the date on which it ceased to exist, the circumstances under which it ceased to exist, and the identity of all Persons having knowledge of the contents of said Document.

7.      <u>No Responsive Documents</u>.  If You do not possess any Documents responsive to a particular request, say so in writing.

8.      Pursuant to Federal Rule of Civil Procedure 45(e)(1), as made applicable by Federal Rule of Bankruptcy Procedure 9016, Documents shall be produced as they are kept in the ordinary course of business or organized and labeled according to the specific request to which they are responsive.

9.      Documents attached to each other should not be separated.

10.      If You object that a certain production of any requested Document is unduly burdensome, describe the precise burden or expense of complying in writing.

11.      If You encounter any ambiguities when construing a request, please set forth in writing the matter deemed ambiguous and the construction You use in responding.

## DOCUMENTS TO BE PRODUCED

Documents responsive to the following categories shall be produced, and You shall be examined with respect to the following categories and topics, including authenticating and explaining any responsive Document:

1.      Produce all Documents regarding or relating to Defendant's relationship with, connection to, or involvement with any of the following:

a.      Coconut Beach, LLC;

b.      Fickes;

c.      Flatley;

d.      Forefront Capital;

e.      Forefront Capital Advisors, LLC;

f.      Forefront Capital Group;

g.      Forefront Capital Holdings, LLC;

h.      Forefront Capital Investments, LLC;

i.      Forefront Capital Management, LLC;

j.      Forefront Capital Markets, LLC;

k.      Forefront Income Trust;

l.      Forefront Partners, LLC;

m.      Forefront Talking Capital Investment, LLC;

n.      Port Royal - NCM, LLC;

o.      Port Royal Reassurance Company SPC, Ltd.;

p.      Rudasill;

8

     q.       Spring Bridge 182 LLC;

     r.        Stamford Brook;

     s.        Summit;

     t.        Syracuse Property Holdings, LLC;

     u.       Wasitowski; and

     v.        Waterbridge Capital, LLC.

2.      Produce all Documents regarding or relating to Your relationship with, connection to, or involvement with Defendant.

3.      Produce all Documents regarding or relating to Your relationship with, connection to, or involvement with each Person listed in Paragraphs 1.a. through 1.v. above.

4.      Produce all Documents regarding or relating to North Carolina Mutual.

5.      Produce all Documents regarding or relating to Defendant's relationship with, connection to, or involvement with North Carolina Mutual, including, but not limited to, his management of the Trust Assets.

6.      Produce all Documents regarding or relating to the Novation Agreement.

7.      Produce all Documents regarding or relating to the Investment Advisory Agreement.

8.      Produce all Documents regarding or relating to the Fraudulent Investment Advisory Agreement.

9.      Produce all Documents regarding or relating to the Fraudulent List of Signers.

10.      Produce all Documents regarding or relating to the Trust.

11.      Produce all Documents regarding or relating to the Trust Agreement.

12.      Produce all Documents regarding or relating to the Trust Account.

13.     Produce all Documents regarding or relating to the use of approximately $10 million of the Trust Assets as seed funding for a closed end investment company (the Forefront Income Trust), as enumerated in Paragraph 42(a) of the Complaint.

14.     Produce all Documents regarding or relating to the transfer of approximately $10.5 million of the Trust Assets to Forefront Partners, LLC, as enumerated in Paragraph 42(b) of the Complaint.

15.     Produce all Documents regarding or relating to the transfer of over $6 million of the Trust Assets to Spring Bridge 182 LLC, as enumerated in Paragraph 42(c) of the Complaint.

16.     Produce all Documents regarding or relating to the transfer of approximately $2.1 million of the Trust Assets to Waterbridge Capital, LLC and You, as enumerated in Paragraph 42(d) of the Complaint.

17.     Produce all Documents regarding or relating to the transfer of approximately $2 million of the Trust Assets to Forefront Talking Capital Investment, LLC, as enumerated in Paragraph 42(e) of the Complaint.

18.     Produce all Documents regarding or relating to the transfer of approximately $1.5 million of the Trust Assets to Syracuse Property Holdings, LLC, as enumerated in Paragraph 42(f) of the Complaint.

19.     Produce all Documents regarding or relating to any delinquencies for promissory notes or other investments funded with Trust Assets.

20.     Without limiting any of the foregoing, produce the following Documents from January 2012 to present:

        a.  Any financial statement for You that You have provided to any other Person;

10

b.  Statements from any bank account into which any portion of the Trust Assets were deposited, directly, or indirectly, including, without limitation, any portion of the $2.1 million of the Trust Assets that was transferred to You and Waterbridge Capital, LLC as enumerated in Paragraph 42(d) of the Complaint.

21.    Without limiting any of the foregoing, produce the following Documents for Coconut Beach, LLC, from January 2012 to present:

a.  All federal, state and local tax returns;

b.  All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.  All income/expense statements;

d.  All general ledgers;

e.  All balance sheets;

f.  All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.  All statements of ownership interests;

h.  All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.  All statements for all bank, savings, and credit accounts;

j.  All Documents showing any assets owned by the entity;

k.  All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.  All Documents showing the entity's equity holders; and

m.  All Documents showing the entity's managers, officers, and directors.

11

22.     Without limiting any of the foregoing, produce the following Documents for Forefront Capital, from January 2012 to present:

      a.     All federal, state and local tax returns;

      b.     All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

      c.     All income/expense statements;

      d.     All general ledgers;

      e.     All balance sheets;

      f.     All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

      g.     All statements of ownership interests;

      h.     All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

      i.     All statements for all bank, savings, and credit accounts;

      j.     All Documents showing any assets owned by the entity;

      k.     All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

      l.     All Documents showing the entity's equity holders; and

      m.     All Documents showing the entity's managers, officers, and directors.

23.     Without limiting any of the foregoing, produce the following Documents for Forefront Capital Advisors, LLC, from January 2012 to present:

      a.     All federal, state and local tax returns;

      b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

      c.      All income/expense statements;

      d.      All general ledgers;

      e.      All balance sheets;

      f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

      g.      All statements of ownership interests;

      h.      All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

      i.      All statements for all bank, savings, and credit accounts;

      j.      All Documents showing any assets owned by the entity;

      k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

      l.      All Documents showing the entity's equity holders; and

      m.      All Documents showing the entity's managers, officers, and directors.

24.      Without limiting any of the foregoing, produce the following Documents for Forefront Capital Group, from January 2012 to present:

      a.      All federal, state and local tax returns;

      b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

      c.      All income/expense statements;

      d.      All general ledgers;

    e.      All balance sheets;

    f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

    g.      All statements of ownership interests;

    h.      All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

    i.      All statements for all bank, savings, and credit accounts;

    j.      All Documents showing any assets owned by the entity;

    k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

    l.      All Documents showing the entity's equity holders; and

    m.      All Documents showing the entity's managers, officers, and directors.

25.      Without limiting any of the foregoing, produce the following Documents for Forefront Capital Holdings, LLC, from January 2012 to present:

    a.      All federal, state and local tax returns;

    b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

    c.      All income/expense statements;

    d.      All general ledgers;

    e.      All balance sheets;

    f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

    g.      All statements of ownership interests;

h.    All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.    All statements for all bank, savings, and credit accounts;

j.    All Documents showing any assets owned by the entity;

k.    All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.    All Documents showing the entity's equity holders; and

m.    All Documents showing the entity's managers, officers, and directors.

26.    Without limiting any of the foregoing, produce the following Documents for Forefront Capital Investments, LLC, from January 2012 to present:

a.    All federal, state and local tax returns;

b.    All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.    All income/expense statements;

d.    All general ledgers;

e.    All balance sheets;

f.    All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.    All statements of ownership interests;

h.    All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.    All statements for all bank, savings, and credit accounts;

j.    All Documents showing any assets owned by the entity;

15

k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

27.    Without limiting any of the foregoing, produce the following Documents for Forefront Capital Management, LLC, from January 2012 to present:

a.      All federal, state and local tax returns;

b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.      All income/expense statements;

d.      All general ledgers;

e.      All balance sheets;

f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.      All statements of ownership interests;

h.      All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.      All statements for all bank, savings, and credit accounts;

j.      All Documents showing any assets owned by the entity;

k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

16

28.    Without limiting any of the foregoing, produce the following Documents for Forefront Capital Markets, LLC, from January 2012 to present:

    a.    All federal, state and local tax returns;

    b.    All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

    c.    All income/expense statements;

    d.    All general ledgers;

    e.    All balance sheets;

    f.    All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

    g.    All statements of ownership interests;

    h.    All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

    i.    All statements for all bank, savings, and credit accounts;

    j.    All Documents showing any assets owned by the entity;

    k.    All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

    l.    All Documents showing the entity's equity holders; and

    m.    All Documents showing the entity's managers, officers, and directors.

29.    Without limiting any of the foregoing, produce the following Documents for the Forefront Income Trust, from January 2012 to present:

    a.    All federal, state and local tax returns;

17

 b.  All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

 c.  All income/expense statements;

 d.  All general ledgers;

 e.  All balance sheets;

 f.  All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

 g.  All statements of ownership interests;

 h.  All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

 i.  All statements for all bank, savings, and credit accounts;

 j.  All Documents showing any assets owned by the entity;

 k.  All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

 l.  All Documents showing the entity's equity holders; and

 m.  All Documents showing the entity's managers, officers, and directors.

30. Without limiting any of the foregoing, produce the following Documents for Forefront Partners, LLC, from January 2012 to present:

 a.  All federal, state and local tax returns;

 b.  All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

 c.  All income/expense statements;

 d.  All general ledgers;

e.      All balance sheets;

f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.      All statements of ownership interests;

h.      All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.      All statements for all bank, savings, and credit accounts;

j.      All Documents showing any assets owned by the entity;

k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

31.     Without limiting any of the foregoing, produce the following Documents for Forefront Talking Capital Investment, LLC, from January 2012 to present:

a.      All federal, state and local tax returns;

b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.      All income/expense statements;

d.      All general ledgers;

e.      All balance sheets;

f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.      All statements of ownership interests;

19

    h.     All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

    i.     All statements for all bank, savings, and credit accounts;

    j.     All Documents showing any assets owned by the entity;

    k.     All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

    l.     All Documents showing the entity's equity holders; and

    m.     All Documents showing the entity's managers, officers, and directors.

32.    Without limiting any of the foregoing, produce the following Documents for Port Royal - NCM, LLC, from January 2012 to present:

    a.     All federal, state and local tax returns;

    b.     All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

    c.     All income/expense statements;

    d.     All general ledgers;

    e.     All balance sheets;

    f.     All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

    g.     All statements of ownership interests;

    h.     All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

    i.     All statements for all bank, savings, and credit accounts;

    j.     All Documents showing any assets owned by the entity;

k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

33.     Without limiting any of the foregoing, produce the following Documents for Port Royal Reassurance Company SPC, Ltd., from January 2012 to present:

a.      All federal, state and local tax returns;

b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.      All income/expense statements;

d.      All general ledgers;

e.      All balance sheets;

f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.      All statements of ownership interests;

h.      All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.      All statements for all bank, savings, and credit accounts;

j.      All Documents showing any assets owned by the entity;

k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

21

34.     Without limiting any of the foregoing, produce the following Documents for Spring Bridge 182 LLC, from January 2012 to present:

a.     All federal, state and local tax returns;

b.     All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.     All income/expense statements;

d.     All general ledgers;

e.     All balance sheets;

f.     All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.     All statements of ownership interests;

h.     All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.     All statements for all bank, savings, and credit accounts;

j.     All Documents showing any assets owned by the entity;

k.     All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.     All Documents showing the entity's equity holders; and

m.     All Documents showing the entity's managers, officers, and directors.

35.     Without limiting any of the foregoing, produce the following Documents for Stamford Brook, from January 2012 to present:

a.     All federal, state and local tax returns;

b.    All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.    All income/expense statements;

d.    All general ledgers;

e.    All balance sheets;

f.    All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.    All statements of ownership interests;

h.    All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.    All statements for all bank, savings, and credit accounts;

j.    All Documents showing any assets owned by the entity;

k.    All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.    All Documents showing the entity's equity holders; and

m.    All Documents showing the entity's managers, officers, and directors.

36.    Without limiting any of the foregoing, produce the following Documents for Summit, from January 2012 to present:

a.    All federal, state and local tax returns;

b.    All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.    All income/expense statements;

d.    All general ledgers;

23

e.      All balance sheets;

f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.      All statements of ownership interests;

h.      All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

i.      All statements for all bank, savings, and credit accounts;

j.      All Documents showing any assets owned by the entity;

k.      All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

37.      Without limiting any of the foregoing, produce the following Documents for Syracuse Property Holdings, LLC, from January 2012 to present:

a.      All federal, state and local tax returns;

b.      All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

c.      All income/expense statements;

d.      All general ledgers;

e.      All balance sheets;

f.      All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

g.      All statements of ownership interests;

24

     h.    All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

     i.    All statements for all bank, savings, and credit accounts;

     j.    All Documents showing any assets owned by the entity;

     k.    All Documents relating to any transfer, gift, sale or any other disposition of the entity's assets in excess of $9,000;

     l.    All Documents showing the entity's equity holders; and

     m.    All Documents showing the entity's managers, officers, and directors.

38.    Without limiting any of the foregoing, produce the following Documents for Waterbridge Capital, LLC, from January 2012 to present:

     a.    All federal, state and local tax returns;

     b.    All corporate records, including, without limitation, Articles of Organization, Bylaws, Operating Agreements, Notices of Meeting, and Meeting Minutes.

     c.    All income/expense statements;

     d.    All general ledgers;

     e.    All balance sheets;

     f.    All annual profit/loss statements, including, without limitation, a year-to-date profit/loss statement for the current year;

     g.    All statements of ownership interests;

     h.    All year-end cash flow statements, including, without limitation, a year-to-date cash flow statement for the current year;

     i.    All statements for all bank, savings, and credit accounts;

     j.    All Documents showing any assets owned by the entity;

k.      All Documents relating to any transfer, gift, sale or any other disposition of
the entity's assets in excess of $9,000;

l.      All Documents showing the entity's equity holders; and

m.      All Documents showing the entity's managers, officers, and directors.

# **EXHIBIT B**

17-09016-cgm   Doc 1   Filed 05/01/17   Entered 05/01/17 13:01:45   Main Document

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BRADLEY C. REIFLER,<br><br>                       Debtor. | Case No. 17-35075 (CGM)<br><br>Chapter 7 |
| NORTH CAROLINA MUTUAL LIFE INSURANCE<br>COMPANY,<br><br>                       Plaintiff,<br><br>            -against-<br><br>BRADLEY C. REIFLER,<br><br>                     Defendant. | Adv. Pro. No. 17 -_____ |

**VERIFIED COMPLAINT FOR NON-DISCHARGEABILITY OF DEBTS**
**AND DENIAL OF DISCHARGE**

Plaintiff North Carolina Mutual Life Insurance Company ("North Carolina Mutual" or

the "Plaintiff") hereby submits this verified complaint (the "Complaint") to oppose the

dischargeability of debts of the above-named debtor, Bradley C. Reifler (the "Debtor" or the

"Defendant"), including, but not limited to, the debt owed by the Debtor to North Carolina

Mutual.

**NATURE OF ADVERSARY PROCEEDING AND BACKGROUND**

1.      Plaintiff and creditor, North Carolina Mutual, brings this adversary proceeding

pursuant to Sections 523(a)(2), 523(a)(4), 523(a)(6) and 727(a)(4)(A) of Title 11 of the United

States Code (the "Bankruptcy Code") to oppose the discharge of the Debtor's liabilities and the

dischargeability of the Debtor's liability to North Carolina Mutual.

1

2.    The Debtor, fraudulently and with willful maliciousness, gained control over and used North Carolina Mutual's assets, in the amount of over \$34 million, while purporting to act as a fiduciary for North Carolina Mutual, to benefit the Debtor and various entities of which he is an insider, as such term is defined in Section 101(31)(A) of the Bankruptcy Code (collectively, the "Insider Entities"), to the detriment of North Carolina Mutual.  The Debtor then falsely listed the amount and nature of his liability to North Carolina Mutual in his sworn bankruptcy schedules.

3.    North Carolina Mutual was founded by black social leaders in 1898 in Durham, North Carolina—sometimes referred to as "the Black Wall Street of America"—to provide insurance services to the underserved African American community.  For much of the 20th century, it was the largest company run by African Americans, and it is the largest and oldest African American-run life insurance company to this day.  North Carolina Mutual services over 200,000 individual policyholders and there are over 250,000 people covered under its group policies nationwide.  It is widely-held as one of North Carolina's most venerable institutions.

4.    North Carolina Mutual is required to maintain a sufficient base of conforming assets to cover the potential liabilities under its policies to comply with applicable insurance-related statutes and regulations.  As is common in the insurance industry, North Carolina Mutual cedes a portion of its liabilities to reinsurers to increase the amount of insurance coverage it can provide.  In that regard, North Carolina Mutual entered into agreements to invest approximately \$34 million in conforming investments through a trust to back its obligations.  The Debtor and his Insider Entities were to serve as the investment manager of the funds in the trust.  They were obligated to exercise their fiduciary duties on North Carolina Mutual's behalf to invest those funds as directed and authorized by North Carolina Mutual and the trustee, in compliance with

2

applicable law.  Instead, as detailed below, the Debtor and his Insider Entities used false

documentation and deception to transfer the trust funds through unauthorized loans to themselves

and for other unauthorized investments in which they were personally interested, in clear

violation of the law.

5.       As a result of the Debtor's fraud and malfeasance, North Carolina Mutual has

suffered millions-of-dollars in damages and is now at risk of being in violation of its own

financial requirements due to the loss of capital the Debtor has caused.  In September 2016,

North Carolina Mutual filed suit against the Debtor and others to recover its funds.  That case is

currently pending in North Carolina.

6.       On January 20, 2017—just days before the Debtor was required to appear in front

of a federal district judge to answer for a potential contempt citation in a separate case brought

by JP Morgan Chase Bank—the Debtor filed for bankruptcy protection in this Court, and now

seeks to have all consequences of his fraudulent and deceitful actions washed away.

## THE PARTIES

7.        North Carolina Mutual is a corporation organized and existing under the laws of

the state of North Carolina, with its principal office and place of business in Durham, North

Carolina.

8.       The Defendant is an individual, the Chapter 7 debtor in the above-captioned case,

and a resident of the state of New York.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

9.       The filing of this Complaint initiates an adversary proceeding pursuant to Rule

7001(6) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334, and the "Amended Standing Order of Reference" of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408(1) and 1409(a).

12.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J).

13.     A meeting of creditors was first convened on March 2, 2017 pursuant to Section 341(a) of the Bankruptcy Code.  [Bankr. Doc. No. 3].  Accordingly, pursuant to Bankruptcy Rules 4004(a) and 4007(c), the deadline to file this Complaint is May 1, 2017, and this Complaint was timely filed.

## FACTUAL ALLEGATIONS

### A.     North Carolina Mutual's Reinsurance and Creation of a Trust

14.     In or around December 2003, North Carolina Mutual and a predecessor of Markel Bermuda, Limited ("Markel"), entered into a co-insurance agreement pursuant to which North Carolina Mutual ceded certain of its insurance liabilities and obligations to Markel.

15.     Port Royal Reassurance Company SPC, Ltd. ("Port Royal") and North Carolina Mutual subsequently entered into an indemnity reinsurance agreement through a Novation Agreement effective as of April 24, 2015 (the "Novation Agreement"), pursuant to which Port Royal accepted and reinsured certain insurance and annuity risks, liabilities, and obligations of North Carolina Mutual.  A true and correct copy of the Novation Agreement is attached hereto as Exhibit A.

16.     The Novation Agreement allowed Markel to keep $5 million as a ceding commission from the novation premium (the "Novation Commission").

4

17.     As required by the Novation Agreement, on April 23, 2015, North Carolina Mutual, Port Royal, and Summit Trust Company ("<u>Summit</u>") executed a reinsurance trust agreement (the "<u>Trust Agreement</u>"). A true and correct copy of the Trust Agreement is attached hereto as <u>Exhibit B</u>.

18.     Pursuant to the Trust Agreement and the Novation Agreement, Markel—on behalf of Port Royal as the grantor under the Trust Agreement—deposited approximately $34 million (the "<u>Trust Assets</u>") into a trust account (the "<u>Trust Account</u>").

19.     Summit is the Trust Account's trustee.

20.     North Carolina Mutual is the Trust Account's beneficiary.

21.     Pursuant to the Novation Agreement, Port Royal was required to make up the $5 million shortfall created by the $5 million Novation Commission kept by Markel.

22.     Forefront Capital Holdings, LLC ("<u>Forefront Capital Holdings</u>") which, upon information and belief, is one of the Insider Entities, was to fund the $5 million shortfall on behalf of Port Royal into the Trust Assets.

23.     The Trust Agreement permits Port Royal to appoint an "Investment Manager" to manage the investment of the Trust Assets.  <u>See</u> <u>Exhibit B</u> (Trust Agreement at § 4(d)).

24.     Section 4(d) of the Trust Agreement requires that the Investment Manager manage the Trust Assets "subject to the terms and conditions of the Trust Agreement."

25.     Section 4(b) of the Trust Agreement requires that the Trustee invest the Trust Assets only in "Eligible Assets."  In order to be an Eligible Asset, the "Eligible Investment" must:

    a.   meet all of the requirements of Section 58-7-173 of the North Carolina General Statute called "Permitted Insurers Investments,"[1] and

    b.   be limited to income producing securities, with

    c.   appropriate duration or maturity dates after consideration of the duration of the reinsured liabilities, and

    d.   have an average rating of a 2 or better rating based upon the ratings of the NAIC's Security Valuation Office,[2] or equivalent rating thereof, and

    e.   be subject to certain concentration limitations prescribed by the North Carolina Insurance Code, and

    f.   meet the level of collateral and term limitations as provided by Section 58-7-173(15) of the North Carolina General Statute.

26.    Compliance with these investment requirements, and in particular with Section 58-7-173(15) of the North Carolina General Statute, is critical for any investment of North Carolina Mutual's assets.

**B.    The Debtor and His Insider Entities Employed Fraud and Deception to Transfer the Trust Assets Directly or Indirectly to Themselves**

27.    Port Royal appointed Stamford Brook Capital, LLC ("Stamford Brook"), one of the Insider Entities, as Investment Manager for the Trust Assets.

28.    Pursuant to Section 4(d) of the Trust Agreement, and allegedly for the direct benefit of North Carolina Mutual, Port Royal and Stamford Brook entered into an investment advisory agreement (the "Investment Advisory Agreement"). A true and correct copy of the Investment Advisory Agreement is attached hereto as Exhibit D.

---

[1] The full text of Section 58-7-173 of the North Carolina General Statute is attached hereto as Exhibit C.

[2] The acronym "NAIC" stands for National Association of Insurance Commissioners.

6

29.     The Investment Advisory Agreement was signed by David Wasitowski, in his capacity as Forefront Capital Holdings' chief financial officer on behalf of Stamford Brook, and Steven W. Fickes in his capacity as President of Port Royal.

30.     Port Royal and Stamford Brook entered into the Investment Advisory Agreement for the direct benefit of North Carolina Mutual, as evidenced by, *inter alia,* the fact that North Carolina Mutual was the sole beneficiary of the assets to be managed by Stamford Brook.

31.     The Investment Advisory Agreement was drafted, at least in part, by Stamford Brook.

32.     In late 2016, North Carolina Mutual discovered that, at a certain point in time after April 24, 2015, unbeknownst to North Carolina Mutual, representatives of Forefront Capital Holdings provided an altered and/or forged copy of the same Investment Advisory Agreement to Summit (the "Fraudulent Investment Advisory Agreement"). A true and correct copy of the Fraudulent Investment Advisory Agreement is attached hereto as Exhibit E.

33.     The Fraudulent Investment Advisory Agreement was altered to make the Debtor the signatory for Stamford Brook and Michael Flatley ("Flatley"), an employee of Forefront Capital Holdings and associate of the Debtor, the signatory for Port Royal.

34.     Flatley has never held any position with Port Royal in any capacity.

35.     In addition, Forefront Capital Holdings submitted to Summit and/or the Trust Account's administrator a list of authorized signers for the Trust Account, which included the Debtor and Flatley as authorized signers (the "Fraudulent List of Signers"). A true and correct copy of the Fraudulent List of Signers is attached hereto as Exhibit F.

36.     Neither the Debtor nor Flatley were ever authorized as signatories of the Trust Account.

37.     In a letter dated April 24, 2015 from Forefront Capital Holdings to North Carolina Mutual, the Debtor represented that he was Stamford Brook's sole owner.  A true and correct copy of the letter is attached hereto as <u>Exhibit G</u>.

38.     However, on or about July 13, 2016, in a letter to North Carolina Mutual that the Debtor signed as "Founder & Trustee" of Forefront Capital, the Debtor represented that Forefront Capital, and not Forefront Capital Holdings, was the "investment manager for the [Trust Account]."   A true and correct copy of the July 13, 2016 letter is attached hereto as <u>Exhibit H</u>.

39.     At a certain point in time after April 24, 2015, unbeknownst to North Carolina Mutual, representatives of Forefront Partners, LLC ("<u>Forefront Partners</u>"), Stamford Brook, Forefront Capital Holdings, and Forefront Capital (collectively, the "<u>Forefront Entities</u>"), relying on the Fraudulent Investment Advisory Agreement and the Fraudulent List of Signers, transferred virtually all of the Trust Assets into accounts, investments, and/or loans that were either directly or indirectly under the control of the Forefront Entities.

40.     Upon information and belief, the Forefront Entities are among the Insider Entities.

41.     Sections 2 and 4 of the Trust Agreement required that the Trustee receive prior written approval from North Carolina Mutual before permitting the substitution of any Trust Assets from the Trust Account.  <u>See</u> <u>Exhibit B</u>.

42.     North Carolina Mutual never provided such approval to the Trustee. Nevertheless, the Forefront Entities purport to have invested North Carolina Mutual's Trust Assets as follows:

a.      Approximately $10 million in Trust Assets was used as "seed funding" for a "closed end investment company" (the "<u>Forefront Income Trust</u>"), which the

8

Forefront Entities sponsored and describe as "a speculative" and "illiquid" investment that "invest[s] substantially all of its assets in a portfolio of unrated or below-investment-grade-rated (commonly referred to as "junk" or high yield/high risk) loans and debt instruments." Upon information and belief, the Trust Assets make up approximately 94% of the money "invested" in the Forefront Income Trust. See Exhibit I (Forefront Income Trust Prospectus at 8, "Investment Strategies").

b.   Approximately $10.5 million of the Trust Assets was transferred to Forefront Partners in exchange for two promissory notes that the Debtor executed on behalf of Forefront Partners. True and correct copies of the two promissory notes are attached hereto as Exhibit J. Thus, the Investment Manager of the Trust Assets improperly loaned to itself, or its affiliates, over $10 million of the Trust Assets. One of the promissory notes was due and payable in full on January 25, 2016; however, the Debtor unilaterally extended the maturity date of the note to January 25, 2017. A true and correct copy of the maturity extension is attached hereto as Exhibit K. That maturity date expired over four (4) months ago, yet none of the money has been repaid.

c.   Over $6 million of the Trust Assets was transferred to Spring Bridge 182 LLC in exchange for two promissory notes. True and correct copies of the two promissory notes are attached hereto as Exhibit L. The address provided for Spring Bridge 182 LLC is "c/o of Waterbridge Capital" ("Waterbridge") and is *identical* to the Forefront Entities' address. Joel Schreiber ("Schreiber") executed the notes on behalf of Spring Bridge 182 LLC. Significantly, in a complaint filed

in another adversary proceeding by JP Morgan Chase Bank on April 24, 2017, JP

Morgan Chase Bank alleges that the Debtor has made other improper transfers of

assets for the benefit of Waterbridge.  (See Bankr. Doc. No. 30 at ¶ 72);

d.  Approximately $2.1 million of the Trust Assets was transferred to Waterbridge

and Schreiber individually in exchange for a promissory note.  A true and correct

copy of the promissory note is attached hereto as Exhibit M.  Again, the address

provided for Waterbridge and Schreiber is identical to the Forefront Entities'

address;

e.  Approximately $2 million of the Trust Assets was transferred to Forefront

Talking Capital Investment, LLC in exchange for a promissory note.  A true and

correct copy of the promissory note is attached hereto as Exhibit N.  The Debtor

executed the promissory note on behalf of Forefront Talking Capital Investment,

LLC.  Thus, the Investment Manager for the Trust Assets once again "loaned"

one of the Insider Entities a substantial portion of the Trust Assets;

f.  Approximately $1.5 million the Trust Assets was transferred to Syracuse Property

Holdings, LLC, in exchange for a promissory note.  A true and correct copy of the

promissory note is attached hereto as Exhibit O.  Once again, Syracuse Property

Holdings, LLC lists its address as "c/o" the same office address as the Forefront

Entities.

43.  The transfers described above, in which the Debtor acted in his own self-interest

and the interest of his Insider Entities, were unauthorized, do not comply with the requirements

of the Trust Agreement or the Investment Advisory Agreement, and do not comply with the

requirements of  Section 58-7-173 of the North Carolina General Statute.

44.    Not only were the Trust Assets improperly transferred to benefit the Debtor and his Insider Entities, but North Carolina Mutual received correspondence from Summit dated April 30, 2015, in which Forefront Income Trust improperly increased the amount that it was charging the Trust Account for its services.  A true and correct copy of the correspondence is attached hereto as Exhibit P.

45.    In or about August 2016, North Carolina Mutual received certain information and documents from Summit regarding the Trust Assets, including the Fraudulent Investment Advisory Agreement and the Fraudulent List of Signers.

46.    During the same time period, North Carolina Mutual also requested and received documents from Port Royal regarding the Trust Assets.

47.    Subsequently, in September 2016, North Carolina Mutual received certain information and documents regarding the Trust Assets from counsel for the Forefront Entities.  A true and correct copy of that correspondence is attached hereto as Exhibit Q.

48.    The information and documents regarding the Trust Assets that were received from Summit, Port Royal and the Forefront Entities are not the same, as evidenced by two different versions of the Investment Advisory Agreement.  This is further compounded by the fact that the Forefront Entities' and Port Royal's list of where North Carolina Mutual's assets were invested are different.

49.    For instance, the Port Royal documents purport to show that certain of the Trust Assets are past due and immediately payable to the Trust Account, including but not limited to the following (see Exhibit R, attached hereto):

   a.    Promissory Note #002 dated July 31, 2015 between Forefront Talking Capital Investment, LLC/Rudare Communications, SL-Tata Communications and Port

11

Royal North Carolina Mutual Reassurance Trust executed on behalf of the borrower by the Debtor;

b.  Promissory Note #002A dated July 31, 2015 between Forefront Talking Capital Investment, LLC/Ikarim Business Services LTD-Verizon UK and Port Royal North Carolina Mutual Reassurance Trust executed on behalf of the borrower by the Debtor; and

c.  A promissory note dated August 18, 2015 between Coconut Beach, LLC and Port Royal North Carolina Mutual Reassurance Trust.

50.  However, these Trust Assets do not match the list of investments that were provided by the Debtor and the Forefront Entities. Moreover, despite being purportedly past-due, none of them have been paid into the Trust Account.

51.  In addition, documents received from Summit show that the Forefront Income Trust paid a dividend to the Trust Account in the amount of $495,048.73 on December 31, 2015.

52.  However, neither Summit, Port Royal, nor North Carolina Mutual ever received the dividend, and no such dividend was deposited into the Trust Account.

53.  Upon information and belief, the wire instructions for the dividend were provided by the Debtor and the account into which dividend was paid was a JP Morgan Chase Bank account in the name of "Port Royal - NCM, LLC."

54.  Neither Port Royal nor North Carolina Mutual has any association with any entity named Port Royal - NCM, LLC, nor do they have any accounts at JP Morgan Chase Bank. However, the Debtor and the Forefront Entities have a relationship with JP Morgan Chase Bank.

55.  The Delaware Secretary of State's website indicates that Port Royal - NCM, LLC was established on February 25, 2015.

12

56.     Upon information and belief, the Debtor—acting alone or in concert with Flatley—created Port Royal - NCM, LLC.

57.     Upon information and belief, the $495,048.73 dividend to which North Carolina Mutual was entitled was paid to an account controlled by the Forefront Entities, the Debtor, or Flatley.

58.     On or about August 26, 2016, North Carolina Mutual contacted Stamford Brook and Forefront Capital Holdings and requested, *inter alia,* confirmation that the Trust Assets were appropriately invested pursuant to the Trust Agreement and the Investment Advisory Agreement.

59.     On or about September 1, 2016, counsel for Forefront Capital Holdings responded by letter to North Carolina Mutual's August 26, 2016 letter.  In its September 1, 2016 letter, Forefront Capital Holdings stated that although "Stamford Brook was formed in Delaware . . . no operating agreement was ever entered into and no tax ID was even applied for."  Forefront Capital Holdings further represented that Stamford Brook "is and always has been a dormant company that never operated in any capacity."

60.     On or about September 9, 2016, Summit sent a letter to the North Carolina Department of Insurance, which included, *inter alia,* a purported statement of the Trust Assets for the period from August 16, 2016 to September 8, 2016.

61.     On or about September 12, 2016, North Carolina Mutual separately received information regarding the Trust Assets as of June 28, 2016 from counsel for Forefront Capital Holdings.

62.     The Trust Assets that Summit identified in its September 9, 2016 letter show assets different from, and inconsistent with, those assets identified as Trust Assets by Forefront Capital Holdings in its September 12, 2016 letter.

17-09016-cgm    Doc 32-1    Filed 05/01/17    Entered 05/01/17 14:32:48    Main Document
(Spreuer)    Pg 275

### C.    North Carolina Mutual Files Suit Against the Debtor and Others, and the Debtor Files for Bankruptcy Protection

63.    On September 23, 2016, North Carolina Mutual filed a complaint (the "North Carolina Complaint") against the Debtor, the Forefront Entities, Port Royal, Summit, and Flatley in the United States District Court for the Middle District of North Carolina (the "North Carolina Action").

64.    The North Carolina Complaint alleges claims against the Debtor and his Insider Entities, the Forefront Entities, for fraud and unfair and deceptive trade practices under Section 75-1.1 of the North Carolina General Statute, as well as claims for breach of contract, breach of fiduciary duty, constructive fraud, corporate veil-piercing, civil conspiracy, and injunctive relief.

65.    On January 20, 2017, the Debtor filed for protection under chapter 7 of the Bankruptcy Code in this Court.

66.    As described in the complaint JP Morgan Chase Bank filed against the Debtor in this Court, the Debtor filed for bankruptcy protection one business day prior to a hearing in which he was at risk of being remanded to jail for contempt of court in a proceeding in which North Carolina Mutual is not a party.  (See Bankr. Doc. No. 30 at ¶¶ 89-94).

67.    On January 23, 2017, the defendants named in the North Carolina Complaint, including the Debtor, filed a Suggestion of Bankruptcy in the North Carolina Action.

68.    On January 27, 2017, the Court in the North Carolina Action entered an order administratively terminating the action against the Debtor as a result of his bankruptcy filing.

69.    The parties to the North Carolina Action, excluding the Debtor, entered into a settlement agreement, effective March 3, 2017 (the "Settlement Agreement").  The Settlement Agreement provided, *inter alia*, that Forefront Partners—one of the Insider Entities—would make periodic payments to repay the Trust Assets in the total approximate amount of $34 million

14

to the Trust Account.  The Debtor executed the Settlement Agreement on Forefront Partners'

behalf.  Under the Settlement Agreement, the parties also agreed to seek a stay of the North

Carolina Action pending completion of the periodic payments, with the stay to be lifted if any of

the payments was not timely made.

70.     As of the date of this Complaint, Forefront Partners has failed to make any of the

required payments under the Settlement Agreement, the Settlement Agreement has become void,

and North Carolina Mutual is entitled to and intends to continue pursuing its claims in the North

Carolina Action.

> **D.     The Debtor's Statements in this Court Regarding the North Carolina Action
> and his Liability to North Carolina Mutual are False**

71.     In his bankruptcy proceeding, the Debtor filed his petition, various schedules

and amended schedules, and a statement and amended statements of financial affairs.  The

Debtor signed the foregoing documents under penalty of perjury that the information provided

was true and correct.

72.     In his most recent amendment to his Statement of Financial Affairs filed on

March 30, 2017, the Debtor, for the first time, listed the North Carolina Action.  None of his

prior statements even acknowledged the existence of the North Carolina Action.  Yet, even in the

most recent version, the Debtor falsely states that the North Carolina Action has been concluded.

(See Bankr. Doc. No. 23 at 4).

73.     Furthermore, in his Amendment to Schedule F filed on February 2, 2017, the

Debtor falsely states that he has an unsecured obligation to North Carolina Mutual in the amount

of $1.00.  (See Bankr. Doc. No. 10).  In truth, while the amount of the Debtor's liability has not

yet been determined in the North Carolina Action, the obligation is likely to be in the tens-of-

millions-of-dollars.

## FIRST CAUSE OF ACTION
(Denial of Dischargeability Pursuant to 11 U.S.C. § 523(a)(2)(A))

74.     North Carolina Mutual re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

75.     Section 523(a)(2)(A) of the Bankruptcy Code provides that a discharge under Section 727 of the Bankruptcy Code "does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

76.     As alleged in detail above, the Debtor misappropriated the Trust Assets for the Debtor's own benefit and the benefit of the Insider Entities by fraudulent intent, and to the detriment of North Carolina Mutual—the beneficiary of the Trust Assets—and has not returned the Trust Assets to its rightful owner.

77.     The Debtor engaged in deceptive acts and practices, submitted false and fraudulent documents in order to obtain control over the Trust Assets, and then used that fraudulently obtained authority to misappropriate and embezzle the Trust Assets, all with fraudulent intent.

78.     The Debtor further concealed from North Carolina Mutual that, at all relevant times, he intended to use the Trust Assets to benefit the Insider Entities, the Forefront Entities, and himself, individually.

79.     The Debtor's deceptive actions, false statements, and material concealments were intentional and reasonably calculated to deceive North Carolina Mutual, so that the Forefront Entities and the Debtor could gain access to the funds in the Trust Account for their benefit.

80.     North Carolina Mutual reasonably relied on the Debtor's representations and concealments to its detriment.

81.     North Carolina Mutual has incurred, and continues to incur, damages as a direct and proximate result of its reasonable reliance.

82.     By virtue of the foregoing, discharge of North Carolina Mutual's claims against the Debtor should be denied pursuant to 11 U.S.C. § 523(a)(2(A), as a result of Debtor's fraudulent conduct.

## SECOND CAUSE OF ACTION
### (Denial of Dischargeability Pursuant to 11 U.S.C. § 523(a)(4))

83.     North Carolina Mutual re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

84.     Section 523(a)(4) of the Bankruptcy Code provides that a discharge under Section 727 of the Bankruptcy Code "does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

85.     As alleged in detail above, the Debtor misappropriated the Trust Assets for the Debtor's own benefit and the benefit of the Insider Entities by fraudulent intent, and to the detriment of North Carolina Mutual—the beneficiary of the Trust Assets—and has not returned the Trust Assets.

86.     The Debtor engaged in deceptive acts and practices, submitted false and fraudulent documents in order to obtain control over the Trust Assets, and then used that fraudulently obtained authority to defalcate and embezzle the Trust Assets, all with fraudulent intent.

87.     The Debtor further concealed from North Carolina Mutual that, at all relevant times, he intended to use the Trust Assets to benefit the Insider Entities, the Forefront Entities, and himself, individually.

88.     At all relevant times during his fraud, defalcation, and embezzlement of the Trust Assets, the Debtor had a fiduciary duty to manage the Trust Assets for the benefit of North Carolina Mutual.

89.     By virtue of the foregoing, discharge of North Carolina Mutual's claims against the Debtor should be denied pursuant to 11 U.S.C. § 523(a)(4), as a result of Debtor's misappropriation of the Trust Assets.

### THIRD CAUSE OF ACTION
(Denial of Dischargeability Pursuant to 11 U.S.C. § 523(a)(6))

90.     North Carolina Mutual re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

91.     Section 523(a)(6) of the Bankruptcy Code provides that a discharge under Section 727 of the Bankruptcy Code "does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity."

92.     As alleged in detail above, the Debtor willfully and maliciously injured North Carolina Mutual through his deceptive acts and practices, intentional acts of fraud, malfeasance, and defalcation of Trust Assets.   Among other things, the Debtor misappropriated the Trust Assets for the Debtor's own benefit and the benefit of the Insider Entities by fraudulent intent, and to the detriment of North Carolina Mutual—the beneficiary of the Trust Assets—and has not returned the funds.

17-09016-cgm    Doc 1    Filed 05/01/17    Entered 05/01/17 15:01:45    Main Document
Pg 19 of 27

93.     The Debtor submitted false and fraudulent documents in order to obtain control over the Trust Assets, and then used that fraudulently obtained authority to defalcate and embezzle the Trust Assets, all with fraudulent intent.

94.     The Debtor further concealed from North Carolina Mutual that, at all relevant times, he intended to use the Trust Assets to benefit the Insider Entities, the Forefront Entities, and himself, individually.

95.     At all relevant times during his fraud, defalcation, and embezzlement of the Trust Assets, the Debtor acted willfully and maliciously towards North Carolina Mutual, who was injured, and continues to suffer injury, as a direct and proximate result of the Debtor's wrongful actions.

96.     By virtue of the foregoing, discharge of North Carolina Mutual's claims against the Debtor should be denied pursuant to 11 U.S.C. § 523(a)(6), as a result of the Debtor's misappropriation of the Trust Assets.

## FOURTH CAUSE OF ACTION
(Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A))

97.     North Carolina Mutual re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

98.     Section 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, or in connection with the case made a false oath or account."

99.     The Debtor, under penalty of perjury, declared in his petition, schedules and amended schedules, and statements and amended statements of financial affairs, that the information provided therein was true and correct.

100. The Debtor made numerous false representations and omissions in or in connection with, and in material relation to, his Chapter 7 bankruptcy case.

101. Such false oaths or accounts include, without limitation:

a. Falsely stating in his latest amended Statement of Financial Affairs that the North Carolina Action has been concluded, when in fact the action remains pending.

b. Falsely representing in his amendment to Schedule F that he owes an unsecured obligation to North Carolina Mutual in the amount of $1.00, when in fact the amount of his liability to North Carolina Mutual is likely to be in the tens-of-millions-of-dollars.

102. Upon information and belief, the Debtor made such false oaths or accounts knowingly and fraudulently, with the intent to deceive.

103. Accordingly, the Debtor should be denied discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, North Carolina Mutual respectfully requests that this Court enter judgment in its favor, and against the Debtor, as follows:

a. On its First Cause of Action, a judgment determining that the claims that North Carolina Mutual has asserted and/or may assert against the Debtor and his estate are not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

b. On its Second Cause of Action, a judgment determining that the claims that North Carolina Mutual has asserted and/or may assert against the Debtor and his estate are not dischargeable pursuant to 11 U.S.C. § 523(a)(4);

c.  On its Third Cause of Action, a judgment determining that the claims that North Carolina Mutual has asserted and/or may assert against the Debtor and his estate are not dischargeable pursuant to 11 U.S.C. § 523(a)(6);

d.  On its Fourth Cause of Action, a judgment denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A);

e.  Awarding North Carolina Mutual the costs and disbursements of this adversary proceeding; and

f.  For all such further relief that the Court deems just and proper.

Dated:  New York, New York
       May 1, 2017

Respectfully submitted,


/s/ Norman N. Kinel

Norman N. Kinel
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone:  (212) 872-9800
Facsimile: (212) 872-9815

-and-

M. Keith Kapp (*pro hac vice application forthcoming*)
Holmes Harden (*pro hac vice application forthcoming*)
WILLIAMS MULLEN
301 Fayetteville Street, Suite 1700
Raleigh, North Carolina 27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300

*Counsel for North Carolina Mutual Life Insurance Company*

## VERIFICATION

I, Michael Lawrence, am the President and CEO for North Carolina Mutual Life Insurance
Company, the Plaintiff in this action.  I have read the foregoing Verified Complaint for Non-
dischargeability of Debts and Denial of Discharge (the "Complaint") and am familiar with its
contents.  I declare under penalty of perjury under the laws of the United States that all of the
factual statements contained in the foregoing Complaint are true and accurate to the best of my
knowledge, understanding, and belief and are based upon personal knowledge, except where
expressly indicated otherwise.

Dated:  May 1, 2017


/s/ Michael Lawrence
Name: Michael Lawrence
Title:   President and CEO
          North Carolina Mutual Life
          Insurance Company

17-09020-cgm Doc 1 Filed 05/01/17 Entered 05/01/17 15:01:45 Main Document Pg 24 of 276 Pg 58 of 177

# EXHIBIT A

# Novation Agreement

**THIS NOVATION AGREEMENT** (hereinafter the "Novation Agreement") is made on this 24th day of April, 2015 (the "Novation Date"), by and between:

(1)     North Carolina Mutual Life Insurance Company (the "***Cedent***");

(2)     Markel Bermuda Limited (formerly known as Max Re Ltd. and Alterra Bermuda Limited) (the "***Reinsurer***"); and

(3)     Port Royal Reassurance Company SPC, Limited (the "***Assuming Reinsurer***")

(the Cedent, the Reinsurer and the Assuming Reinsurer together the "***Parties***" and individually a "***Party***").

**WHEREAS**, the Cedent and the Reinsurer entered into that certain Coinsurance Agreement made and entered into as of the 19th day of December 2003 by and between the Cedent and the Reinsurer (hereinafter referred to as the "***Reinsurance Contract***"); and

**WHEREAS**, the Cedent, the Reinsurer and Summit Trust Company (as successor to Mellon Bank, N.A.), as trustee, entered into a Reinsurance Trust Agreement dated as of December 19, 2003, as amended (the "***Trust Agreement***") pursuant to which the Reinsurer has deposited assets in the trust account thereunder in order to secure the obligations of the Reinsurer to the Cedent under the Reinsurance Contract; and

**WHEREAS**, the Reinsurer now wishes to assign to the Assuming Reinsurer, and the Assuming Reinsurer agrees to accept, all rights and all obligations of the Reinsurer under the Reinsurance Contract in order to effectuate a novation of the Reinsurance Contract from the Reinsurer to the Assuming Reinsurer; and

**WHEREAS**, the Cedent consents to the assignment, acceptance and novation and agrees to accept the Assuming Reinsurer as replacement for the Reinsurer under the Reinsurance Contract; and

**WHEREAS**, the Cedent, the Assuming Reinsurer and Summit Trust Company, as trustee, have entered into a trust agreement for the benefit of the Cedent and Assuming Reinsurer to replace the Trust Agreement.

**NOW THEREFORE**, in consideration of the mutual benefits to be received by the Parties and the mutual covenants herein contained, the Parties hereto agree as follows:

## Article 1.    Novation and Substitution

1.1.    The Reinsurer hereby assigns and novates to the Assuming Reinsurer, who agrees to such assignment and novation, all of its rights and benefits without limitation, known and unknown, actual or otherwise, in connection with the Reinsurance Contract; and the Assuming Reinsurer hereby agrees that it shall:

    (a)    Assume all obligations of the Reinsurer in connection with the Reinsurance Contract and shall be substituted in place of the Reinsurer as if the Assuming Reinsurer had originally entered into the Reinsurance Contract with the Cedent; and

    (b)    Perform all of the Reinsurer's obligations in connection with the Reinsurance Contract in place of the Reinsurer.

1.2.    The Cedent hereby consents to the foregoing assignment, novation and assumption. The Cedent hereby agrees and acknowledges that it shall no longer have any rights or claims against the Reinsurer in connection with or arising out of the Reinsurance Contract.

## Article 2.    Release, Discharge and Indemnification of the Reinsurer

2.1.    The Cedent hereby releases and discharges the Reinsurer from any and all liabilities and obligations in relation to the Cedent of any kind, known, unknown or otherwise, which have arisen or which may arise after the Novation Date under or by reason of the Reinsurance Contract.

2.2.    The Cedent agrees that the Assuming Reinsurer shall instead be responsible for any claims, losses or other liabilities which have arisen or may arise after the Novation Date under or by reason of the Reinsurance Contract; it being understood that as of the Novation Date the Assuming Reinsurer shall be substituted in place of the Reinsurer, with effect retroactively back to the inception of the Reinsurance Contract, for all obligations there under.

2.3.    In the event that any claims, lawsuits, arbitrations or other such disputes (each an "*Outstanding Dispute*") with respect to the Reinsurance Contract are pending between the Cedent and the Reinsurer at the Novation Date, it is hereby agreed that the Assuming Reinsurer shall be substituted in place of the Reinsurer in such Outstanding Disputes. The Assuming Reinsurer hereby agrees to indemnify and hold the Reinsurer harmless for any liabilities, obligations, losses, damages, costs, expenses or fees, including attorney fees, incurred as a result of such Outstanding Disputes.

## Article 3.    Trust Account and Payment

On or before the Novation Date, the Cedent and the Reinsurer shall take all necessary actions to ensure that (a) the Trust Agreement is terminated and (b) the assets held in the trust account created under the Trust Agreement (the "*Trust Assets*") are, at the Reinsurer's sole discretion, either (i) liquidated and the proceeds there from distributed to the Reinsurer or its designee or (ii) released and returned to the Reinsurer or its designee.

3.1. On the Novation Date:

(a) the Reinsurer shall, at its sole discretion, either (i) cause the Trustee to transfer Trust Assets to the Assuming Reinsurer with an aggregate market value equal to the statutory benefit and claim reserves for the Covered Business (as defined in the Reinsurance Contract) reported by the Cedent as of December 31, 2014 ($34,194,634 the "*Novation Premium*") or (ii) pay the Assuming Reinsurer funds in an amount equal to the Novation Premium, in each case, to the account designated in Section 3.3 below; provided, however, that the Reinsurer may satisfy its obligation under this clause (a) by transferring or paying to the Assuming Reinsurer Trust Assets or funds in an amount equal to the Novation Premium less the Novation Ceding Commission.

(b) The Assuming Reinsurer shall pay to the Reinsurer a novation ceding commission in an amount equal to $5,000,000 (the "*Novation Ceding Commission*"). Unless otherwise deducted from the amounts transferred by the Reinsurer to the Cedent as provided above, the Novation Ceding Commission shall be paid by wire to an account designated in writing to the Assuming Reinsurer by the Reinsurer on the Novation Date.

(c) Within 2 business days following the Cedent's completion of the reinsurance accounting statement for the Reinsurance Contract for the quarter ended March 31, 2015, the Assuming Reinsurer shall pay to the Reinsurer any decrease in reserves, if any, which occurred between December 31, 2014 and March 31, 2015.

> If the reserves from December 31, 2014 through March 31, 2015 increased, the Reinsurer shall pay such increase to the Assuming Reinsurer.

(d) Within 2 business days following the Cedent's completion of the reinsurance accounting statement for the Reinsurance Contract for the quarter ended June 30, 2015, the Assuming Reinsurer shall pay to the Reinsurer any decrease in reserves, if any, which occurred between March 31, 2015 and the Novation date.

> If the reserves from March 31, 2015 through the Novation Date increased, the Reinsurer shall pay such increase to the Assuming Reinsurer.

3.2. The Parties agree that the Statement (as defined in the Reinsurance Contract) shall be prepared by the Cedent for the period running from March 31, 2015 through the Novation date at the time when the Cedent prepares the Statement for the quarter ending

June 30, 2015. If the Statement through the Novation date shows an amount due to the Cedent then the Reinsurer shall pay such amount to the Assuming Reinsurer. If the Statement through the Novation date shows an amount due to the Reinsurer then the Assuming Reinsurer shall pay such amount to the Reinsurer. Such settlement for the stub-period shall occur between the Reinsurer and the Assuming Reinsurer, within 3 business days following the Cedent's completion of the reinsurance accounting statement for the Reinsurance Contract for the quarter ended June 30, 2015.

The Parties agree that the Statement (as defined in the Reinsurance Contract) for the quarter ending June 30, 2015 shall be settled by and between the Cedent and the Assuming Reinsurer, within 5 business days following the Cedent's completion of the reinsurance accounting statement for the Reinsurance Contract for the quarter ended March 31, 2015.

3.3.   Any amounts transferred or paid to the Assuming Reinsurer by the Reinsurer pursuant to this Novation Agreement shall be transferred or paid to the following account:

Summit Trust Company
Account Number: █████████

3.4.   The Cedent and the Reinsurer agree that on the Novation Date, that certain Collateral Trust Agreement dated as of December 19, 2003, by and between the Reinsurer and the Cedent (the *"Collateral Trust Agreement"*) shall be terminated and that the Collateral Trust Agreement shall have no further force or effect thereafter.

**Article 4.       Novation Date**

It is hereby agreed that, subject to the satisfaction and performance of the Parties' respective obligations under Article 3 above, the effective date of this assignment, novation and assumption shall be April 24, 2015 (the "Novation Date").

**Article 5.       Exclusive Benefit and Binding Effect**

This Novation Agreement shall be binding upon and shall inure solely to the benefit of the Parties hereto and their respective assigns.  It is the intent of the Parties not to create any third party beneficiaries to this Novation Agreement.

**Article 6.       Representations and Warranties**

6.1.   Each Party represents and warrants to the other Parties that:

(i)       Such Party is a corporation in good standing in its respective jurisdiction of domicile;

(ii)      The execution and performance of this Novation Agreement is fully authorized by such Party;

     (iii)     The persons executing this Novation Agreement have full authority to execute this agreement on behalf of such Party and its respective successors and assigns;

     (iv)     This Novation Agreement constitutes the valid and binding obligation of such Party and is enforceable according to its terms;

     (v)     There are no pending or existing agreements, transactions or negotiations to which such Party is a party that would render this Novation Agreement, or any part of it, void, voidable or unenforceable;

     (vi)     Such Party shall seek to obtain all authorizations, consents and approvals of any governmental or regulatory authority required to make this Novation Agreement valid and binding, and the performance of such Party's obligations under this Novation Agreement does not contravene or fail to comply with any directive given by any governmental authority with regulatory authority over the Party; and

     (vii)     No claim or loss being settled and discharged by this Novation Agreement has been assigned, transferred or sold to any other person or entity.

6.2.    The Reinsurer hereby expressly represents and warrants that at the date of this Novation Agreement no order has been made or petition presented or step taken for it to be wound up or for the appointment of a liquidator, provisional liquidator, receiver, administrator or other like office holder in any jurisdiction.

## Article 7.    Independent Investigation and Analysis

Each Party acknowledges that it has entered into this Novation Agreement in reliance on its own independent investigation and analysis and not on the basis of any representation or warranty by any other Party other than those representations and warranties contained in this Novation Agreement.

## Article 8.    Confidentiality

Each of the Parties agrees that the terms and conditions of this Novation Agreement are confidential.  Except as may be required by law, or authority of any court, administrative tribunal or arbitration panel, regulatory or supervisory body, the terms of this Novation Agreement shall not be divulged to any third party (where "third party" shall expressly include any associated or affiliated company of a Party not directly involved with the Reinsurance Contract) without the express written consent of the Parties, other than the respective Party's professional, legal or financial advisors, the Internal Revenue Service, the brokers of the Reinsurance Contract, the respective Parties' reinsurers or retrocessionaires (provided that such brokers, reinsurers or retrocessionaires confirm in writing before being informed of the terms and conditions of this Novation Agreement that they will not divulge its terms to any third party without the express written consent of the other Parties).

**Article 9.**      **Other Actions**

The Parties agree that this Novation Agreement and the negotiations and proceedings leading to this agreement shall not form the basis for any claim by any Party against another Party or against any officer, director, consultant, professional or shareholder of a Party, except with respect to an action for enforcement of this agreement.

The Parties further agree to cooperate with and provide reasonable assistance to one another in the event that any other person or entity asserts against a Party any right, demand, claim, or suit arising out of or relating to the Reinsurance Contract, such assistance to include but not to be limited to the full and prompt cooperation of personnel (whether in providing access to or copies of statements, documentation, files and records, electronic, paper based or otherwise or similar requests for assistance) in relation to requests that arise out of or relate to any such right, demand, claim or suit; provided, however, that any such request that is made of the Reinsurer shall be at the sole cost and expense of the requesting Party.

**Article 10.**      **Governing Law and Jurisdiction**

(a)      This Novation Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina.

(b)      The Parties hereby consent to the exclusive jurisdiction of any court of the State of North Carolina or the United States District Court for North Carolina in connection with any legal action related to this Novation Agreement and agree to comply with all requirements necessary to give that court jurisdiction.

**Article 11.**      **Miscellaneous**

(a)      This Novation Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original, but all of which shall constitute one and the same agreement.

(b)      The failure of any Party to enforce any provision of this Novation Agreement shall not be construed as a waiver of such provision or of any other provision of this agreement. No waiver of any provision of this Novation Agreement shall be deemed a waiver of any other term of this agreement, nor shall such waiver constitute a continuing waiver unless expressly agreed by the waiving Party.

(c)      For the avoidance of doubt, this Novation Agreement is not intended to and shall not be construed so as to deprive any Party of any rights it may have against any entity that is not a Party to this Novation Agreement, whether relating to the Reinsurance Contract or otherwise.

(d)      The rights and obligations set forth in this Novation Agreement shall be binding upon and inure to the benefit of the Parties and shall be binding upon any and all predecessors, successors, liquidators, receivers and assigns of the Parties.

(e)     Any notice or other communication under or in connection with this Novation Agreement shall be in writing and shall be delivered by recognized delivery service that allows for tracking and confirmation of delivery, or sent via air mail, by fax transmission or by email to the respective address set forth below or such other address as a Party shall specify by notice in writing to the other.

If to the "Cedent:"

North Carolina Mutual Life Insurance Company (the "Cedent');

Address:     411 West Chapel Hill Street
              Durham, NC 27701-3616
              Attn: James H. Speed, Jr.
Email: jspeed@ncmutuallife.com
Fax: 919-313-7800

If to the "Reinsurer:"

Markel Bermuda Limited (the "Reinsurer"); and

Address: c/o Markel Corporation
         Ten Parkway North
         Deerfield, IL 60015
Attn: Ron Herrig
Email: herrig@markelcorp.com
Fax: (847) 572-6377

If to the "Assuming Reinsurer:"

Port Royal Reassurance Company SPC, Limited (the Assuming Reinsurer)

Address:     113 South Church Street
              Grand Cayman, Cayman Islands

Attn: Paul Macey
Email: pmacey@usarisk.ky
Fax: 877-483-1864

In the absence of evidence of earlier receipt, any notice or other communication shall be deemed to have been duly served:

(i)     if sent by fax, when delivered to the intended recipient's fax machine;

(ii)    if sent by air mail overseas, six days after posting;

(iii)   if delivered personally, when left at the address specified by the receiving Party pursuant to this Article 11; or

(iv) if sent via email, upon confirmation of delivery by the sender's email system.

**IN WITNESS WHEREOF**, the Parties caused this Novation Agreement to be executed by their respective authorized officers, as of the date aforementioned:

NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY (the "Cedent");

_____

Authorized Signatory

Name: James H. Speed, Jr.
Title: President & CEO

MARKEL BERMUDA LIMITED (the "Reinsurer"); and

_____

Authorized Signatory

Name: Richard R. Whitt, III
Title: President

PORT ROYAL REASSURANCE COMPANY SPC, LIMITED (the "Assuming Reinsurer")

_____

Authorized Signatory

Name: Steven W. Fiores
Title:

8

# EXHIBIT B

REINSURANCE TRUST AGREEMENT

THIS REINSURANCE TRUST AGREEMENT, dated as of April 23, 2015 (the "Agreement"), is entered into by and among PORT ROYAL REASSURANCE COMPANY SPC, LIMITED, a Cayman Island corporation (the "Grantor"), NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY, domiciled in North Carolina (together with any successor thereof by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator, the "Beneficiary"), and SUMMIT TRUST COMPANY, an Illinois trust company (the "Trustee") (the Grantor, the Beneficiary and the Trustee are hereinafter each sometimes referred to individually as a "Party" and collectively as the "Parties").

WITNESSETH:

WHEREAS, Port Royal Reassurance Company SPC, Limited is a Cayman Island reinsurer ("Reinsurer") and has entered into an indemnity reinsurance agreement with the Beneficiary, through a Novation Agreement effective April 24, 2015 (the "Reinsurance Arrangement"), pursuant to which Grantor accepted and reinsured on a one hundred percent (100%) coinsurance basis certain risks, liabilities and obligations of the Beneficiary under certain of its life insurance policies and annuity contracts;

WHEREAS, the Beneficiary desires the Grantor to secure payments of all amounts at any time and from time to time owing by the Grantor to the Beneficiary under or in connection with the Reinsurance Arrangement for the purpose of obtaining credit for reinsurance to the Beneficiary;

WHEREAS, the Grantor desires to transfer to the Trustee on the date hereof and from time to time for deposit into a trust account (the "Trust Account") maintained with the Trustee qualified assets in order to secure payment of amounts owed by the Grantor to the Beneficiary under or in connection with the Reinsurance Arrangement;

WHEREAS, the Trustee has agreed to act as Trustee hereunder, and to hold such assets in trust in the Trust Account in accordance with North Carolina statutes; and

WHEREAS, this Agreement is made for the sole use and benefit of the Beneficiary and for the purpose of setting forth the duties and powers of the Trustee with respect to the Trust Account.

NOW, THEREFORE, for and in consideration of the promises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

SECTION 1.        Deposit of Assets to the Trust Account.

(a)     The Grantor shall, on the date of this Agreement, establish the Trust Account with the Trustee, and the Trustee shall administer the Trust Account in its name as Trustee solely for the benefit of the Beneficiary. Legal title to the Assets (as defined below) held in the Trust Account will be vested in the name of the Trustee for the benefit of the Beneficiary, its assigns and successors in interest. The Assets held in the Trust Account shall be subject to withdrawal by the

Beneficiary or by the Grantor upon Trustee's receipt of the prior written consent of the Beneficiary, in each case, solely as provided herein. All Assets at all times shall be held and maintained by the Trustee in the Trust Account at the Trustee's office in the United States of America, except when depositories or sub-custodians of the Trustee hold such assets in the United States of America, as agents of the Trustee. All Assets shall be held by the Trustee separate and distinct from all other assets of or held by the Trustee and shall be continuously kept in a safe place.

(b)     The Grantor shall transfer, or cause to be transferred, to the Trustee, on the date of this Agreement for deposit to the Trust Account, all the cash and invested assets listed in Exhibit A hereto, and shall transfer, or cause to be transferred, to the Trustee, for deposit to the Trust Account, such other assets as the Grantor is required from time to time under the Reinsurance Arrangement or this Agreement or as it may otherwise from time to time desire (each such asset actually received by the Trustee and deposited by the Trustee into the Trust Account is herein referred to individually as an "Asset" and collectively as the "Assets"). The Assets shall consist only of Eligible Assets (as hereinafter defined). If, on any Measurement Date, the fair market value of the Assets held in the Trust Account on such date shall be less than the Statutory Reserves and Liabilities (as defined in the Assignment Agreement) as set forth in the quarterly settlement report delivered by the Beneficiary to the Grantor on such date (such amount, a "Reinsurance Trust Deficiency Amount"), the Reinsurer shall promptly, but in no event later than five (5) Business Days after such date, deposit additional Assets having a fair market value of not less than such Reinsurance Trust Deficiency Amount.

(c)     The Grantor hereby represents, warrants and covenants to the Trustee and the Beneficiary: (i) that the Grantor shall, with five (5) Business Days after its receipt thereof, provide to the Trustee a copy of the Grantor's Foreign Insurance Company Election Under Section 953(d) of the Internal Revenue Code of 1986, as amended, stamped approved by the Internal Revenue Service; (ii) that all Assets transferred by the Grantor to the Trustee for deposit into the Trust Account will be in such form that the Beneficiary whenever necessary may, and the Trustee upon direction by the Beneficiary will, negotiate any such Assets without consent or signature from or any notice to the Grantor or any other person in accordance with the terms of this Agreement; and (iii) that all Assets transferred by the Grantor to the Trustee for deposit into the Trust Account consist only of Eligible Assets on the dates of their respective transfers into the Trust Account.

(d)     The Trustee shall have no responsibility to value or determine whether the Assets in the Trust Account are sufficient to secure the Grantor's liabilities to the Beneficiary under the Reinsurance Arrangement. Further, the Trustee shall have no responsibility whatsoever to determine whether the Assets in the Trust Account constitute Eligible Assets or entitle either of the Grantor or the Beneficiary to favorable or unfavorable tax, accounting or other treatment, consideration, evaluation or calculation under any law, rule or regulation.

2

SECTION 2.     Withdrawal of Assets from the Trust Account.

(a)     Without any notice by the Trustee or the Beneficiary to the Grantor, the Beneficiary shall have the right, at any time and from time to time, to withdraw from the Trust Account, upon written notice from an Authorized Person of the Beneficiary to the Trustee (the "Withdrawal Notice"), such Assets as are specified in such Withdrawal Notice. The Withdrawal Notice may designate a third party (the "Designee") to whom Assets specified therein shall be delivered by the Trustee and may condition delivery of such Assets to such Designee upon the receipt and deposit into the Trust Account of other Assets specified in such Withdrawal Notice. The Beneficiary need present no statement, instruction or document in addition to a Withdrawal Notice in order to withdraw any Assets from the Trust Account; nor is said right of withdrawal or any other provision of this Agreement subject to any conditions, limitations or qualifications not contained in this Agreement.

(b)     Upon its receipt of a Withdrawal Notice from the Beneficiary, the Trustee shall immediately take any and all steps necessary to transfer absolutely and unequivocally all rights, titles and interests in the Assets specified in such Withdrawal Notice and shall deliver such Assets to or for the account of the Beneficiary or such Designee as specified in such Withdrawal Notice.

(c)     The Grantor may seek approval of the Beneficiary (which approval shall not be unreasonably withheld, conditioned or delayed) to withdraw from the Trust Account all or any part of the Assets and transfer such Assets to the Grantor; provided, that, after such withdrawal and transfer, the fair market value of the Assets remaining in the Trust Account is no less than 100% of the Statutory Reserves and Liabilities. Upon the Beneficiary's approval of such withdrawal request, the Beneficiary shall deliver a Withdrawal Notice to the Trustee which directs the Trustee to withdraw the applicable Assets from the Trust Account and deliver such Assets to the Grantor. The Trustee shall have no responsibility whatsoever to determine whether the conditions described in this Section 2(c) have been satisfied.

(d)     Subject to Section 4 of this Agreement, in the absence of the delivery of a Withdrawal Notice to the Trustee by the Beneficiary, the Trustee shall allow no substitution or withdrawal of any Asset from the Trust Account.

(e)     The Trustee shall have no responsibility whatsoever to determine that any Assets withdrawn from the Trust Account pursuant to this Section 2 will be used and applied in the manner contemplated by Section 3 of this Agreement.

SECTION 3.     Application of Assets.

The Beneficiary hereby covenants to the Grantor that it shall use and apply any withdrawn Assets from the Trust Account, without diminution because of the insolvency of the Beneficiary or the Grantor, for the following purposes only:

3

(a) to pay or reimburse the Beneficiary for any premiums which are returned, but not yet recovered by the Beneficiary from the Grantor, to the owners of the Assigned Policies (as defined in the Assignment Agreement) because of surrenders, cancellations or other terminations of Assigned Policies;

(b) to pay or reimburse the Beneficiary for any Insurance Liabilities (as defined in the Reinsurance Arrangement) paid by the Beneficiary, but not yet recovered by the Beneficiary from the Grantor;

(c) to make payment to the Grantor under Section 2(c) of any amounts held in the Trust Account that exceed the actual amount required to fund the Grantor's entire Obligations (as hereinafter defined); and

(d) where the Beneficiary and the Grantor have delivered notice of termination of this Agreement pursuant to Section 10(a) and where the Grantor's obligations under the Reinsurance Arrangement remain unliquidated and undischarged ten (10) days prior to the termination date, to withdraw amounts equal to such obligations of the Grantor, to the extent that such obligations have not yet been paid by the Grantor to the Beneficiary, and deposit those amounts into a separate account, in the name of the Beneficiary, in any Qualified U.S. Financial Institution (as defined below) that becomes a successor Trustee pursuant to Section 9 apart from its general assets, in trust for the uses and purposes specified in (i), (ii) and (iii) above as may remain executory after such withdrawal and for any period after the termination date. "Qualified U.S. Financial Institution" shall mean an institution that is a member of the Federal Reserve System or is (1) organized or, in the case of a United States branch or agency office of a foreign banking organization, is licensed under the laws of the United States or any state thereof and has been granted authority to operate with fiduciary powers and (2) regulated, supervised, and examined by federal or state authorities having regulatory authority over banks and trust companies.

SECTION 4.        Redemption, Investment and Substitution of Assets.

(a) The Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit the principal amount of the proceeds of any such payment to the Trust Account.

The Trustee shall provide notice to Beneficiary when an Asset held in the Trust Account matures, is surrendered by the Trustee for payment and/or called for redemption.

(b) From time to time, at the written order and direction of the Investment Manager (as defined below) or any sub-investment manager acting for the Investment

4

Manager), the Trustee shall invest Assets in the Trust Account only in Eligible Assets.

(c)     From time to time, subject to the Trustee's receipt of the prior written approval of the Beneficiary (which approval shall not be unreasonably or arbitrarily withheld or delayed), the Grantor (or the Investment Manager or any sub-investment manager acting for the Investment Manager) may direct the Trustee to substitute Eligible Assets for other Eligible Assets held in the Trust Account at such time; provided that the Grantor shall, at the time of such withdrawal, replace the withdrawn Assets with other assets constituting Eligible Assets and having a fair market value at least equal to the fair market value of the withdrawn Assets (such withdrawal and replacement deposit, a "Substitution"). The instructions of the Grantor (or the Investment Manager or any sub-investment manager acting for the Investment Manager) regarding a Substitution shall constitute a representation and warranty by the Grantor to the Trustee and the Beneficiary that, on the date of deposit, any assets so deposited are Eligible Assets, and that the fair market value of the Assets so deposited is at least equal to the fair market value of the Assets so withdrawn. The Trustee shall have no responsibility whatsoever to determine the value of such substituted securities or that such substituted securities constitute Eligible Assets. For the avoidance of doubt, so long as any Substitution complies with the other provisions of this Section 4(c), the Beneficiary shall be deemed to have approved such Substitution.

(d)     The Grantor has appointed Stamford Brook Capital, LLC, a Delaware limited liability company (the "Investment Manager"), to manage the investment of the Assets in the Trust Account and any subaccounts thereof, which appointment will be effective as of the date hereof. The Investment Manager shall have full right to provide instructions to the Trustee hereunder with respect to such Trust Account and sub-accounts subject to the terms and conditions of this Agreement, and each such instruction shall be binding upon the Beneficiary and the Grantor, and the Trustee shall be fully protected in following any such instruction or action as if taken directly from the Beneficiary. The Grantor shall promptly notify the Trustee in writing of the termination of the appointment of the Investment Manager.

(e)     The Investment Manager may further designate one or more sub-investment managers to manage the investment of the Assets held in the Trust Account or sub-accounts thereof over which the Investment Manager has authority and the limitations, if any, of the sub-investment manager's authority and/or discretion. In such event, the Investment Manager shall notify the Trustee and the Beneficiary in writing of the appointment of each such sub-investment manager, and of the Trust Account or sub-accounts over which such sub-investment manager may exercise authority. Subject to the terms set forth in such written notice, any such sub-investment manager shall have full right to provide instructions to the Trustee hereunder with respect to such Trust Account or sub-accounts, and the Trustee shall be fully protected in following any such instruction or action as if taken directly from the Beneficiary. Each such

5

instruction shall be binding upon the Investment Manager, the Beneficiary and the Grantor; provided, however, that if conflicting instructions are given by the Investment Manager and a sub-investment manager, the instructions given by the Investment Manager shall govern; provided, further that nothing herein shall be construed to limit the ability of the Investment Manager to enforce its rights against any sub-investment manager pursuant to any other agreements entered into between them. The Investment Manager shall promptly, but in no event later than three (3) Business Days after termination, notify the Trustee and the Beneficiary in writing of the termination by the Investment Manager of its appointment of any such sub-investment manager.

(f)     All investments and substitutions of securities referred to in paragraphs (b) and (c) of this Section 4 shall be in compliance with the applicable provisions of the North Carolina Insurance Code, as set forth in the definition of "Eligible Assets" in Section 11 of this Agreement. The Trustee has no discretionary authority over investments or substitutions of securities. The Trustee shall have no responsibility whatsoever to determine that any Assets in the Trust Account are or continue to be Eligible Assets. Any instruction or order concerning such investments or substitutions of securities shall be referred to herein as an "Investment Order". The Trustee shall execute Investment Orders and settle securities transactions by itself or by means of an agent or broker. The Trustee shall not be responsible for any act or omission, or for the solvency, of any such agent or broker unless said act or omission is the result, in whole or in part, of the Trustee's negligence, willful misconduct or lack of good faith.

(g)     Any loss incurred from any investment pursuant to the terms of this Section 4 shall be borne exclusively by the Trust Account. The Trustee shall not be liable for any loss due to changes in market rates or penalties for early redemption.

SECTION 5.     The Income Account.

All payments of interest and dividends actually received in respect of Assets in the Trust Account shall be deposited by the Trustee, subject to deduction of the Trustee's compensation and expenses as provided in Section 8 of this Agreement, in a separate account (the "Income Account") established and maintained by the Grantor at an office of the Trustee. The Trustee shall treat the Grantor as tax owner of all Trust Account income. The Grantor shall have the right to withdraw funds from the Income Account at any time.

SECTION 6.     Right to Vote Assets.

The Trustee shall forward all annual and interim stockholder reports and all proxies and proxy materials relating to the Assets in the Trust Account to the Investment Manager or applicable sub-investment manager acting for the Investment Manager (or, if the appointment of the Investment Manager has been terminated, to the Grantor). The Grantor (and the Investment Manager or sub-investment manager acting for the Investment Manager), shall have the full and unqualified right to vote any Assets in the Trust Account.

6

SECTION 7.    Additional Rights and Duties of the Trustee.

(a)    The Trustee shall notify the Grantor, the Beneficiary and the Investment Manager in writing within five (5) days following each deposit to, or withdrawal from, the Trust Account.

(b)    Before accepting any Asset for deposit to the Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary whenever necessary can, or the Trustee upon direction by the Beneficiary can, negotiate such Asset without consent or signature from or notice to the Grantor or any person or entity other than the Trustee in accordance with the terms of this Agreement.

(c)    The Trustee may deposit any Assets in the Trust Account in the centralized National Book-Entry System of the Federal Reserve or in depositories such as the Depository Trust Company. Assets may be held in the name of a nominee maintained by the Trustee or by any such depository.

(d)    The Trustee shall accept and promptly open all mail directed to the Grantor or the Beneficiary in care of the Trustee and deliver a copy of such mail to the Grantor and the Beneficiary promptly after the Trustee's receipt thereof.

(e)    The Trustee shall furnish to the Grantor and the Beneficiary a statement of all Assets in the Trust Account upon the inception of the Trust Account and at the end of each calendar quarter thereafter.

(f)    Upon the request of the Grantor or the Beneficiary, the Trustee shall promptly permit the Grantor or the Beneficiary, their respective agents, employees, counsel or independent auditors to examine, audit, excerpt, transcribe and copy, during the Trustee's normal business hours, any books, documents, papers and records relating to the Trust Account, the Assets or this Agreement.

(g)    The Trustee is authorized to follow and rely upon all instructions given by officers authorized in writing by the Grantor and the Beneficiary, respectively, and by the Investment Manager or authorized sub-investment managers and attorneys-in-fact acting under written authority furnished to the Trustee by the Grantor or the Beneficiary, including, without limitation, instructions given by letter, facsimile transmission, telegram, teletype, cablegram or electronic media other than e-mail, if the Trustee believes such instructions to be genuine and to have been signed, sent or presented by the proper party or parties. Such instructions may also be in a tested communication or in a communication utilizing access codes effected between electro-mechanical or electronic devices. The Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such instructions. The Trustee shall not incur any liability in executing instructions (i) from such an attorney-in-fact prior to receipt by the Trustee of notice of the revocation of the written authority of the attorney-in-fact, (ii) from any officer of the Grantor or the Beneficiary authorized in a writing, which may be updated from time to time or (iii) from the Investment Manager or any authorized sub-investment managers.

7

(h)     The duties and obligations of the Trustee shall only be such as are specifically set forth in this Agreement, as it may from time to time be amended, and no implied duties or obligations shall be read into this Agreement against the Trustee. The Trustee shall only be liable for its own negligence, willful misconduct or lack of good faith.

(i)     No provision of this Agreement shall require the Trustee to take any action which, in the Trustee's reasonable judgment, would result in any violation of this Agreement or any provision of law.

(j)     The Trustee may confer with counsel of its own choice in relation to matters arising under this Agreement and shall have full and complete authorization from the other Parties hereunder for any action taken or suffered by it under this Agreement or under any transaction contemplated hereby in good faith and in accordance with the opinion of such counsel.

(k)     Except as may arise from the Trustee's own negligence, willful misconduct, or lack of good faith, the Trustee shall be without liability for any loss, liability, claim or expense resulting from or caused by events or circumstances beyond the reasonable control of the Trustee, including, without limitation, the interruption, suspension or restriction of trading on or the closure of any securities markets, power or other mechanical or technological failures or interruptions, or computer viruses or communications disruptions, work stoppages, natural disasters or other similar events or acts, delays or inability to perform its duties due to any disorder in market infrastructure with respect to any particular security or changes to any provision of any present or future law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or any court of competent jurisdiction.

(l)     The Trustee, in incurring any debt, liability or obligation, or in taking or omitting to take any action, for or in connection with the Trust Account, is and shall be deemed to be acting solely as a trustee, and not in an individual capacity. The Trustee shall assume no responsibility and shall not be held to any personal liability whatsoever in tort, contract, or otherwise for any action taken or omitted pursuant to this Agreement. In the event that the Grantor or the Beneficiary enters into any agreement or arrangement of any kind with any third party with respect to all or any part of the Trust Account, the Grantor or the Beneficiary, as appropriate, shall ensure that the agreement or arrangement shall pose no risk of personal liability to the Trustee.

SECTION 8.     The Trustee's Compensation, Expenses and Indemnification.

(a)     The Grantor shall, upon its receipt of an invoice from the Trustee, (i) pay the Trustee, as compensation for its services under this Agreement, a fee as may be agreed upon in writing by the Trustee and the Grantor from time to time and (ii) pay or reimburse the Trustee for all of the Trustee's reasonable expenses, disbursements and advancements in connection with its duties under this

8

Agreement (including reasonable attorney's fees and expenses), except any such expenses, disbursements or advances as may arise from the Trustee's negligence, willful misconduct or lack of good faith. If the Grantor fails to pay such compensation and expenses within thirty (30) days following the Trustee's delivery of the invoice therefore, the Trustee shall be entitled to deduct such compensation and expenses from payments of dividends, interest and other income in respect of the Assets held in the Trust Account prior to the deposit thereof to the Income Account as provided in Section 5 of this Agreement. The Grantor also hereby indemnifies the Trustee for, and holds it harmless against, any loss, liability, costs or expenses (including reasonable attorney's fees and expenses) incurred or made without negligence, willful misconduct or lack of good faith on the part of the Trustee, arising out of or attributable to the Trustee's entrance into this Agreement or in connection with the performance of its obligations in accordance with the provisions of this Agreement, including any loss, liability, costs or expenses arising out of or in connection with the status of the Trustee and its nominee as the holder of record of the Assets. In no event shall the Trustee be liable for indirect, special or consequential damages. The Grantor hereby acknowledges that the foregoing indemnities shall survive the resignation of the Trustee or the termination of this Agreement and hereby grants the Trustee a lien, right of set-off and security interest in the funds in the Income Account for the payment of any claim for compensation, reimbursement or indemnity hereunder.

(b) No Assets shall be withdrawn from the Trust Account or used in any manner for paying compensation to, or reimbursement or indemnification of, the Trustee. The Trustee shall have no security interest in, lien on or right of setoff against the Trust Account or any Assets therein.

SECTION 9.     Resignation or Removal of the Trustee.

(a) The Trustee may resign at any time by giving not less than ninety (90) days' prior written notice thereof to the Beneficiary and to the Grantor, such resignation to become effective on the acceptance of appointment by a successor trustee and the transfer to such successor trustee of all Assets in the Trust Account in accordance with paragraph (c) of this Section 9.

(b) The Trustee may be removed by the Grantor at any time by giving not less than ninety (90) days' written notice thereof to the Trustee and to the Beneficiary, such removal to become effective on the acceptance of appointment by a successor trustee and the transfer to such successor trustee of all Assets in the Trust Account in accordance with paragraph (c) of this Section 9.

(c) Upon (i) their receipt of the Trustee's notice of resignation or (ii) their providing a notice of removal to the Trustee, the Grantor and the Beneficiary shall jointly appoint a successor trustee. Any successor trustee shall be a Qualified U.S. Financial Institution. The successor trustee shall not be an Affiliate of the Grantor or the Beneficiary. Upon the acceptance of the appointment as trustee hereunder

9

by a successor trustee and the transfer to such successor trustee of all Assets in the Trust Account, the resignation or removal, as applicable, of the Trustee shall become effective. Thereupon, such successor trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the Trustee, and the Trustee shall be discharged from any future duties and obligations under this Agreement, but the Trustee shall continue after its resignation or removal to be entitled to the benefits of the indemnities provided herein for the Trustee.

SECTION 10.    Termination of the Trust Account.

(a)    The Trust Account and this Agreement will remain in effect as long as the Grantor has outstanding obligations under the Reinsurance Arrangement. The Trust Account and this Agreement, except for the indemnities provided herein, may be terminated only after (i) the Grantor or the Beneficiary has given the Trustee written notice of its intention to terminate the Trust Account and (ii) the Trustee has given the Beneficiary and the North Carolina Department of Insurance not less than thirty (30) days prior written notice of the intended termination date.

(b)    On the termination date, upon the Trustee's receipt of written approval of the Beneficiary, the Trustee shall transfer to the Grantor any Assets remaining in the Trust Account, at which time all liability of the Trustee with respect to such Assets shall cease.

SECTION 11.    Definitions.

Except as the context shall otherwise clearly require, the following terms shall have the following meanings for all purposes of this Agreement (the definitions to be applicable to both the singular and the plural forms of each term defined if both such forms of such term are used in this Agreement):

The term "Affiliate" with respect to any corporation shall mean a corporation which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such corporation.   The term "control" (including the related terms "controlled by" and "under common control with") shall mean the ownership, directly or indirectly, of more than fifty percent (50%) of the voting stock of a corporation.

The term "Authorized Person" of the Beneficiary shall mean each person listed on Exhibit B attached hereto .

The term "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

The term "Eligible Assets" shall mean cash (United States legal tender) and those securities specified in the investment guidelines attached hereto as Exhibit C and to the Assignment Agreement as Exhibit D which are free and clear of all charges, encumbrances, liens, security interest and claims of any kind; provided, however, that no such securities shall

10

have been issued by an Affiliate of the Beneficiary or by the parent, subsidiary or an Affiliate of the Grantor.

The term "Measurement Date" shall mean each date on which a monthly settlement report is delivered by the Beneficiary to the Grantor pursuant to the Reinsurance Arrangement.

The term "Obligations" shall mean, with respect to the Reinsurance Arrangement, (a) losses and allocated loss expenses paid by the Beneficiary, but not recovered from the Grantor, (b) reserves for losses reported and outstanding, (c) reserves for losses incurred but not reported, (d) reserves for allocated loss expenses, (e) reserves for unearned premiums and (f) the Insurance Liabilities (as defined under the Reinsurance Arrangement).

The term "person" shall mean and include an individual, a corporation, a partnership, an association, a trust, an unincorporated organization or a government or political subdivision thereof.

SECTION 12.    Governing Law.

This Agreement shall be subject to and governed by the laws of the State of North Carolina.

SECTION 13.    Successors and Assigns.

No Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of all the other Parties; provided, however, that this Agreement shall inure to the benefit of and bind those who, by operation of law, become successors to the Parties, including, without limitation, through merger, consolidation, sale of all or substantially all of its assets, liquidation, dissolution or otherwise; provided, further, that, in the case of the Trustee, the successor is eligible to be a trustee under the terms hereof.

SECTION 14.    Severability.

In the event that any provision of this Agreement shall be declared invalid or unenforceable by any regulatory body or court having jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portions of this Agreement.

SECTION 15.    Entire Agreement.

This Agreement, together with the Reinsurance Arrangement, constitutes the entire agreement among the Parties with respect to the subject matter hereof, and there are no understandings or agreements, conditions or qualifications relative to this Agreement which are not fully expressed in this Agreement.

SECTION 16.    Amendments.

This Agreement may be modified or otherwise amended, and the observance of any term of this Agreement may be waived, only if such modification, amendment or waiver is in writing

11

and signed by all of the Parties; provided, however, that any amendment to this Agreement shall be filed with the North Carolina Department of Insurance no later than thirty (30) days after approval of the amendment by the commissioner who has regulatory oversight of the Trust Account.

SECTION 17.     Notices.

Unless otherwise provided in this Agreement, all notices, directions, requests, demands, acknowledgments and other communications required or permitted to be given or made under the terms hereof shall be in writing and shall be deemed to have been duly given or made (a)(i) when delivered personally, (ii) when made or given by email or facsimile (provided that an original is delivered by national or international air courier service) , (iii) in the case of mail delivery, upon the expiration of three (3) days after any such notice, direction, request, demand, acknowledgment or other communication shall have been deposited in the United States mail for transmission by first class mail, postage prepaid, or upon receipt thereof, whichever shall first occur or (iv) two (2) days following the day on which the same has been delivered prepaid to a national or international air courier service and (b) when addressed as follows:

If to the Grantor:

Port Royal Reassurance Company SPC, Limited
113 South Church Street
Grand Cayman, Cayman Islands
Attention: Paul Macey
Telephone: 811-483-1850 extension 2281

If to the Trustee:

Summit Trust Company
190 Bethlehem Pike, Suite One
Colmar, PA 18915
Attention: Meade Rudasill
Telephone: 215-822-6601

If to the Beneficiary:

North Carolina Mutual Life Insurance Company
411 West Chapel Hill Street
Durham, NC 27701-3616
Attention: Richard Barnes
Telephone: 919-313-7800

If to the Investment Manager:

12

Stamford Brook Capital, LLC
Times Square Tower
7 Times Square, 37 floor
New York, New York 10022
Attention: David Wasitowski
Telephone: 646-597-6068

Each Party may from time to time designate a different address for notices, directions, requests, demands, acknowledgments and other communications by giving written notice of such change to the other Parties.

SECTION 18.    Headings.

The headings of the Sections have been inserted for convenience of reference only, and shall not be deemed to constitute a part of this Agreement.

SECTION 19.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute one and the same Agreement.

SECTION 20.    Trust Account Records.

The Grantor, the Beneficiary and the North Carolina Department of Insurance may examine the Trustee's records relating to the Trust Account at any time during the Trustee's business hours, upon reasonable request.

SECTION 21.    Insolvency of Grantor.

(a)    Notwithstanding any other provisions in this Agreement, if the Grantor has been declared insolvent or placed into receivership, rehabilitation, liquidation, or similar proceedings under the laws of its state or country of domicile, the Trustee shall comply with an order of the commissioner with regulatory oversight over the Trust Account or court of competent jurisdiction directing the Trustee to transfer to the commissioner with regulatory oversight or other designated receiver all of the Assets.

(b)    The Assets shall be applied in accordance with the priority statutes and laws of the state in which the Trust Account is domiciled applicable to the assets of insurance companies in liquidation.

(c)    If the commissioner with regulatory oversight determines that the Assets of the Trust Account or any part thereof are not necessary to satisfy claims of the U.S. beneficiaries of the Trust Account, the Assets or any part of them shall be returned to the Trustee for distribution in accordance with this Trust Agreement.

13

SECTION 22.     Use of Information.

The Grantor and the Beneficiary agree to use reasonable care to avoid disclosure or unpermitted use of the Trustee's confidential or proprietary information, and the Trustee agrees to use reasonable care to avoid disclosure or unpermitted use of the Grantor's and the Beneficiary's confidential or proprietary information. Each Party agrees that it shall treat confidentially all information provided hereunder by any other Party regarding such other Party's business and operations. All confidential information provided hereunder by any Party shall be used by the other Parties solely for the purpose of rendering or receiving services pursuant to this Agreement and, except as may be required in carrying out this Agreement, shall not be disclosed to any third party. The foregoing shall not be applicable to any information (i) that is publicly available when provided or thereafter becomes publicly available, other than through a breach of this Agreement, or that is independently derived by any party hereto without the use of any information provided by the other party hereto in connection with this Agreement, (ii) that is required in any legal or regulatory proceeding, investigation, audit, examination, subpoena, civil investigative demand or other similar process, or by operation of law or regulation, or (iii) where the party seeking to disclose has received the prior written consent of the party providing the information, which consent shall not be unreasonably withheld. Notwithstanding anything herein to the contrary, the Trustee and its affiliates may report and use nonpublic account holdings information of its clients on an aggregated basis with all or substantially all other client information and without specific reference to any party or Account.

SECTION 23.     Regulation GG.

The Grantor and the Beneficiary each hereby represents and warrants that it does not engage in an "Internet Gambling Business", as such term is defined in Section 233.2(r) of the Federal Reserve Regulation GG (12 CFR 233.1-233.7) ("Regulation GG"). The Grantor and the Beneficiary each hereby covenants and agrees that it shall not engage in an Internet gambling business. In accordance with Regulation GG, the Grantor and the Beneficiary are hereby notified that "Restricted Transactions", as such term is defined in Section 233.2(y) of Regulation GG, are prohibited in any dealings with the Trustee pursuant to this Agreement or otherwise between or among any party hereto.

14

IN WITNESS WHEREOF, the parties hereto have executed or caused this Trust Agreement to be executed by duly authorized representatives as of the date first above written.

BENEFICIARY:

NORTH CAROLINA MUTUAL LIFE
INSURANCE COMPANY

By:_____
    Name:
    Title:  Chief Executive Officer

GRANTOR:

PORT ROYAL REASSURANCE
COMPANY SPC, LIMITED

By:_____
    Name:
    Title:

TRUSTEE:

SUMMIT TRUST COMPANY, as Trustee

By:_____
    Name:  MOHAN H. RUDASULL, JR.
    Title:  PRESIDENT & CEO

*[SIGNATURE PAGE TO TRUST AGREEMENT]*

IN WITNESS WHEREOF, the parties hereto have executed or caused this Trust
Agreement to be executed by duly authorized representatives as of the date first above written.

BENEFICIARY:

NORTH CAROLINA MUTUAL LIFE
INSURANCE COMPANY

By: _____
Name: James H. Speed Jr.
Title: Chief Executive Officer


GRANTOR:

PORT ROYAL REASSURANCE
COMPANY SPC, LIMITED

By: _____
Name: STEVEN W. FLORES
Title:


TRUSTEE:

SUMMIT TRUST COMPANY, as Trustee

By: _____
Name:
Title:


*[SIGNATURE PAGE TO TRUST AGREEMENT]*

Exhibit A

## List of Assets Deposited in the Trust Account

Cash in an amount equal to thirty four million one hundred and ninety four thousand six hundred and thirty four dollars ($34,194,634).

Exhibit B

<u>Authorized Persons of the Beneficiary</u>

1.   James H. Speed, Jr.

Exhibit C

### Investment Guidelines

All Eligible Investments must;

(1) meet all of the requirements of North Carolina's General Statute 58-7-173, and

(2) will be limited to income producing securities, with

(3) appropriate duration or maturity dates after consideration of the duration of the reinsured liabilities, and

(4) have an average rating of a 2 or better rating based upon the ratings of the NAIC's Security Valuation Office ("SVO"), or equivalent rating thereof, and

Ratings or equivalent ratings shall be determined as:

      (i) SVO if available,
      (ii) Moody's or S&P rating, for same creditor - adjusted for priority
      (iii) ratings of similar credits - adjusted for priority, or
      (iv) other methods acceptable under the North Carolina Insurance Code

(5) subject to certain concentration limitations prescribed by the North Carolina Insurance Code

(6) meeting the level of collateral and term limitations as provided by North Carolina's General Statute 58-7-173 section (15)

# EXHIBIT C

# N.C. Gen. Stat. § 58-7-173

Current through Session Laws 2016-124 of the 2016 Third Extra Session, Session Laws 2016-126 of the 2016 Fourth Extra Session, and Session Laws 2017-2 of the 2017 Regular Session, but not including Session Laws 2016-125 of the 2016 Fourth Extra Session, or corrections and changes made by the Revisor of Statutes. The final official version of statutes affected by the 2016 Third and Fourth Extra Sessions will appear on Lexis.com and Lexis Advance in May 2017. The final official version of statutes affected by the 2017 Regular Session will appear on Lexis.com and Lexis Advance in November 2017.

*General Statutes of North Carolina  >  CHAPTER 58. INSURANCE  >  ARTICLE 7. GENERAL DOMESTIC COMPANIES*

# § 58-7-173. Permitted insurer investments

An insurer may invest in:

**(1)** Bonds, notes, warrants, and other evidences of indebtedness that are direct obligations of the U.S. Government or for which the full faith and credit of the U.S. Government is pledged for the payment of principal and interest.

**(2)** Loans insured or guaranteed as to principal and interest by the U.S. Government or by any agency or instrumentality of the U.S. Government to the extent of the insurance or guaranty.

**(3)** Student loans insured or guaranteed as to principal by the U.S. Government or by any agency or instrumentality of the U.S. Government to the extent of the insurance or guaranty.

**(4)** Bonds, notes, warrants, and other securities not in default that are the direct obligations of any state or United States territory or the government of Canada or any Canadian province, or for which the full faith and credit of such state, government, or province has been pledged for the payment of principal and interest.

**(5)** Bonds, notes, warrants, and other securities not in default of any county, district, incorporated city, or school district in any state of the United States, or the District of Columbia, or in any Canadian province, that are the direct obligations of the county, district, city, or school district and for payment of the principal and interest of which the county, district, city, or school district has lawful authority to levy taxes or make assessments.

**(6)** Bonds, notes, certificates of indebtedness, warranties, or other evidences of indebtedness that are payable from revenues or earnings specifically pledged therefor of any public toll bridge, structure, or improvement owned by any state, incorporated city, or legally constituted public corporation or commission, all within the United States or Canada, for the payment of the principal and interest of which a lawful sinking fund has been established and is being maintained and if no default by the issuer in payment of principal or interest has occurred on any of its bonds, notes, warrants, or other securities within five years prior to the date of investment therein.

**(7)** Bonds, notes, certificates of indebtedness, warrants, or other evidences of indebtedness that are valid obligations issued, assumed, or guaranteed by the United States, any state, any county, city, district, political subdivision, civil division, or public instrumentality of any such government or unit thereof, or in any province of Canada; if by statute or other legal requirements the obligations are payable as to both principal and interest from revenues or earnings from the whole or any part of any utility supplying water, gas, a sewage disposal facility, electricity, or any other public service, including but not limited to a toll road or toll bridge.

**(8)** Bonds, debentures, or other securities of the following agencies, whether or not those obligations are guaranteed by the U.S. Government:

    **a.** Fannie Mae, and stock thereof when acquired in connection with the sale of mortgage loans to the Association.

    **b.** Any federal land bank, when the securities are issued under the Farm Loan Act;

17-09016-cgm   Doc 3-1   Filed 09/12/17   Entered 09/12/17 16:32:48   Exhibit 1 -
Subpoena (Sphreor) 275   Pg 90 of 177   Page 2 of 3

N.C. Gen. Stat. § 58-7-173

    **c.**   Any federal home loan bank, when the securities are issued under the Home Loan Bank Act;

    **d.**   The Home Owners' Loan Corporation, created by the Home Owners' Loan Act of 1933;

    **e.**   Any federal intermediate credit bank, created by the Agricultural Credits Act;

    **f.**   The Central Bank for Cooperatives and regional banks for cooperatives organized under the Farm Credit Act of 1933, or by any of such banks; and any notes, bonds, debentures, or other similar obligations, consolidated or otherwise, issued by farm credit institutions under the Farm Credit Act of 1971;

    **g.**   Any other similar agency of the U.S. Government that is of similar financial quality.

**(9)**  Bonds, debentures, or other securities of public housing authorities, issued under the Housing Act, of 1949, the Municipal Housing Commission Act, or the Rural Housing Commission Act, or issued by any public housing authority or agency in the United States, if the bonds, debentures, or other securities are secured by a pledge of annual contributions to be paid by the United States or any United States agency.

**(10)**  Obligations issued, assumed, or guaranteed by the International Bank for Reconstruction and Development, the International Finance Corporation, the Inter-American Development Bank, the Asian Development Bank, or the African Development Bank; and the cost of investments made under this subdivision in any one institution shall not exceed three percent (3%) of the insurer admitted assets.

**(11)**  Bonds, notes, or other interest-bearing or interest-accruing obligations of any solvent institution organized under the laws of the United States, of any state, Canada or any Canadian province; provided the instruments are designated and valued in accordance with the Purposes and Procedures Manual of the NAIC Securities Valuation Office. The cost of investments made under this subdivision in any one issuer shall not exceed three percent (3%) of an insurer's admitted assets.

**(12)**  Secured obligations of duly constituted churches and of church-holding companies; and the cost of investments made under this subdivision shall not exceed three percent (3%) of the insurer's admitted assets.

**(13)**  Equipment trust obligations or certificates adequately secured and evidencing an interest in transportation equipment, wholly or in part within the United States, and the right to receive determined portions of rental, purchase, or other fixed obligatory payments for the use or purchase of that transportation equipment; and the cost of investments made under this subdivision shall not exceed twenty percent (20%) of the insurer's admitted assets.

**(14)**  Share or savings accounts of credit unions, savings and loan associations or building and loan associations.

**(15)**  Loans with a maturity not in excess of 12 years from the date thereof that are secured by the pledge of securities eligible for investment under this Chapter or by the pledge or assignment of life insurance policies issued by other insurers authorized to transact insurance in this State. On the date made, no such loan shall exceed in amount seventy-five percent (75%) of the market value of the collateral pledged, except that loans upon the pledge of U.S. Government bonds and loans upon the pledge or assignment of life insurance policies shall not exceed ninety-five percent (95%) of the market value of the bonds or the cash surrender value of the policies pledged. The market value of the collateral pledge shall at all times during the continuance of the loans meet or exceed the miminum percentages herein. Loans made under this section shall not be renewable beyond a period of 12 years from the date of the loan.

**(16)**  Stocks, common or preferred, of any corporation created or existing under the laws of the United States, any U.S. territory, Canada or any Canadian province, or of any state. An insurer may invest in stocks, common or preferred, of any corporation created or existing under the laws of any foreign country other than Canada subject to the provisions of G.S. 58-7-178.

**(17)**  Mortgage-backed securities that are designated a 1 or 2 in accordance with the Purposes and Procedures Manual of the NAIC Securities Valuation Office including, without limitation, collateral mortgage obligations backed by a pool of mortgages of the kind, class, and investment quality as those eligible for investment under G.S. 58-7-179.

# History

1991, c. 681, s. 29; 1993, c. 105, s. 1; c. 452, s. 14; c. 504, s. 44; 2001-223, ss. 8.3, 8.4, 8.5, 8.6, 8.7, 8.8; 2001-487, s. 14(g); 2005-215, ss. 8, 9; 2011-221, s. 6.

General Statutes of North Carolina

Copyright 2017 by Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved

# EXHIBIT D

# INVESTMENT ADVISORY AGREEMENT

This Agreement, entered into with Stamford Brook Capital, LLC, a Delaware limited liability company ("Manager") effective the 24th day of April, 2015 by the undersigned, Port Royal Reassurance Company SPC, Limited ("Client"), being duly authorized, hereby appoints Manager, as investment manager for the assets of the Client in Summit Trust Company accounts ███████ and ███████, the details of which are set forth in the Schedule A attached hereto (the "Accounts"), on the following terms and conditions.

(1)     Investments.  Manager is authorized to manage and administer the Accounts without prior consultation or approval of Client; subject, however, to guidelines as provided by Client and set forth on Schedule B attached hereto. This authority includes the power to buy, sell, exchange, convert and otherwise trade in any and all bonds and other securities Manager may deem advisable in the best interest and for the account and risk of Client.

(2)     Transaction Procedure.  All transactions shall be consummated by payment or delivery by Client, or such person, firm or corporation as Client may designate in writing (the "Custodian") of all cash and/or securities due to or from the Accounts. Manager shall not act as custodian for the Accounts to take or have possession of any assets of the Accounts. Instructions of Manager to Client and/or the Custodian shall be made in writing or orally and confirmed in writing as soon as practicable thereafter, and Manager shall instruct all brokers executing orders on behalf of the Accounts to forward to the Client and the Custodian copies of all brokerage confirmations promptly after execution of transactions. All trading will reflect best execution and best price.

(3)     Accounts.  Manager will maintain complete records of Client and shall furnish monthly written statements of Accounts and valuation of the investment assets as of the last business day of each month during the term of this Agreement and such other reports as are agreed upon by the parties from time to time. Reports will be delivered to the Client no later than the sixth business day following the month end.

(4)     Reports to Manager and Client.  Client shall instruct the Custodian to provide Manager and Client with such periodic reports concerning the status of the Accounts as Manager may reasonably request from time to time.

(5)     Voting.  Unless otherwise directed by the Client, Manager shall not be obligated to take any action with respect to the voting of securities (or proxies with respect thereto) in which assets of the Accounts may be invested from time to time.

(6)     Fees and Expenses.  Upon presentation of an invoice by Manager after the close of each quarter, the Client shall pay to Manager a management fee which shall be calculated and paid in accordance with the Schedule C attached hereto.  In valuing the Accounts, the value of the assets in the Accounts shall be determined as provided in Section (7) hereof and the value of the Accounts shall include all cash and cash equivalents. In the event that the management fee is payable with respect to less than three months the amount thereof shall be prorated proportionately. All expenses related to the Accounts, including, but not limited to, any costs of safekeeping, transport and acquisition and disposition, such as brokerage and other execution costs, custody fees and margin cost, shall be paid by the Client.

(7)    Valuation. In computing the market value of any investment of the Accounts, each security listed on any national securities exchange shall be valued at the last quoted sale price, on the consolidated tape on the valuation date or, if not traded on such date, on the most recent date on which any such security was traded. Unlisted stocks regularly traded in the over-the-counter market shall be valued at the latest available bid price quotation furnished to Manager by such sources as it may deem appropriate. Any other security shall be valued in good faith by Manager in reflecting its fair market value as of the date of valuation.

(8)    Representation by Client. The execution and delivery of this Agreement by Client shall constitute the representation by Client that the terms hereof do not violate any obligation by which Client is bound, whether arising by contract, operation of law or otherwise, and that Client has the power, capacity, and authority to enter into this Agreement and to perform in accordance herewith.

(9)    Manager's Liability. Manager shall manage the assets of the Accounts in accordance with its interpretation of the investment objectives, investment guidelines and restrictions as provided by Client, and in accordance with its duty as a fiduciary, as set forth in paragraph 12 herein.

(10)    Limitation of Liability. Client agrees that all transactions in Client's Accounts are for Client's sole account and risk. The Company shall not be excluded from liability for losses occasioned by the Company's willful misfeasance, bad faith, or gross negligence in the performance of its duties hereunder. The federal securities laws impose liabilities under certain circumstances on persons who act in good faith, and nothing in this Agreement shall constitute a waiver of limitation of any rights which the Client may have under applicable federal or state law.

(11)    Secretary's Certificate. The Client, if a corporation, shall provide Manager with a certificate of the Secretary or an Assistant Secretary to the Client setting forth the names and specimen signatures of the individuals who are authorized to act on behalf of the Client. Manager shall not be liable and shall be fully protected in relying upon any written notice, instruction, direction or other communication that Manager reasonably believes (based on the most recent certificate of the Secretary or an Assistant Secretary of the Client that has been received by Manager ) to have been executed by an individual who is authorized to act on behalf of the Client.

(12)    Fiduciary Duty. Manager acknowledges (a) that it is a fiduciary with respect to the Accounts and assumes the duties, responsibilities and obligations of a fiduciary operating under the prudent man rule.

(13)    Termination. This Agreement may be terminated at any time by the Manager by giving to the Client written notice at least thirty (30) days prior to the date on which such termination is to become effective. The Client can terminate this agreement only by a majority vote of the Company's Board of Directors, provide that the Board finds that the Manager has acted in Bad Faith.

The Manager shall be determined to have acted in Bad Faith if in the course of undertaking the Managers respective responsibilities to the Company the Manager; (i) exhibited gross incompetence, or willful negligence with caused or could have caused the Company material financial harm; or (ii) knowingly made an investment which violated the Company's investment guidelines, or (iii) failed to disclose an investment to the Investment Committee of the Board of Directors, or (iv)

Notwithstanding the above, the Client may at any time upon delivery of written notice to Manager terminating the discretionary authority of the Manager or make changes to the Client's investment guidelines and restrictions.

Upon termination fees will be prorated to the date of termination and Manager will return any unearned portion of prepaid fees.

(14)    Assignment.    No Assignment (as that term is defined in the Investment Advisers Act of 1940) of the Agreement shall be made by Manager without written consent of Client nor is this Agreement assignable by Client.

(15)    Notices.    All notices, instructions and advice with respect to security transactions, or any other matters contemplated by this Agreem
ent, shall be deemed duly given if transmitted by first-class mail or hand-delivered with acknowledgment to Client at the address appearing below, to Manager at the address appearing below, and to the Custodian at such address as it may specify, in each case, in a notice similarly given:

To Manager:

Stamford Brook Capital, LLC
Times Square Tower
7 Times Square, 37 floor
New York, New York 10022
Attention: David Wasitowski
Telephone: 646-597-6068

To Client:

Port Royal Reassurance Company SPC, Limited
113 South Church Street
Grand Cayman, Cayman Islands
Attention: Paul Macey
Telephone: 811-483-1850 extension 2281

Addresses for notices hereunder may be changed by giving notice thereof to the other party to the Agreement.

(16)    Law Governing.    To the extent not inconsistent with federal law, the law of the State of North
Carolina shall govern the interpretation of this Agreement.

(17)    Amendments.    Any amendment, change, or modification of this Agreement shall not be valid or binding on any party, unless such amendment, change, or modification is set forth in writing signed by each party hereto.

(18)    Severability of Provisions.    Each provision of this Agreement shall be considered severable, and if for any reason any provision that is not essential to the effectuation of the basic purposes of the Agreement is determined to be invalid and contrary to any existing or future law,

such invalidity shall not impair the operation of or affect those provisions of this Agreement that are valid.

(19)     No Continuing Waiver.     No party hereto shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by such party. The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

(20)     Disputes.     All controversies, claims, disputes, and other matters in question between the parties to this Agreement, arising from or relating to this Agreement or the breach thereof, which cannot be resolved by the parties themselves shall  be settled by arbitration in Durham, North Carolina in accordance with  the Commercial Arbitration Rules of the American Arbitration Association then existing, unless the parties mutually agree otherwise. This Agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law.

Notice of the demand for arbitration shall be filed in writing with each other party to this Agreement and with the American Arbitration Association. The demand shall be made within a reasonable time after the controversy, claim, dispute or other matter in question has arisen; however, in no event shall the demand for arbitration  be made after the date when institution of legal or equitable proceedings based on any such controversy, claim, dispute, or other matter in question would be barred by the applicable statute of limitation.  The award rendered  by the arbitrator(s)  shall be final and binding upon  the parties,  and judgment may be entered  upon it in accordance with the applicable  law in any court having jurisdiction thereof.  The costs of arbitration  shall be assessed by the arbitrators.

Notwithstanding  the foregoing, this Section shall not be deemed to limit the rights of a party to obtain from a court provisional  or ancillary remedies, such as (but not limited to) injunctive relief or appointment  of a receiver, before, during, or after the pendency  of any arbitration  proceeding brought pursuant to this Agreement.  The institution or maintenance of an action for provisional or ancillary remedies shall not constitute a waiver or the right of any party, including the claimant in any such action, to arbitrate the merits of the controversy or claim occasioning the resort to such remedies.

(21)     Receipt of Form ADV.  The Client acknowledges receipt at least 48 hours prior to its execution of the Agreement of Part II of the Adviser's  current Form ADV. The Adviser will offer in writing at least annually to provide the Client with a copy of its then current Form ADV.

(22)     Term.  This contract  will terminate on December 31, 2024 unless otherwise terminated by the parties. It will be automatically renewed for five years from the date of expiration unless either party acts to terminate it or modify it within 30 days after date of expiration.

Agreed and accepted this [  ] day of April, 2015.

"Manager"                                              "Client"
Stamford Brook Capital, LLC                            Port Royal Reassurance Company SPC, Limited

By:                                                    By:
Name:                                                  Name:  STEVEN  N. FRENES
Title:                                                 Title:

4 | P a g e

Schedule A:

Trust Account

Summit Trust Company
Reinsurance Trust Account - Port Royal Prime
Account Number: ▮▮▮▮▮
190 Bethlehem Pike, Suite One
Colmar, PA 18915

Schedule B:

Investment Guidelines

All Eligible Investments must;

(1) meet all of the requirements of North Carolina's General Statute 58-7-173, and

(2) will be limited to income producing securities, with

(3) appropriate duration or maturity dates after consideration of the duration of the reinsured liabilities, and

(4) have an average rating of a 2 or better rating based upon the ratings of the NAIC's Security Valuation Office ("SVO"), or equivalent rating thereof, and

Ratings or equivalent ratings shall be determined as:

    (i) SVO if available,
    (ii) Moody's or S&P rating, for same creditor - adjusted for priority
    (iii) ratings of similar credits - adjusted for priority, or
    (iv) other methods acceptable under the North Carolina Insurance Code

(5) subject to certain concentration limitations prescribed by the North Carolina Insurance Code

(6) meeting the level of collateral and term limitations as provided by North Carolina's General Statute 58-7-173 section (15)

## Schedule C:

### Fee Schedule

|                                            | Fee Per Annum |
|--------------------------------------------|----------------------------|
| Traditional Fixed Income Portfolio         | 12 Basis Points (.12%) |
| Structured Finance Fixed Income Portfolio  | 40 Basis Points (.40%) |

*Fees are paid quarterly in arrears and are based on the ending market value of the portfolio.*

# EXHIBIT E

# INVESTMENT ADVISORY AGREEMENT

This Agreement, entered into with Stamford Brook Capital, LLC, a Delaware limited liability company ("Manager") effective the 24th day of April, 2015 by the undersigned, Port Royal Reassurance Company SPC, Limited ("Client"), being duly authorized, hereby appoints Manager, as investment manager for the assets of the Client in Summit Trust Company accounts ▐▐▐ and ▐▐▐, the details of which are set forth in the Schedule A attached hereto (the "Accounts"), on the following terms and conditions.

(1)  Investments.  Manager is authorized to manage and administer the Accounts without prior consultation or approval of Client; subject, however, to guidelines as provided by Client and set forth on Schedule B attached hereto. This authority includes the power to buy, sell, exchange, convert and otherwise trade in any and all bonds and other securities Manager may deem advisable in the best interest and for the account and risk of Client.

(2)  Transaction Procedure.  All transactions shall be consummated by payment or delivery by Client, or such person, firm or corporation as Client may designate in writing (the "Custodian") of all cash and/or securities due to or from the Accounts. Manager shall not act as custodian for the Accounts to take or have possession of any assets of the Accounts. Instructions of Manager to Client and/or the Custodian shall be made in writing or orally and confirmed in writing as soon as practicable thereafter, and Manager shall instruct all brokers executing orders on behalf of the Accounts to forward to the Client and the Custodian copies of all brokerage confirmations promptly after execution of transactions. All trading will reflect best execution and best price.

(3)  Accounts.  Manager will maintain complete records of Client and shall furnish monthly written statements of Accounts and valuation of the investment assets as of the last business day of each month during the term of this Agreement and such other reports as are agreed upon by the parties from time to time. Reports will be delivered to the Client no later than the sixth business day following the month end.

(4)  Reports to Manager and Client.  Client shall instruct the Custodian to provide Manager and Client with such periodic reports concerning the status of the Accounts as Manager may reasonably request from time to time.

(5)  Voting.  Unless otherwise directed by the Client, Manager shall not be obligated to take any action with respect to the voting of securities (or proxies with respect thereto) in which assets of the Accounts may be invested from time to time.

(6)  Fees and Expenses.  Upon presentation of an invoice by Manager after the close of each quarter, the Client shall pay to Manager a management fee which shall be calculated and paid in accordance with the Schedule C attached hereto.  In valuing the Accounts, the value of the assets in the Accounts shall be determined as provided in Section (7) hereof and the value of the Accounts shall include all cash and cash equivalents. In the event that the management fee is payable with respect to less than three months the amount thereof shall be prorated proportionately. All expenses related to the Accounts, including, but not limited to, any costs of safekeeping, transport and acquisition and disposition, such as brokerage and other execution costs, custody fees and margin cost, shall be paid by the Client.

1 | Page

(7)  Valuation.  In computing the market value of any investment of the Accounts, each security listed on any national securities exchange shall be valued at the last quoted sale price, on the consolidated tape on the valuation date or, if not traded on such date, on the most recent date on which any such security was traded. Unlisted stocks regularly traded in the over-the-counter market shall be valued at the latest available bid price quotation furnished to Manager by such sources as it may deem appropriate. Any other security shall be valued in good faith by Manager in reflecting its fair market value as of the date of valuation.

(8)  Representation by Client.  The execution and delivery of this Agreement by Client shall constitute the representation by Client that the terms hereof do not violate any obligation by which Client is bound, whether arising by contract, operation of law or otherwise, and that Client has the power, capacity, and authority to enter into this Agreement and to perform in accordance herewith.

(9)  Manager's Liability.  Manager shall manage the assets of the Accounts in accordance with its interpretation of the investment objectives, investment guidelines and restrictions as provided by Client, and in accordance with its duty as a fiduciary, as set forth in paragraph 12 herein.

(10)  Limitation of Liability.  Client agrees that all transactions in Client's Accounts are for Client's sole account and risk. The Company shall not be excluded from liability for losses occasioned by the Company's willful misfeasance, bad faith, or gross negligence in the performance of its duties hereunder. The federal securities laws impose liabilities under certain circumstances on persons who act in good faith, and nothing in this Agreement shall constitute a waiver of limitation of any rights which the Client may have under applicable federal or state law.

(11)  Secretary's Certificate.  The Client, if a corporation, shall provide Manager with a certificate of the Secretary or an Assistant Secretary to the Client setting forth the names and specimen signatures of the individuals who are authorized to act on behalf of the Client. Manager shall not be liable and shall be fully protected in relying upon any written notice, instruction, direction or other communication that Manager reasonably believes (based on the most recent certificate of the Secretary or an Assistant Secretary of the Client that has been received by Manager ) to have been executed by an individual who is authorized to act on behalf of the Client.

(12)  Fiduciary Duty.  Manager acknowledges (a) that it is a fiduciary with respect to the Accounts and assumes the duties, responsibilities and obligations of a fiduciary operating under the prudent man rule.

(13)  Termination.  This Agreement may be terminated at any time by the Manager by giving to the Client written notice at least thirty (30) days prior to the date on which such termination is to become effective. The Client can terminate this agreement only by a majority vote of the Company's Board of Directors, provide that the Board finds that the Manager has acted in Bad Faith.

The Manager shall be determined to have acted in Bad Faith if in the course of undertaking the Managers respective responsibilities to the Company the Manager; (i) exhibited gross incompetence, or willful negligence with caused or could have caused the Company material financial harm; or (ii) knowingly made an investment which violated the Company's investment guidelines, or (iii) failed to disclose an investment to the Investment Committee of the Board of Directors, or (iv)

2 | Page

Notwithstanding the above, the Client may at any time upon delivery of written notice to Manager terminating the discretionary authority of the Manager or make changes to the Client's investment guidelines and restrictions.

Upon termination fees will be prorated to the date of termination and Manager will return any unearned portion of prepaid fees.

(14)   Assignment.   No Assignment (as that term is defined in the Investment Advisors Act of 1940) of the Agreement shall be made by Manager without written consent of Client nor is this Agreement assignable by Client.

(15)   Notices.   All notices, instructions and advice with respect to security transactions, or any other matters contemplated by this Agreem
ent, shall be deemed duly given if transmitted by first-class mail or hand-delivered with acknowledgment to Client at the address appearing below, to Manager at the address appearing below, and to the Custodian at such address as it may specify, in each case, in a notice similarly given:

To Manager:

Stamford Brook Capital, LLC
Times Square Tower
7 Times Square, 37 floor
New York, New York 10022
Attention: David Wasilowski
Telephone: 646-597-6068

To Client:

Port Royal Reassurance Company SPC, Limited
113 South Church Street
Grand Cayman, Cayman Islands
Attention: Paul Macey
Telephone: 811-483-1850 extension 2281

Addresses for notices hereunder may be changed by giving notice thereof to the other party to the Agreement.

(16)   Law Governing.   To the extent not inconsistent with federal law, the law of the State of North
Carolina shall govern the interpretation of this Agreement.

(17)   Amendments. Any amendment, change, or modification of this Agreement shall not be valid or binding on any party, unless such amendment, change, or modification is set forth in writing signed by each party hereto.

(18)   Severability of Provisions.   Each provision of this Agreement shall be considered severable, and if for any reason any provision that is not essential to the effectuation of the basic purposes of the Agreement is determined to be invalid and contrary to any existing or future law,

3 | Page

such invalidity shall not impair the operation of or affect those provisions of this Agreement that are valid.

(19) No Continuing Waiver. No party hereto shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by such party. The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

(20) Disputes. All controversies, claims, disputes, and other matters in question between the parties to this Agreement, arising from or relating to this Agreement or the breach thereof, which cannot be resolved by the parties themselves shall be settled by arbitration in Durham, North Carolina in accordance with the Commercial Arbitration Rules of the American Arbitration Association then existing, unless the parties mutually agree otherwise. This Agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law.

Notice of the demand for arbitration shall be filed in writing with each other party to this Agreement and with the American Arbitration Association. The demand shall be made within a reasonable time after the controversy, claim, dispute or other matter in question has arisen; however, in no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on any such controversy, claim, dispute, or other matter in question would be barred by the applicable statute of limitation. The award rendered by the arbitrator(s) shall be final and binding upon the parties, and judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction thereof. The costs of arbitration shall be assessed by the arbitrators.

Notwithstanding the foregoing, this Section shall not be deemed to limit the rights of a party to obtain from a court provisional or ancillary remedies, such as (but not limited to) injunctive relief or appointment of a receiver, before, during, or after the pendency of any arbitration proceeding brought pursuant to this Agreement. The institution or maintenance of an action for provisional or ancillary remedies shall not constitute a waiver or the right of any party, including the claimant in any such action, to arbitrate the merits of the controversy or claim occasioning the resort to such remedies.

(21) Receipt of Form ADV. The Client acknowledges receipt at least 48 hours prior to its execution of the Agreement of Part II of the Adviser's current Form ADV. The Adviser will offer in writing at least annually to provide the Client with a copy of its then current Form ADV.

(22) Term. This contract will terminate on December 31, 2024 unless otherwise terminated by the parties. It will be automatically renewed for five years from the date of expiration unless either party acts to terminate it or modify it within 30 days after date of expiration.

Agreed and accepted this [ ] day of April, 2015.

"Manager"
Stamford Brook Capital, LLC

By:
Name: BRADLE REIFLER
Title: MANAGING DIRECTOR

"Client"
Port Royal Reassurance Company SPC, Limited

By:
Name: MICHAEL FLATLEY
Title: MANaging Member

4 | P a g e

Schedule A:

Trust Account

Summit Trust Company
Reinsurance Trust Account - Port Royal Prime
Account Number: ▓▓▓▓
190 Bethlehem Pike, Suite One
Colmar, PA 18915

Schedule B:

Investment Guidelines

All Eligible Investments must;

(1) meet all of the requirements of North Carolina's General Statute 58-7-173, and

(2) will be limited to income producing securities, with

(3) appropriate duration or maturity dates after consideration of the duration of the reinsured liabilities, and

(4) have an average rating of a 2 or better rating based upon the ratings of the NAIC's Security Valuation Office ("SVO"), or equivalent rating thereof, and

Ratings or equivalent ratings shall be determined as:

    (i) SVO if available,
    (ii) Moody's or S&P rating, for same creditor - adjusted for priority
    (iii) ratings of similar credits - adjusted for priority, or
    (iv) other methods acceptable under the North Carolina Insurance Code

(5) subject to certain concentration limitations prescribed by the North Carolina Insurance Code

(6) meeting the level of collateral and term limitations as provided by North Carolina's General Statute 58-7-173 section (15)

Schedule C:

Fee Schedule

| | Fee Per Annum |
|---|---|
| Traditional Fixed Income Portfolio | 12 Basis Points (.12%) |
| Structured Finance Fixed Income Portfolio | 40 Basis Points (.40%) |

*Fees are paid quarterly in arrears and are based on the ending market value of the portfolio.*

# EXHIBIT F

List of authorized signers for Port Royal North Carolina Mutual
Reassurance Trust Custodial Accounts:


Bradley Reiflor, CEO
Forefront Partners


Michael Flatley, Managing Director
Forefront Partners

# EXHIBIT G

# Forefront Capital Holdings, LLC

*Times Square Tower*
*New York, New York*

Mr. James H. Speed, Jr.
President and CEO
North Carolina Mutual Life Insurance Company
411 West Chapel Hill Street
Durham, North Carolina 27701

April 24, 2015

Dear Mr. Speed:

This letter is intended to clarify certain aspects of the Investment Advisory Agreement dated April 24, 2015 between Stamford Brook Capital, LLC ("Stamford") and Port Royal Reassurance Company SPC, Limited ("Port Royal").

(1) Stamford is a wholly owned by me. To date Stamford has no business and is being used as the investment advisor to Port Royal in order to facilitate the anticipated potential future partnership arrangement between Port Royal, Forefront Capital Holdings, LLC ("Forefront Capital") and NCM.

(2) Forefront Capital also owns Forefront Capital Markets, LLC ("FFCM"). FFCM is a Registered Investment Advisor with the Securities Exchange Commission, ("SEC"). The same individuals who manage FFCM will manage the investments for Stamford.

(3) Because, for now, Stamford's sole client will be Port Royal, Stamford is not required to be register as an Investment Advisor. If at any point in the future, Stamford does become required to register as an Investment Advisor, Forefront Capital will cause Stamford to become so registered.

Sincerely,

Forefront Capital

Bradley Reifler
Title: Chief Executive Officer

EXHIBIT H



**Forefront** Capital

**Forefront Capital**
Times Square Tower
7 Times Square, 37th Floor
New York, NY 10036

Michael L. Lawrence
President & Chief Executive Officer
North Carolina Mutual Life Ins.
411 West Chapel Hill Street
Durham, NC 27701-3616

July 13, 2016

Re: Talking Capital Notes

Dear Mike,

It has come to my attention that the Talking Capital notes, from various Talking Capital entities which are being held in the Port Royal/North Carolina Mutual Reinsurance trust account for the benefit of North Carolina Mutual are being considered by the North Carolina Department of Insurance as potentially being non-admissible assets.

The maturity of the underlying collateral supporting each of the Talking Capital notes is in the range of 60 to 70 days. Therefore, actual maturities will on the average occur sooner.

As per our instructions, as the investment manager for the trust we will begin immediately using the proceeds from such maturities to redeem _all of_ the Talking Capital notes.

If have any other requests or instruction, please let me know.

Sincerely,

Bradley Reifler
Founder & Trustee
**Forefront** Capital

# EXHIBIT I

497 1 v396084_497.htm 497

# FOREFRONT INCOME TRUST

## COMMON SHARES OF BENEFICIAL INTEREST

This Prospectus relates to the offering of 10,000,000 common shares of beneficial interest, $0.01 par value ("Shares") of Forefront Income Trust (the "Trust", "we," "us" or "our"), a newly organized Delaware statutory trust registered under the Investment Company Act of 1940 (the "1940 Act") as a closed-end, non-diversified, "interval" management investment company. The Trust has registered the offering and sale of the Shares under the Securities Act of 1933 (the "Securities Act").

*Investment Objective.* The Trust's investment objective is to seek current income, primarily by investing in unrated or below-investment-grade-rated (commonly referred to as "junk" or high yield/high risk) loans and debt instruments with maturities of generally not more than three years that represent what the Advisor believes to be deep value opportunities. See "Investment Objective and Principal Investment Strategies". There can be no assurance that the Trust will achieve its investment objective.

**An investment in the Shares involves a high degree of risk, will be illiquid and should be considered speculative. You could lose some or all of your investment. See "Risk Factors" beginning on page 21 of this Prospectus.**

The Trust's investment adviser, Forefront Capital Advisors, LLC (the "Advisor"), will not be paid a management fee. It will be paid an advisory fee, but only after shareholders receive the first 8.00% of annual pre-advisory fee net investment income. Thereafter, the Advisor will receive 80% of such income above 8.00% to and including 18.00% (while shareholders receive 20%), and 20% of such income above 18.00% (while shareholders receive 80%). See "Management of the Trust—Advisor—Advisory Fee". For example:

| If Pre-Advisory Fee Net Investment Income is: | Fee to Advisor | Return to Shareholders |
|---|---|---|
| 5.00% | 0.00% | 5.00% |
| 10.00% | 1.60% | 8.40% |
| 14.00% | 4.80% | 9.20% |
| 19.00% | 8.20% | 10.80% |

The Shares will be offered during an initial offering period at the initial offering price, which is $10 per Share. The initial offering period will terminate when the Trust closes on its first Share subscriptions. This is expected to be three business days after the date ("T+3") on which the Trust first confirms orders for Shares based on non-binding indications of interest received. The Trust will not commence investment operations until after the initial offering period terminates. After the initial offering period terminates, the Trust will continuously offer Shares at a price per Share equal to the Trust's net asset value ("NAV") per Share plus the applicable sales load. During and after the initial offering period, the minimum required initial investment for each investor is $2,500.

**The Shares will be illiquid. They have not been and will not be listed on a securities exchange, and no Trust shareholder or other person will have the right to require the Trust to redeem any particular Shares. As an interval fund, the Trust has adopted a fundamental policy to make quarterly repurchase offers of its Shares at NAV, and it expects to offer to repurchase up to 5% of its then outstanding Shares per quarter. But you should not expect these offers to provide significant liquidity, you should not expect to be able to sell any particular Shares in any particular offer (because that offer may be oversubscribed) and you should not expect to be able to sell Shares other than through these repurchase offers. See "Share Repurchases".**

| | Price to Public | Sales Load (1) | Proceeds to the Trust |
|---|---|---|---|
| **Per Share** | $10 | $0.30 | $9.70 |
| **Minimum per Investor (2)** | $2,500 | $75.00 | $2,425 |
| **Maximum for Offering (3)** | $100,000,000 | $3,000,000 | $97,000,000 (4) |

(1) A total of 3.00% of the gross proceeds shall be paid to certain brokers and dealers ("Selling Agents") who have entered into selling agreements with Northern Lights Distributors, LLC, which is serving as distributor of the Shares on a reasonable efforts basis (the "Distributor"). During and after the initial offering period, the actual sales load paid by a particular shareholder may vary depending on the financial intermediaries involved in the shareholder's purchase. You should consult your financial intermediaries about their charges. See "Plan of Distribution".
(2) During and after the initial offering period, the minimum required initial investment per investor is the same. See "Plan of Distribution".

(3) Assumes that all 10,000,000 Shares are sold at the initial offering price during the initial offering period. Proceeds from Shares sold after the initial offering period will be less than shown here, if NAV per Share at the time of such sales is lower than the initial offering price.

(4) The Trust's expenses during the initial offering period, other than the 3.00% sales load, will be approximately $400,000. These expenses will initially be paid by the Advisor. The Trust will reimburse the Advisor for these expenses after the end of the initial offering period, up to the actual amounts incurred by the Advisor. See "Management of the Trust—Reimbursement of Certain Expenses Borne by Advisor".



This Prospectus is dated December 8, 2014.

ii

*Leverage.* The Trust will not borrow money (except for temporary purposes only, in compliance with Section 18 of the 1940 Act) or issue debt or preferred securities during its first 12 months of operations and currently does not foresee doing any of the foregoing at any time; however, subject to the limitations imposed by the 1940 Act, the Trust is authorized to borrow from banks, issue debt and preferred securities and enter into certain portfolio transactions that may give rise to leverage.

**If you purchase Shares in the Trust, you will become bound by the applicable terms and conditions in the Trust's Agreement and Declaration of Trust, as amended from time to time (the "Declaration of Trust").**

**An investment in the Trust should be considered a speculative investment that entails substantial risks, including but not limited to the following:**

- The Trust is newly organized and has no operating history.
- Shareholders may lose capital and the Trust may fail to effectively achieve its investment objective.
- The Trust will invest primarily in unrated or below-investment-grade-rated (commonly referred to as "junk" or high yield/high risk) loans and debt instruments, which involve greater risks of default and are more volatile than investment grade securities.
- The Shares will not be listed on any securities exchange and will be illiquid.
- Many of the Trust's investments will be illiquid and will not trade on any exchange or active secondary market. The Trust's valuation of these investments will not be based on market prices or other independent pricing sources but will instead be the result of fair value determinations made in accordance with the Trust's valuation processes and procedures. Fair valuation determinations are subjective and based on estimates, and such determinations may differ materially from the values that would have been used if a ready market for these securities existed. As a result of such fair value determinations, the Trust's NAV on a given date may not reflect the value that the Trust could ultimately receive on one or more of its investments.
- Although the Trust will operate as an "interval fund" by making repurchase offers to its shareholders on a quarterly basis, no assurance can be given that shareholders will be able to sell all of their Shares tendered to the Trust pursuant to any particular repurchase offer or that any particular Shares tendered will be accepted in such repurchase offer. Therefore, you should not expect to be able to sell your Shares at any particular time, regardless of how the Trust performs.
- The Shares are appropriate only for shareholders who can tolerate a high degree of risk and do not require a liquid investment.
- The Trust is classified as a "non-diversified" investment company, which means that the Trust may invest a greater portion of its assets in a more limited number of issuers than a diversified investment company, and the percentage of its assets that may be invested in the securities of a single issuer is not limited by the 1940 Act. As a result, the Trust's investment portfolio may be subject to greater risk and volatility than if its investments were made in the securities of a broad range of issuers.
- The Trust intends to elect to be treated as a "regulated investment company" ("RIC") under Subchapter M of the Internal Revenue Code of 1986 (the "Internal Revenue Code" or the "Code"). To qualify as a RIC and avoid having its earnings subject to corporate-level U.S. federal income tax, the Trust must satisfy certain income, asset diversification and distribution requirements, which may in some cases prevent it from taking advantage of attractive investment opportunities or force it to liquidate investments at disadvantageous times or prices.
- If you may need access to the money you invest, then the Trust's Shares are not a suitable investment, because you will not have access to the money you invest until the Trust offers to repurchase Shares in a quarterly repurchase offer and your Shares are accepted in such a repurchase offer.
- Distributions may be funded from the capital you invest or from borrowings, if the Trust does not have sufficient earnings. Any invested capital that is returned to you will be reduced by the Trust's fees and expenses, including sales loads.

This Prospectus sets forth concisely information you should know about the Trust before investing. You are advised to read this Prospectus carefully and retain it for future reference. Additional information about the Trust, including the Trust's Statement of Additional Information ("SAI") dated December 8, 2014, has been filed with the Securities and Exchange Commission ("SEC"). You may request a copy of this Prospectus, the SAI and the Trust's annual and semi-annual reports (when they become available) and make shareholder inquiries without charge by writing to the Trust, c/o Gemini Fund Services, LLC, the Trust's transfer agent (the "Transfer Agent"), at 17605 Wright Street, Suite 2, Omaha, NE 68130, or calling 1-844-GET-FITX (1-844-438-3489). The SAI in its entirety is incorporated by reference into this Prospectus. The table of contents of the SAI appears on page 59 hereof. The Trust will send annual and semi-annual reports, including financial statements, when they become available, to all holders of its Shares. You can obtain the SAI, other material incorporated by reference herein and other information about the Trust on the SEC's website, www.sec.gov.

**The SEC has not approved or disapproved these securities or passed upon the adequacy of this Prospectus. Any representation to the contrary is a criminal offense.**

No broker, dealer, salesperson or other person is authorized to give a prospective shareholder any information or to represent anything not contained in this Prospectus or the SAI. You must not rely on any unauthorized information or representations that anyone provides to you, including information not contained in this Prospectus or the SAI. The information contained in this Prospectus and the SAI is current only as of their respective dates.

iii

Subscriptions for Shares will not be accepted until the Trust's registration statement of which this Prospectus forms a part is declared effective.

The Shares are not deposits or obligations of or guaranteed or endorsed by, any bank or other insured depository institution and are not federally insured by the Federal Deposit Insurance Corporation, the Federal Reserve Board or any other government agency. Prospective shareholders should not construe the contents of this Prospectus as legal, tax or financial advice. Each prospective shareholder should consult with his or her own professional advisers as to the legal, tax, financial or other matters relevant to the suitability of an investment in the Trust.

iv

**PROSPECTUS TABLE OF CONTENTS**

Page

| | |
|---|---|
| Prospectus Summary | 1 |
| Summary of Fees and Expenses | 11 |
| The Trust | 13 |
| Use of Proceeds | 13 |
| Investment Objective and Principal Investment Strategies | 14 |
| Risk Factors | 21 |
| Management of the Trust | 32 |
| Conflicts of Interest | 36 |
| Description of Shares | 39 |
| Determination of Net Asset Value | 40 |
| Share Repurchases | 41 |
| Distribution and Dividend Reinvestment Policies | 44 |
| Plan of Distribution | 46 |
| How to Subscribe for Shares | 48 |
| Certain Provisions in the Declaration of Trust | 51 |
| Tax Considerations | 52 |
| Statement of Additional Information Table of Contents | 58 |

**You should rely only on the information contained in or incorporated by reference into this Prospectus. The Trust has not authorized anyone to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. The Trust is not making an offer of its Shares in any jurisdiction where the offer or sale is not permitted.**

**All dealers that buy, sell or trade the Trust's shares, whether or not participating in this offering, may be required to deliver a prospectus.**

v

**PROSPECTUS SUMMARY**

*This is only a summary and does not contain all of the information that a prospective shareholder should consider before investing in Forefront Income Trust. Before investing, a prospective shareholder should carefully read the more detailed information appearing elsewhere in this Prospectus and the Trust's SAI, which in its entirety is incorporated by reference into this Prospectus. The Prospectus and SAI should be retained for future reference by any prospective shareholder.*

| | |
|---|---|
| **The Trust:** | Forefront Income Trust is a newly organized, closed-end, non-diversified "interval" management investment company. Throughout this Prospectus, we refer to Forefront Income Trust as the "Trust" or as "we", "us" or "our". See "The Trust". The Trust will operate as an "interval fund", by making repurchase offers to its shareholders on a quarterly basis. See "Share Repurchases". |
| **The Offering:** | The Shares will be offered during an initial offering period at the initial offering price, which is $10 per Share. The initial offering period will terminate when the Trust closes on its first Share subscriptions. This is expected to be three business days after the date ("T+3") on which the Trust first confirms orders for Shares based on non-binding indications of interest received. The Trust will not commence investment operations until after the initial offering period terminates. After the initial offering period terminates, the Trust will continuously offer Shares at a price per Share equal to the Trust's NAV per Share plus the applicable sales load. |
| **Investment Objective:** | The Trust's investment objective is to seek current income, primarily by investing in Fixed Income Securities (as defined below). There can be no assurance that the Trust will achieve its investment objective. See "Investment Objective and Principal Investment Strategies". Additional information with respect to the Trust's investment policies and restrictions is contained in the SAI. |
| **Investment Strategies:** | The Trust will invest substantially all of its assets in a portfolio of unrated or below-investment-grade-rated (commonly referred to as "junk" or high yield/high risk) loans and debt instruments with maturities of generally not more than three years, as well as, to a lesser extent, dividend yielding preferred securities, all of which will represent what the Advisor believes to be deep value opportunities, in that they will offer prospective returns that are high in proportion to their risks as assessed by the Advisor based on its fundamental analysis (collectively, "Fixed Income Securities"). Under normal market conditions, the Trust's investment policies will include investments in any combination of the following securities: (i) asset-backed securities; (ii) senior secured or unsecured loans or debt ("Senior Loans"); (iii) second lien or other subordinated, secured or unsecured loans or debt ("Second Lien or Subordinated Loans"); (iv) dividend yielding preferred securities; and (v) other securities described herein. |
| | We expect a substantial portion of our investments to take the form of individually sourced business loans, which will be individually and privately sourced, negotiated by the Trust's Advisor and made directly by the Trust to the borrowing business. We expect to find investment opportunities in a variety of different industries, but we will concentrate at least 25% of our investments in the short-term business credit institution industry. If there is an attractive opportunity, we may invest in smaller or larger companies. |
| | The Trust expects its investments to be non-correlated to the equity markets and structured to have certain terms, protections and features that the Advisor believes may help mitigate the risks of the investment. Some of these features may include, but need not be limited to: senior secured investments, the collateralization of specific assets, personal guarantees, insurance guarantees, default penalties, restrictions concerning change in control, provisions based on financial performance and certain controls on mechanisms affecting operations. |
| | A significant portion of the Trust's investments will not trade on any exchange or in any dealer market and therefore will be considered illiquid, and any liquidity will generally only be available upon the maturity of a particular investment. By investing in Fixed Income Securities with maturities of generally not more than three years, and often with more frequent interest payments (e.g., monthly or quarterly) as compared to many other available investments, the Advisor believes that the Trust may be able to enhance the overall liquidity of the Trust's portfolio. See "Investment Objective and Principal Investment Strategies—Investment Strategies". |

**REMAINDER OF EXHIBIT OMITTED FOR LENGTH**

17-09020-cgm    Doc 1    Filed 05/01/17    Entered 05/01/17 14:01:46    Main Document
Pg 123 of 270

# EXHIBIT J

# PROMISSORY NOTE

10,000,000.00                                                          May 5, 2015
New York, New York

      Forefront Partners, LLC hereby pledges its equity interest in Symmetry Property Development, LLC, a New York limited liability company, (**"Borrower"**) **(40% SPD – Chicago; 39% SPD - Hawaii and 33⅓% SPD – China)** included but not limited to the Chicago, Hawaii and China developments, hereby promises to pay to the order of **PORT ROYAL NORTH CAROLINA MUTUAL REASSURANCE TRUST, ("Lender"),** the principal sum of TEN MILLIONS DOLLARS and 00/100 DOLLARS ($10,000,000.00), with interest thereon in the amounts set forth in this Promissory Note (this **"Note"**), pursuant to the terms and conditions of this Note.

      1.    <u>Maturity Date</u>. Borrower shall repay the Loan and accrued interest in full on January 25, 2016 (the **"Maturity Date"**).

      2.    <u>Payments</u>. The Note will be paid on the Maturity Date at 10% per annum. If borrower fails to repay the principal amount of this Note and accrued interest thereon on the Maturity Date, interest shall accrue on the principal amount of this Note at a rate per annum equal to the lesser of the (i) the maximum amount permitted by law and (ii) the Default Rate. For purposes of this Agreement, the term **"Default Rate"** means 24% per annum. Nothing in this Section 2 shall derogate from Lender's rights to pursue the rights and remedies accorded to it by Section 3 hereof upon the occurrence of an Event of Default (as hereinafter defined).

      3.    <u>Events of Default</u>. If one or more of the following events shall occur and be continuing (each an **"Event of Default"**): (a) Borrower defaults in the payment of principal or interest hereunder on the Maturity Date; (b) Borrower, pursuant to or within the meaning of any Bankruptcy Law (as hereinafter defined): (i) commences a voluntary case or proceeding, (ii) consents to the entry of an order for relief against it in an involuntary case or proceeding, (iii) consents to the appointment of a custodian of it or all or substantially all of its properties, (iv) makes a general assignment for the benefit of creditors, or (v) generally is unable to pay its debts as the same become due; (c) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against Borrower in an involuntary case or proceeding, (ii) appoints a custodian of Borrower for all or substantially all of its properties, or (iii) orders the liquidation of Borrower, and in each case the order or decree remains unstayed and in effect for sixty (60) days; or (d) an involuntary case or proceeding pursuant to or within the meaning of any Bankruptcy Law is commenced against Borrower and remains unstayed for sixty (60) days following Borrower obtaining knowledge thereof;

then, and in every event and at any time thereafter during the continuance of such Event of Default, the Lender may exercise all of its rights and remedies at law or in equity, including, without limitation, realizing upon the security granted by the other Loan Documents. For purposes of this Note, the term **"Bankruptcy Law"** means Title 11 of the U.S. Code or any similar Federal or state law for the relief of debtors, and the term **"Custodian"** means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

4. <u>Waivers: Rights Cumulative</u>. Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of <u>nonpayment</u> or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder. Each and every right, power and remedy hereby specifically given to the Lender shall be in addition to every other right, power and remedy specifically given under this Note or under any other document now or hereafter existing at law or in equity, or statute, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Lender. All such rights, power and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission by the Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the obligations of Borrower under this Note, shall impair any such right, power or remedy or shall be construed to be a waiver thereof.

5. <u>Successors and Assigns</u>. All of the Lender's rights hereunder shall inure to the benefit of its successors, assigns and designees and all duties and obligations of Borrower shall be binding upon its successors and assigns.

6. <u>Further Assurances</u>. Borrower agrees that it will execute any customary further documents, instruments, agreements and other writings as shall be reasonably requested by the Lender to effectuate the provisions hereof, provided that such documents do not unreasonably impose additional obligations or liabilities on Borrower in excess of the amounts due under this Note.

7. <u>Severability</u>. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8. <u>Governing Law: Waiver of Jury Trial Right</u>. This Note shall be governed by the laws of the State of New York without regard to its conflicts of laws principles. BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS NOTE.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first above written.

BORROWER:

Forefront Partners, LLC

By: Bradley Reifler
Member:

4

# PROMISSORY NOTE

$495,048.73                                                                           January 8, 2016
New York, New York

       Forefront Partners, LLC hereby pledges its equity interest in Symmetry Property Development, LLC, a New York limited liability company, (**"Borrower"**) **(40% SPD – Chicago; 39% SPD - Hawaii and 33⅓% SPD – China)** included but not limited to the Chicago, Hawaii and China developments, hereby promises to pay to the order of **PORT ROYAL NORTH CAROLINA MUTUAL REASSURANCE TRUST, ("Lender")**, the principal sum of Four Hundred Ninety Five Thousand and 73/100 DOLLARS ($495,048.73), with interest thereon in the amounts set forth in this Promissory Note (this **"Note"**), pursuant to the terms and conditions of this Note.

     1.    <u>Maturity Date</u>. Borrower shall repay the Loan and accrued interest in full on January 8, 2017 (the **"Maturity Date"**).

     2.    <u>Payments</u>. The Note will be paid on the Maturity Date at 10% per annum. If borrower fails to repay the principal amount of this Note and accrued interest thereon on the Maturity Date, interest shall accrue on the principal amount of this Note at a rate per annum equal to the lesser of the (i) the maximum amount permitted by law and (ii) the Default Rate. For purposes of this Agreement, the term **"Default Rate"** means 24% per annum. Nothing in this Section 2 shall derogate from Lender's rights to pursue the rights and remedies accorded to it by Section 3 hereof upon the occurrence of an Event of Default (as hereinafter defined).

     3.    <u>Events of Default</u>. If one or more of the following events shall occur and be continuing (each an **"Event of Default"**): (a) Borrower defaults in the payment of principal or interest hereunder on the Maturity Date; (b) Borrower, pursuant to or within the meaning of any Bankruptcy Law (as hereinafter defined): (i) commences a voluntary case or proceeding, (ii) consents to the entry of an order for relief against it in an involuntary case or proceeding, (iii) consents to the appointment of a custodian of it or all or substantially all of its properties, (iv) makes a general assignment for the benefit of creditors, or (v) generally is unable to pay its debts as the same become due; (c) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against Borrower in an involuntary case or proceeding, (ii) appoints a custodian of Borrower for all or substantially all of its properties, or (iii) orders the liquidation of Borrower, and in each case the order or decree remains unstayed and in effect for sixty (60) days; or (d) an involuntary case or proceeding pursuant to or within the meaning of any Bankruptcy Law is commenced against Borrower and remains unstayed for sixty (60) days following Borrower obtaining knowledge thereof;

then, and in every event and at any time thereafter during the continuance of such Event of Default, the Lender may exercise all of its rights and remedies at law or in equity, including, without limitation, realizing upon the security granted by the other Loan Documents. For purposes of this Note, the term **"Bankruptcy Law"** means Title 11 of the U.S. Code or any similar Federal or state law for the relief of debtors, and the term **"Custodian"** means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

4.    Waivers: Rights Cumulative. Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder. Each and every right, power and remedy hereby specifically given to the Lender shall be in addition to every other right, power and remedy specifically given under this Note or under any other document now or hereafter existing at law or in equity, or statute, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Lender. All such rights, power and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission by the Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the obligations of Borrower under this Note, shall impair any such right, power or remedy or shall be construed to be a waiver thereof.

5.    Successors and Assigns. All of the Lender's rights hereunder shall inure to the benefit of its successors, assigns and designees and all duties and obligations of Borrower shall be binding upon its successors and assigns.

6.    Further Assurances. Borrower agrees that it will execute any customary further documents, instruments, agreements and other writings as shall be reasonably requested by the Lender to effectuate the provisions hereof, provided that such documents do not unreasonably impose additional obligations or liabilities on Borrower in excess of the amounts due under this Note.

7.    Severability. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.    Governing Law: Waiver of Jury Trial Right. This Note shall be governed by the laws of the State of New York without regard to its conflicts of laws principles. BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS NOTE.

2

17-09016-cgm    Doc 1    Filed 05/01/17    Entered 05/01/17 13:01:45    Main Document
Pg 230 of 276

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first above written.

BORROWER:

Forefront Partners, LLC

By: Bradley Reifler
Member

4

# EXHIBIT K

# Promissory Note Extension Agreement

January 26, 2016

This Promissory Note Extension Agreement, hereinafter referred to as "Extension Agreement," is entered into as of the date above written, by and between Forefront Partners, LLC hereby pledges  equity interest in Symmetry Property Development, LLC (40% SPD – Chicago; 39% SPD – Hawaii and 33⅓% SPD – China) ("Borrower") and Port Royal North Carolina Mutual Reassurance Trust  ("Lender").

WHEREAS, Lender and Borrower have entered into a Promissory Note dated May 5, 2015, in the original principal amount of $10,000,000.00, hereinafter referred to as the "Note". The Note was originally due January 25, 2016.

WHEREAS, the principal balance and interest of 10% of the Note prior to this Extension Agreement is principal of $10,000,000 and interest of $726,027.40 totaling in $10,726,027.40.

WHEREAS, Lender and Borrower desire to enter into this Extension Agreement with the interest rate of 12% in order to extend the due date of the Note to January 25, 2017.

NOW, THEREFORE, in consideration (the "Payment") of the amount of **$10,726,027.40** to be credited to the Note, Lender and Borrower hereby agree as follows:

1. The maturity date of the Note is extended to January 25, 2017 (the "Extended Maturity Date").

2. The Payment shall be applied to the Note as follows:

   Principal: $10,726,027.40
   Interest payment thru January 25, 2017: $1,287,123.30

3. All other terms and conditions of the Note remain unchanged and in effect.

Addendum:

Provided that the collateral remains in place and there is no change to the value of said collateral, the borrower will have the rights to extend all or part of the loan for 12 months at increase of 2% more than the existing rate.

**IN WITNESS WHEREOF**, the party have executed and agreed to this Agreement as of the date first set forth above.


Forefront Partners, LLC


By: _____

Bradley Reifler,  Member

17-09020-cgm    Doc 1    Filed 05/01/17    Entered 05/01/17 13:01:45    Main Document
Subpoena (Schreiber) - Pg 253 of 270

# EXHIBIT L

PROMISSORY NOTE

$1,050,000.00                                                                                    March 31, 2016

New York, New York

Spring Bridge 182 LLC, a Delaware limited liability company and having an address at c/o Waterbridge
Capital LLC, 7 Times Square, 37th Floor, New York, New York 10036 ("Borrower"), hereby promises to
pay to the order of PORT ROYAL NORTH CAROLINA MUTUAL REASSURANCE TRUST, ("Lender"), the
principal sum of One MILLION and 050/100 DOLLARS ($1,050,000.00), with interest thereon in the
amounts set forth in this Promissory Note (this "Note"), pursuant to the terms and conditions of this
Note.

1.      Maturity Date.  Borrower shall repay the Loan and accrued interest in full on December 30, 2016
(the "Maturity Date").

2.      Payments.  Interest (12.5%) shall accrue under this Note and be payable, together with the
principal amount of this Note, ($1,050,000.00) on the Maturity Date.  If payment is not made in full on
the maturity date then a penalty of $4,000 per day will be charged. If the borrower fails to pay the
interest and principal and the penalty by December 30, 2016 then the remedies listed in the "Events of
Default" will be triggered. interest shall accrue on the principal amount of this Note at a rate per annum
equal to the lesser of the (i) the maximum amount permitted by law and (ii) the Default Rate.  For
purposes of this Agreement, the term "Default Rate" means 24% per annum.  Nothing in this Section 2
shall derogate from Lender's rights to pursue the rights and remedies accorded to it by Section 3 hereof
upon the occurrence of an Event of Default (as hereinafter defined).

3.      Events of Default.  If one or more of the following events shall occur and be continuing (each an
"Event of Default"): (a) Borrower defaults in the payment of principal or interest hereunder on the
Maturity Date; (b) Borrower, pursuant to or within the meaning of any Bankruptcy Law (as hereinafter
defined): (i) commences a voluntary case or proceeding, (ii) consents to the entry of an order for relief
against it in an involuntary case or proceeding, (iii) consents to the appointment of a custodian of it or
all or substantially all of its properties, (iv) makes a general assignment for the benefit of creditors, or (v)
generally is unable to pay its debts as the same become due; (c) a court of competent jurisdiction enters
an order or decree under any Bankruptcy Law that: (i) is for relief against Borrower in an involuntary

case or proceeding, (ii) appoints a custodian of Borrower for all or substantially all of its properties, or (iii) orders the liquidation of Borrower, and in each case the order or decree remains unstayed and in effect for sixty (60) days; or (d) an involuntary case or proceeding pursuant to or within the meaning of any Bankruptcy Law is commenced against Borrower and remains unstayed for sixty (60) days following Borrower obtaining knowledge thereof;

then, and in every event and at any time thereafter during the continuance of such Event of Default, the Lender may exercise all of its rights and remedies at law or in equity, including, without limitation, realizing upon the security granted by the other Loan Documents. For purposes of this Note, the term "Bankruptcy Law" means Title 11 of the U.S. Code or any similar Federal or state law for the relief of debtors, and the term "Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

4.      Waivers; Rights Cumulative. Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder. Each and every right, power and remedy hereby specifically given to the Lender shall be in addition to every other right, power and remedy specifically given under this Note or under any other document now or hereafter existing at law or in equity, or statute, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Lender. All such rights, power and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission by the Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the obligations of Borrower under this Note, shall impair any such right, power or remedy or shall be construed to be a waiver thereof.

5.      Successors and Assigns.  All of the Lender's rights hereunder shall inure to the benefit of its successors, assigns and designees and all duties and obligations of Borrower shall be binding upon its successors and assigns.

6.      Further Assurances.  Borrower agrees that it will execute any customary further documents, instruments, agreements and other writings as shall be reasonably requested by the Lender to effectuate the provisions hereof, provided that such documents do not unreasonably impose additional obligations or liabilities on Borrower in excess of the amounts due under this Note.

7.      Severability.  Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.      Governing Law; Waiver of Jury Trial Right.  This Note shall be governed by the laws of the State of New York without regard to its conflicts of laws principles.  BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS NOTE.

9.      Amendments; Entire Agreement.  None of the terms or provisions hereof may be waived, altered, modified, limited or amended except by an agreement expressly referring hereto and to which the Borrower and Lender each consents in a writing duly signed by it.  This Note embodies the entire agreement among the parties and supersedes any and all prior agreements, whether written or oral, relating to the subject matter hereof.

10.     Loan Documents Defined.  For purposes of this Note, the term "Loan Documents" shall mean, collectively, this Note, and that certain Mortgage, dated the date hereof (the "Mortgage"), executed and delivered by Spring Bridge 182, LLC, which is the owner of fee title to the premises located at Spring Bridge 182, LLC New York, New York (the "Property"), as security for this Note and encumbering the Property. All of the terms, covenants and conditions contained in the Mortgage are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first above written.

BORROWER:

SPRING BRIDGE 182 LLC

By: _____

Name: Joel Schreiber

Title: Sole Member

# PROMISSORY NOTE

[$5,000,000.00]                                                                                        August 1, 2015
New York, New York

      **SPRING BRIDGE 182 LLC**, a Delaware limited liability company and having an address at c/o Waterbridge Capital LLC, 7 Times Square, 37th Floor, New York, New York 10036 ("**Borrower**"), hereby promises to pay to the order of **PORT ROYAL NORTH CAROLINA MUTUAL REASSURANCE TRUST**, a having an address at ("**Lender**"), the principal sum of [FIVE MILLION and 00/100 DOLLARS ($5,000,000.00)], with interest thereon in the amounts set forth in this Promissory Note (this "**Note**"), pursuant to the terms and conditions of this Note.

    1.    <u>Maturity Date.</u>  Borrower shall repay the Loan and accrued interest in full on May 1, 2016 (the "**Maturity Date**"). The borrower has the option to extend the Note and pay $2,500,000 plus interest on February 1, 2017 and the other $2,500,000 plus interest on May 1, 2017. If early payment is 3 months before maturity date then interest shall be reduced to 12%.

    2.    <u>Payments.</u>  Interest shall accrue under this Note at the rate of 18% per annum. Interest shall accrue and be payable, together with the principal amount of this Note, on the Maturity Date. Notwithstanding the foregoing, if Borrower fails to repay the principal amount of this Note and accrued interest thereon on the Maturity Date, interest shall accrue on the principal amount of this Note at a rate per annum equal to the maximum amount permitted by law. For the purposes of this Agreement, the term "Default Rate" means 24% per annum.

    3.    <u>Events of Default.</u>  If one or more of the following events shall occur and be continuing (each an "**Event of Default**"): (a) Borrower defaults in the payment of principal or interest hereunder on the Maturity Date; (b) Borrower, pursuant to or within the meaning of any Bankruptcy Law (as hereinafter defined): (i) commences a voluntary case or proceeding, (ii) consents to the entry of an order for relief against it in an involuntary case or proceeding, (iii) consents to the appointment of a custodian of it or all or substantially all of its properties, (iv) makes a general assignment for the benefit of creditors, or (v) generally is unable to pay its debts as the same become due; (c) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against Borrower in an involuntary case or proceeding, (ii) appoints a custodian of Borrower for all or substantially all of its properties, or (iii) orders the liquidation of Borrower, and in each case the order or decree remains unstayed and in effect for sixty (60) days; or (d) an involuntary case or proceeding pursuant to or within the meaning of any Bankruptcy Law is commenced against Borrower and remains unstayed for sixty (60) days following Borrower obtaining knowledge thereof;

    then, and in every event and at any time thereafter during the continuance of such Event of Default, the Lender may exercise all of its rights and remedies at law or in equity, including, without limitation, realizing upon the security granted by the other Loan Documents. For purposes of this Note, the term "**Bankruptcy Law**" means Title 11 of the U.S. Code or any similar Federal or state law for the relief of debtors, and the term "**Custodian**" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

4.    Prepayment. This Note is prepayable in full only at any time, provided, however, that any prepayment is accompanied by such amount which, when aggregated with all other payments of interest made hereunder, equals $225,000.

5.    Waivers; Rights Cumulative. Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder. Each and every right, power and remedy hereby specifically given to the Lender shall be in addition to every other right, power and remedy specifically given under this Note or under any other document now or hereafter existing at law or in equity, or statute, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Lender. All such rights, power and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission by the Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the obligations of Borrower under this Note, shall impair any such right, power or remedy or shall be construed to be a waiver thereof.

6.    Successors and Assigns. All of the Lender's rights hereunder shall inure to the benefit of its successors, assigns and designees and all duties and obligations of Borrower shall be binding upon its successors and assigns.

7.    Further Assurances. Borrower agrees that it will execute any customary further documents, instruments, agreements and other writings as shall be reasonably requested by the Lender to effectuate the provisions hereof, provided that such documents do not unreasonably impose additional obligations or liabilities on Borrower in excess of the amounts due under this Note.

8.    Severability. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.    Governing Law; Waiver of Jury Trial Right. This Note shall be governed by the laws of the State of New York without regard to its conflicts of laws principles. BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS NOTE.

10.    <u>Amendments; Entire Agreement</u>.  None of the terms or provisions hereof may be waived, altered, modified, limited or amended except by an agreement expressly referring hereto and to which the Borrower and Lender each consents in a writing duly signed by it. This Note embodies the entire agreement among the parties and supersedes any and all prior agreements, whether written or oral, relating to the subject matter hereof.

11.    <u>Loan Documents Defined</u>.  For purposes of this Note, the term **"Loan Documents"** shall mean, collectively, this Note, and each of the following documents executed and delivered by Joel Schreiber, an individual and affiliate of Borrower (**"Guarantor"**), in favor of Lender on the date hereof: (i) Pledge and Security Agreement (182/186 Spring Street Interests) by Guarantor in favor of Lender; (ii) Pledge and Security Agreement (WB East 14th Street LLC Interests) by Guarantor in favor of Lender; (iii) Pledge and Security Agreement (WB Mercer LLC Interests) by Guarantor in favor of Lender; and (iv) Pledge and Security Agreement (WB Berry Street LLC Interests) by Guarantor in favor of Lender.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first above
written.

BORROWER:

SPRING BRIDGE 182 LLC

By:_____

Name: Joel Schreiber
Title: Sole Member

# EXHIBIT M

$2,100,000  Date: December 1, 2015

## The pledge of 1/24th of the membership interest in We Member LLC will be between Port Royal North Carolina Mutual Reassurance Trust and Joel Schreiber (and any entity that has the membership interest associated in any capacity with Joel

For value received, the undersigned Waterbridge Capital and Joel Schreiber personally (the "Borrower"), at Time Square Tower; 37th floor, New York, New York 10036, promises to pay to the order of Port Royal North Carolina Mutual Reassurance Trust at Time Square Tower, New York, New York 10036 (or at such other place as the Lender may designate in writing), the sum of $2,100,000

A. Payments

$2,100,000 plus interest at 13.6% is due December 1, 2016

The Borrower promises to pay a late charge $2500.00 per day. for each installment that remains unpaid more than three day(s) after its Due Date. This late charge shall be paid as liquidated damages in lieu of actual damages, and not as a penalty. Payment of such late charge shall, under no circumstances, be construed to cure any default arising from or relating to such late payment. Unpaid amounts after the Due Date will add 2500.00 per day.

If due amounts plus liquidated damages Is not paid in full after 60 days, then the pledged collateral will be foreclosed upon.

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees.

SECURITY

This Note is secured by personal property in a 1/24th membership interest in WE MEMBER LLC. The Lender is not required to rely on the above security instrument and the assets secured therein for the payment of this Note in the case of default, but may proceed directly against the Borrower.

The Borrower reserves the right to prepay this Note (in whole or in part) prior to the Due Date with no prepayment penalty.

Additional events will immediately cause the payments due in principal plus the interest and damages to the end of the note.

the liquidation, dissolution, incompetency or death of the Borrower;

the filing of bankruptcy proceedings involving the Borrower as a debtor;

the application for the appointment of a receiver for the Borrower;

the making of a general assignment for the benefit of the Borrower's creditors;

the insolvency of the Borrower;

a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

the sale of a material portion of the business or assets of the Borrower.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any assets pledged as security for the payment of this Note, or if there is a default in any security agreement which secures this Note.

If the We Work stock is sold or borrowed against and there is not at least $5,000,000 of collateral for the lender then a like amount of collateral will replace the sold or borrowed entity; stock; private; real estate.

SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and demand of th is Note.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This note may not be amended without the written approval of the holder.

This Note shall be construed in accordance with the laws of the State of New York.

SIGNATURES

This Note shall be signed by Joel Schreiber and Nanci Hom, on behalf of Waterbridge Capital/We Member

Joel Schreiber

# EXHIBIT N

October 23, 2015                                            $ 2,000,000.00

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, FOREFRONT TALKING CAPITAL INVESTMENT, LLC, a Delaware limited liability company /Bolotel Limited, a U.K. Limited company (the "**Borrower**"), promises to pay to the order of Port Royal North Carolina Mutual Reassurance Trust with offices located at 7 Times Square – 37th Floor, New York, NY 10036 , its successors and assigns (the "**Lender**"), at such offices or at such other place or places as Lender may from time to time designate in writing, the principal sum of together with interest at the rate or rates hereinafter provided until paid, said principal and interest being due and payable as follows:

INTEREST RATE AND PAYMENT:

Interest shall accrue upon the unpaid principal balance of this Note at ten percent (10%) per annum.

The entire balance of principal plus interest accrued thereon at the aforesaid rate shall be due and payable in full upon 60 days request after a minimum of 9 months investment period.

Notwithstanding the foregoing, the entire balance of principal remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid shall be due and payable in full upon 60 days written notice of demand provided by the Lender to the Borrower (after the minimum 9 month investment period).

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty-five (365) day calendar year based on the actual number of days elapsed.

This Note may be prepaid in full or in part at any time, without premium or penalty. Any partial prepayment shall be applied against the principal sum then outstanding and shall not postpone the due date of any subsequent installment or change the amount of any such installment.

The validity and construction of this Note and all matters pertaining thereto are to be determined according to the laws of the State of New York.

If any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be construed as if such invalid, illegal or

1

unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

Borrower does hereby grant to Lender a security interest in certain property, which is more fully described in a Security Agreement, dated October 23, 2015 between Borrower and Lender.

Borrower represents and warrants that the loan evidenced by this Note was made and transacted solely for the purpose of carrying on or acquiring a business or commercial enterprise.

This Note provides for the making of a loan by Lender, in its capacity as a lender, to Borrower, in its capacity as a borrower, and for the payment of interest and repayment of principal by Borrower to Lender. The relationship between Lender and Borrower is limited to that of creditor/secured party, on the one hand, and debtor, on the other hand.

Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

The repayment of this Note is in part secured by a Security Agreement of even date hereof from Borrower to Lender

BORROWER HEREBY (I) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY A JURY, AND (II) WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN, KNOWINGLY AND VOLUNTARILY, BY BORROWER, AND THIS WAIVER IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED AND REQUESTED TO SUBMIT THIS NOTE TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES HERETO, SO AS TO SERVE AS CONCLUSIVE EVIDENCE OF BORROWER'S WAIVER OF THE RIGHT TO JURY TRIAL.

This Note is non-negotiable.

Time is of the essence with respect to all provisions of this Note.

2

17-09016-cgm  Doc 1  Filed 05/01/17  Entered 05/01/17 13:01:45  Main Document
Pg 250 of 270

SIGNATURE PAGE TO FOLLOW

3

MADE under seal as of the date first above written.


**FOREFRONT TALKING CAPITAL INVESTMENT, LLC,**
a Delaware limited liability company


By: _____
*Bradley Reifler,* Manager

4

# EXHIBIT O

# PROMISSORY NOTE

$1,500,000.00                                                                  March 31, 2016
New York, New York

      Syracuse Property Holdings LLC, a New York limited liability company and having an address at c/o Waterbridge Capital LLC, 7 Times Square, 37th Floor, New York, New York 10036 ("Borrower"), hereby promises to pay to the order of **PORT ROYAL NORTH CAROLINA MUTUAL REASSURANCE TRUST**, ("**Lender**"), the principal sum of One MILLION FIVE HUNDRED THOUSAND and 00/100 DOLLARS ($1,500,000.00), with interest thereon in the amounts set forth in this Promissory Note (this "**Note**"), pursuant to the terms and conditions of this Note.

    1.    <u>Maturity Date.</u> Borrower shall repay the Loan and accrued interest in full on December 30, 2016 (the "**Maturity Date**").

    2.    <u>Payments.</u> **Interest shall accrued (18%) under this Note and be payable together with the principal amount of this Note.** Notwithstanding the foregoing, if Borrower fails to repay the principal amount of this Note and accrued interest thereon on the Maturity Date, interest shall accrue on the principal amount of this Note at a rate per annum equal to the lesser of the (i) the maximum amount permitted by law and (ii) the Default Rate. For purposes of this Agreement, the term "**Default Rate**" means 24% per annum. Nothing in this Section 2 shall derogate from Lender's rights to pursue the rights and remedies accorded to it by Section 3 hereof upon the occurrence of an Event of Default (as hereinafter defined). Upon maturity if loan is not paid in full, a $5,000.00 per day fee will be charged.

    3.    <u>Events of Default.</u> If one or more of the following events shall occur and be continuing (each an "**Event of Default**"): (a) Borrower defaults in the payment of principal or interest hereunder on the Maturity Date; (b) Borrower, pursuant to or within the meaning of any Bankruptcy Law (as hereinafter defined): (i) commences a voluntary case or proceeding, (ii) consents to the entry of an order for relief against it in an involuntary case or proceeding, (iii) consents to the appointment of a custodian of it or all or substantially all of its properties, (iv) makes a general assignment for the benefit of creditors, or (v) generally is unable to pay its debts as the same become due; (c) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against Borrower in an involuntary case or proceeding, (ii) appoints a custodian of Borrower for all or substantially all of its properties, or (iii) orders the liquidation of Borrower, and in each case the order or decree remains unstayed and in effect for sixty (60) days; or (d) an involuntary case or proceeding pursuant to or within the meaning of any Bankruptcy Law is commenced against Borrower and remains unstayed for sixty (60) days following Borrower obtaining knowledge thereof;

then, and in every event and at any time thereafter during the continuance of such Event of Default, the Lender may exercise all of its rights and remedies at law or in equity, including, without limitation, realizing upon the security granted by the other Loan Documents. For purposes of this Note, the term "**Bankruptcy Law**" means Title 11 of the U.S. Code or any similar Federal or state law for the relief of debtors, and the term "**Custodian**" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

    4.    <u>Waivers; Rights Cumulative.</u> Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of

nonpayment or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder. Each and every right, power and remedy hereby specifically given to the Lender shall be in addition to every other right, power and remedy specifically given under this Note or under any other document now or hereafter existing at law or in equity, or statute, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Lender. All such rights, power and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise any other or others. No delay or omission by the Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the obligations of Borrower under this Note, shall impair any such right, power or remedy or shall be construed to be a waiver thereof.

5.    <u>Successors and Assigns</u>.  All of the Lender's rights hereunder shall inure to the benefit of its successors, assigns and designees and all duties and obligations of Borrower shall be binding upon its successors and assigns.

6.    <u>Further Assurances</u>.  Borrower agrees that it will execute any customary further documents, instruments, agreements and other writings as shall be reasonably requested by the Lender to effectuate the provisions hereof, provided that such documents do not unreasonably impose additional obligations or liabilities on Borrower in excess of the amounts due under this Note.

7.    <u>Severability</u>.  Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.    <u>Governing Law; Waiver of Jury Trial Right</u>.  This Note shall be governed by the laws of the State of New York without regard to its conflicts of laws principles.  BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS NOTE.

9.    <u>Amendments; Entire Agreement</u>.  None of the terms or provisions hereof may be waived, altered, modified, limited or amended except by an agreement expressly referring hereto and to which the Borrower and Lender each consents in a writing duly signed by it.  This Note embodies the entire agreement among the parties and supersedes any and all prior agreements, whether written or oral, relating to the subject matter hereof.

2

10.    <u>Loan Documents Defined.</u>    For purposes of this Note, the term **"Loan Documents"**
shall mean, collectively, this Note, and that certain Mortgage, dated the date hereof (the
"**Mortgage**"), executed and delivered by Syracuse Property Holdings LLC, a New York limited
liability company, which is the owner of fee title to the premises located at 221 S Warren Street,
Syracuse, New York (the "**Property**"), as security for this Note and encumbering the Property. All of
the terms, covenants and conditions contained in the Mortgage are hereby made part of this Note to
the same extent and with the same force as if they were fully set forth herein.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first above written.

By: _____

Name: Joel Schreiber

Title: Member

17-09016-cgm   Doc 1   Filed 05/01/17   Entered 05/01/17 13:01:45   Main Document
Pg 257 of 270

# EXHIBIT P



April 30, 2015

Forefront Income Trust
c/o Gemini Fund Services, LLC
17605 Wright Street, Suite 2,
Omaha, NE 68130

RE: <u>Sales Load for investment by Port Royal North Carolina Mutual Reassurance Trust</u>

To Whom It May Concern:

We, Port Royal North Carolina Mutual Reassurance Trust, as investor in Forefront Income Trust
(the "Trust"), acknowledge that the registration statement for Forefront Income Trust permits the
reduction of the applicable sales load from 3.0% to 1.5% of invested assets for investments in the
Trust exceeding $5 million. While the current investment in the Trust is in excess of $5 million,
we understand and accept that the sales load for this investment shall remain at the full 3.0%.

Regards,

**Port Royal North Carolina Mutual Reassurance Trust**

By: _____
Meade Rudasill
Trustee



# NEW ACCOUNT APPLICATION

*Do not use this form for IRA accounts.*

Please print clearly in CAPITAL LETTERS

To establish an account, the minimum initial investment in the Fund is $2,500.

If you have any questions or need any help filling out the application, please call **1-844-GET-FITX (1-844-438-3489)**.

After you have completed and signed this application, Please mail to:

**FOREFRONT INCOME TRUST**
**c/o GEMINI FUND SERVICES, LLC**
**PO BOX 541150**
**OMAHA, NE 68154**

Distributed by Northern Lights Distributors, LLC

---

Please provide complete information for EITHER A, B, C or D:

**A. INDIVIDUAL OR JOINT** *(Please check one)*:

☐ Individual    ☐ Joint Account*    *Tenants with Rights of Survivorship will be assumed, unless otherwise specified.

| | | / / |
|---|---|---|
| Name | Social Security Number | Date of Birth |

| | | / / |
|---|---|---|
| Joint Owner | Social Security Number | Date of Birth |

Email

Citizenship    ☐ U.S. or Resident Alien    ☐ Other *(please specify)* _____

**B. UNIFORM GIFTS TO MINORS ACCOUNT (UGMA) OR**
**UNIFORM TRANSFERS TO MINORS ACCOUNT (UTMA)**

| | | / / |
|---|---|---|
| Custodian's Name | Custodian's Social Security Number | Custodian's Date of Birth |

| | | / / |
|---|---|---|
| Minor's Name | Minor's Social Security Number | Minor's Date of Birth |

| | |
|---|---|
| Minor's State of Residence | Email |

**C. TRUST** *(Include a copy of the title page, authorized individual page and signature page of the Trust Agreement. Failure to provide this documentation may result in a delay in processing your application.)*

*Port Royal North Carolina Mutual Reassurance Trust*
Trust or Plan Name

| April, 27, 2015 | 98-1124974 | Email  Meade H. Rudasill |
|---|---|---|
| Trust Date (mo/day/yr) | Employer or Trust Taxpayer Identification Number | Trustee's (Authorized Signer's) Name |

| | |
|---|---|
| Trustee's Date of Birth (mo/day/yr) | Trustee's Social Security Number |

Co-Trustee's (Authorized Signer's) Name (First, Middle Initial, Last)

| | |
|---|---|
| Co-Trustee's Date of Birth (mo/day/yr) | Co-Trustee's Social Security Number |

Page 1 of 4

**D.   CORPORATIONS OR OTHER ENTITIES** *(Include a copy of one of the following documents: registered articles of incorporation, government-issued business license, partnership papers, plan documents or other official documentation that verifies the entity and lists the authorized individuals. Failure to provide this documentation may result in a delay in processing your application.)*

☐ C Corporation      ☐ S Corporation      ☐ Corporation      ☐ Partnership      ☐ Government Entity

☐ Other *(please specify)* _____

**If no classification is provided, per IRS regulations, your account will default to an S Corporation.**

| Name of Corporation or Other Business Entity | Tax ID Number | Email |
|---|---|---|

| Authorized Individual | Social Security Number | Date of Birth |
|---|---|---|

| Co-Authorized Individual | Social Security Number | Date of Birth |
|---|---|---|

## 2.   MAILING AND CONTACT INFORMATION

**LEGAL ADDRESS** *(Must be a street address)*

Street Address _____     Daytime Telephone _____

City, State, Zip _____     Evening Telephone _____

☐ Please send mail to the address below. Please provide your primary legal address above, in addition to any mailing address (if different).

Mailing Address _____     City, State, Zip _____

## 3.   INITIAL INVESTMENT (Minimum initial investment is $2,500)

**Forefront Income Trust**          $  __10,000,000.00__

Make check payable to **Forefront Income Trust.**
If investing by wire: Call **1-844-GET-FITX (1-844-438-3489)** and indicate the amount of the wire $10,000,000.00.

**Third Party checks are not accepted.**

## 4.   DIVIDEND AND CAPITAL GAIN DISTRIBUTIONS

All dividends and capital gains will be reinvested in shares of the Fund that pay them unless this box is checked.

☐   Please pay all dividends and capital gains in cash.

## 5.   AUTOMATIC INVESTMENT PLAN (AIP)

AIP allows you to add regularly to the Fund by authorizing us to deduct money directly from your checking account every month. Your bank must be a member of the Automated Clearing House (ACH). If you choose this option, please complete **Section 6 and attach a voided check.**

Please transfer $_____ **($100 minimum)** from my bank account:

☐ Monthly   ☐ Quarterly   on the _____ day of the month   Beginning: / /____

**Important Note:** If the AIP date falls on a holiday or weekend the deduction from your checking or savings account will occur on the next business day.

I authorize the Fund to purchase shares through the Automatic Investment Plan by the Automated Clearing House of which my bank is a member.

Type of Account:  ☐ Checking  ☐ Savings

Name on Bank Account _____    Bank Account Number _____

Bank Name _____    Bank Routing/ABA Number _____

Bank Address _____

**Please attach a voided check from your account.**

## 7. COST BASIS METHOD

Note: The default cost basis calculation method for your new account will be Average Cost. If you wish to elect a different cost basis method, please contact the Fund to obtain a Cost Basis Election Form.

## 8. DEALER/REGISTERED INVESTMENT ADVISOR INFORMATION

If opening your account through a Broker/Dealer or Registered Investment Advisor, please have them complete this section.

Forefront Capital Markets, LLC    151812
Dealer Name          Dealer Number

Representative's Last Name,          First Name

**DEALER HEAD OFFICE**
7 Times Square, 37th FL
Address
New York, NY, 10036
City, State, ZIP
212-607-8124
Telephone Number

**REPRESENTATIVE'S BRANCH OFFICE**

Address

City, State, ZIP

Rep Telephone Number          Rep ID Number

Info@forefrontgroup.com
Email Address

Rep Email Address

001
Branch ID Number

Branch Telephone Number (if different than Rep Phone Number)

## 9. STATE ESCHEATMENT LAWS

Escheatment laws adopted by various states require that personal property that is deemed to be abandoned or ownerless, including mutual fund shares and bank deposits, be transferred to the state. Under such laws, ownership of your Fund shares may be transferred to the appropriate state if no activity occurs in your account within the time period specified by applicable state law. The Fund retains a search service to track down missing shareholders and will escheat an account only after several attempts to locate the shareholder have failed. To avoid this from happening to your account, please keep track of your account and promptly inform the Fund of any change in your address.

## 10. SIGNATURE(S) & CERTIFICATION (REQUIRED)

We must have signatures to process your Application and to certify your Taxpayer Identification number. IRS regulations require your signature to avoid any backup withholding.

**W-9 9 Certification: Under penalty of perjury:**

(a) **I certify that the number shown on this form is my/our current Social Security number(s) or Taxpayer Identification number(s).**

Page 3 of 4

(b) I am not subject to backup withholding because; (1) I am exempt from backup withholding, or (2) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends, or (3) the IRS has notified me that I am no longer subject to backup withholding.

(c) I am a U.S. person (including a resident alien.)

(d) I am exempt from FATCA reporting.

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, social security number/ Tax ID number and other information that will allow us to identify you. We may also ask to see other identifying documents. Until you provide the information or documents we need, we may not be able to open an account or effect any additional transactions for you.

When opening an account for a foreign business, enterprise or a non-U.S. person that does not have an identification number, we require alternative government-issued documentation certifying the existence of the person, business or enterprise.

The undersigned represents and warrants that:

- I have full authority and am of legal age to purchase shares of the Fund;
- I have received and read a current prospectus for **Forefront Income Trust** and agree to be bound by the terms contained therein; and
- The information contained on this New Account Application is complete and accurate.

If Fund shares are being purchased on behalf of an Investment Company (as that term is defined under the Investment Company Act of 1940), I hereby certify that said Investment Company will limit its ownership to 3% or less of the Funds outstanding shares.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.**

| | |
|---|---|
| Signature *of owner (or custodian)* | Date |
| Signature of *joint owner (or corporate officer, partner or other)* | Date |
| Trustee *(if applicable)* | Date |

---

## TO CONTACT US:

**By Telephone**
Toll free **1-844-GET-FITX**
**(1-844-438-3489)**

**In Writing**
**Forefront Income Trust**
c/o Gemini Fund Services, LLC
PO Box 541150
Omaha, NE 68154
Or
Via Overnight Delivery
17605 Wright Street, Suite 2
Omaha, NE 68130

Distributed by Northern Lights Distributors, LLC

# EXHIBIT Q

**Conley, Sarah**

| | |
|---|---|
| **From:** | Gary M. Fellner <gmfellner@pbnlaw.com> |
| **Sent:** | Monday, September 12, 2016 1:29 PM |
| **To:** | Broughton, Turner |
| **Subject:** | FW: NCM Reassurance Trust Portfolio as of June 28, 2016 - email #1 |
| **Attachments:** | Port Royal North Carolina Mutual Reassurance Trust Portfolio as of June 28, 2016.pdf |

Turner, as discussed, please see attached summary page of the NCM Reassurance Trust portfolio as of June 28, 2016 (no investment has changed). The backup supporting documents for the eight named investments in this summary will follow momentarily in two separate emails.

**Gary M. Fellner, Esq.**
**PORZIO, BROMBERG & NEWMAN, P.C.**
**156 West 56th Street, Suite 803 | New York, NY 10019-3800**
**100 Southgate Parkway, P.O. Box 1997 | Morristown, NJ 07962-1997**

**P: 646.348.6722 | M: 973.715.0727 | F: 212.957.3983 |** vCard **|** CV
**P: 973.889.4332 | F: 973.538.5146**
gmfellner@pbnlaw.com **|** www.pbnlaw.com

This electronic communication, including any authorized attachments, contains information from the law firm of Porzio, Bromberg & Newman, P.C., that may be legally privileged, confidential, and exempt from disclosure under applicable law. This communication also may include content that was not originally generated by the firm. If you are not the intended recipient, any use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete it from all computers on which it may be stored. In addition, if you are not currently a client of the firm, this communication is not to be construed as establishing an attorney- client relationship.

## Port Royal North Carolina Mutual Reassurance Trust portfolio as of June 28, 2016

| # | Name | Amount | Interest | Maturity Date | Notes |
|---|------|--------|----------|---------------|-------|
| 1 | Forefront Partners Equity in SPD | $ 10,000,000.00 | 10% | 1/25/2017/See Adendum | |
| 2 | Forefront Income Trust (FIT) | $ 10,000,000.00 | | See Prospectus | Looking for invstments to replace |
| 3 | Talking Capital | $ 2,000,000.00 | 10% | In process | |
| 4 | Syracuse Property Holdings | $ 1,500,000.00 | 18% | 30-Dec-16 | |
| 5 | Forefront Partners Equity in SPD | $ 495,048.73 | 10% | 8-Jan-17 | |
| 6 | We Member | $ 2,100,000.00 | 13.6% | 1-Dec-16 | |
| 7 | Spring Bridge 182 | $ 1,050,000.00 | 18% | 30-Dec-16 | |
| 8 | Spring Bridge 182 | $ 5,000,000.00 | 15% | $2.5M /Feb 1-2017 & $2.5M/May 1-2017 | |
| 9 | Cash on hand | $ 1,100,000.00 | | Carillion Tower paid in full on 10-Aug-2016 | |
| | **Total** | **33,245,049 *** | | | |

* The reserved portfolio is reduced by payments made to North Carolina Mutual Reassurance Trust:

| Q2 | $301,410.02 |
|----|-------------|
| Q3 | $327,070.71 |
| Q4 | $303,059.23 |
| Q1 | $304,534.08 |
| Q2 | $288,789.03 |

**Total paid to North Carolina Mutual Reassurance Trust including deat| $1,524,863.07**

# EXHIBIT R

WILLIAMS MULLEN

Direct Dial: 804.420.6926
tbroughton@williamsmullen.com

August 26, 2016

**By FEDEX, Email and U.S. Mail**

Stamford Brook Capital, LLC
Times Square Tower
7 Times Square, 37th Floor
New York, New York 10022
Attention: David Wasitowski
dwasitowski@forefrontgroup.com

Bradley Reifler
Forefront Capital Holdings, LLC
Times Square Tower
7 Times Square, 37th Floor
New York, New York 10022
breifler@forefrontgroup.com

Dear Mr. Wasitowski and Mr. Reifler:

On April 23, 2015, our client, North Carolina Mutual Life Insurance Company ("North Carolina Mutual"), Port Royal Reassurance Company SPC, LTD ("Port Royal"), and Summit Trust Company ("Summit") executed a reinsurance trust agreement (the "Agreement"). Pursuant to the Agreement and related documents, $34,194,634 in cash was deposited into a trust account (the "Trust Account"). Summit serves as the Trust Account's trustee and North Carolina Mutual is the Trust Account's beneficiary. The Agreement designates Stamford Brook Capital, LLC ("Stamford Brook") as the Trust Account's "Investment Manager." In a letter addressed to North Carolina Mutual dated April 24, 2015, a copy of which is enclosed for your convenience, Bradley Reifler represented in writing to North Carolina Mutual that he is Stamford Brook's sole owner.

In its capacity as Investment Manager for the Trust Account, we understand that Stamford Brook changed the assets held by the Trust Account from cash to other forms of investment without procuring North Carolina Mutual's prior written approval. In fact, North Carolina Mutual has written evidence, provided by Summit, of distributions from the Trust Account executed by Forefront Partners (presumably on behalf of its affiliate, Stamford Brook), where the proceeds were used by Stamford Brook and Forefront Partners for such unauthorized investments. Stamford Brook's actions in this regard constitute a breach of the Trust Agreement's terms. Moreover, to date, neither Stamford Brook, Port Royal or Summit has provided North Carolina Mutual with documentation sufficient to demonstrate that the investments made by Stamford Brook now held in the Trust Account are "Eligible Assets" which meet the requirements of the Trust Agreement and North Carolina's General Statute Section 58-7-173.

# WILLIAMS MULLEN

Regarding the investments made by Stamford Brook, the investments appear to consist of a number of promissory notes.  The following of those promissory notes are now past due and immediately payable to the Trust Account:

(1) Promissory Note #002 dated July 31, 2015 in the amount of $1,000,000 between Forefront Talking Capital Investment, LLC/Rudare Communications, SL-Tata Communications and Port Royal North Carolina Mutual Reassurance Trust executed on behalf of the borrower by Bradley Reifler;

(2) Promissory Note #002A dated July 31, 2015 in the amount of $1,000,000 between Forefront Talking Capital Investment, LLC/Ikarim Business Services LTD-Verizon UK and Port Royal North Carolina Mutual Reassurance Trust executed on behalf of the borrower by Bradley Reifler; and,

(3) A promissory note dated August 18, 2015 in the amount of $1,000,000 between Coconut Beach, LLC and Port Royal North Carolina Mutual Reassurance Trust.

Despite North Carolina Mutual's repeated inquiries to both Stamford Brook and Port Royal regarding the status of payment of the foregoing promissory notes, neither Stamford Brook nor Port Royal has provided adequate information concerning, or evidence supporting the payment of these notes to the Trust Account. North Carolina Mutual is willing to continue working with Stamford Brook and Port Royal in good faith to cure these issues and collect the funds due to the Trust Account; provided that immediate action is taken by Stamford Brook and Port Royal.  Specifically, North Carolina Mutual demands that the $3,000,000 in cash owed pursuant to terms of these promissory notes be deposited into the Trust Account on or before August 31, 2016.  Likewise, North Carolina Mutual demands, for all of the remaining noncash investments per the listing enclosed, that cash in the full amount of each such promissory note be deposited into the Trust Account immediately upon the earlier of the maturity date of each such note as indicated in the enclosed listing or November 30, 2016.

If our instructions in this regard are not clear to you, or you have any questions concerning this matter, please contact me immediately.

Very truly yours,

Turner A. Broughton

Turner A. Broughton

Encl.

WILLIAMS MULLEN

cc:    Port Royal Reassurance Company SPC, LTD
       113 South Church Street
       Grand Cayman, Cayman Islands
       Attention:  Paul Macey and Steven Fickes
       sfickes@raedelfs.com

       Summit Trust Company
       190 Bethlehem Pike, Suite One
       Colmar, PA 18915
       Attention: Meade Rudasill
       meaderudasill@summittrust.com

       North Carolina Mutual Life Insurance Company
       411 West Chapel Hill Street
       Durham, NC 27701
       Attention: Michael L. Lawrence, President
       mlawrence@ncmutuallife.com

# Forefront Capital Holdings, LLC

*Times Square Tower*
*New York, New York*

Mr. James H. Speed, Jr.
President and CEO
North Carolina Mutual Life Insurance Company
411 West Chapel Hill Street
Durham, North Carolina 27701

April 24, 2015

Dear Mr. Speed:

This letter is intended to clarify certain aspects of the Investment Advisory Agreement dated April 24, 2015 between Stamford Brook Capital, LLC ("Stamford") and Port Royal Reassurance Company SPC, Limited ("Port Royal").

(1) Stamford is a wholly owned by me. To date Stamford has no business and is being used as the investment advisor to Port Royal in order to facilitate the anticipated potential future partnership arrangement between Port Royal, Forefront Capital Holdings, LLC ("Forefront Capital") and NCM.

(2) Forefront Capital also owns Forefront Capital Markets, LLC ("FFCM"). FFCM is a Registered Investment Advisor with the Securities Exchange Commission, ("SEC"). The same individuals who manage FFCM will manage the investments for Stamford.

(3) Because, for now, Stamford's sole client will be Port Royal, Stamford is not required to be register as an Investment Advisor. If at any point in the future, Stamford does become required to register as an Investment Advisor, Forefront Capital will cause Stamford to become so registered.

Sincerely,

Forefront Capital

Bradley Reifler
Title: Chief Executive Officer



**Distribution Form (Non-IRA)**

(04162014)

8861 West Sahara Ave. Suite 215
Las Vegas, NV 89117
Ph: 877.268.9115

1

For Information Contact Summit Trust Company at 877.268.9115

Summit Account Number:

**Instructions:**

Complete this form for all distributions from **Non-IRA Accounts** at Summit Trust Company. Please refer to the Operations Guide for processing guidelines. Note: Not to be used for Individual Retirement Accounts (IRA).

- For distributions by check, complete Section 1-3, 5, 8 (if applicable) and 9.
- For distributions by wire or ACH, complete Sections 1-3, 6, 8 (if applicable) and 9.
- For liquidation and transfer to another Summit Trust Company account, complete Sections 1-3, 7 and 9.

**Note:** Distributions must be received by Summit Trust Company no later than 2:30 PM EST. Requests received after 2:30 PM will be placed the following business day. Please refer to the Operations Guide for Summit Trust Company processing guidelines.

Forward completed form to address below.

| Check Payments | Overnight Mail |
|---|---|
| Summit Trust Company | Summit Trust Company |
| P.O. Box 204666 | 8861 West Sahara Ave., Suite 215 |
| Dallas, TX 75320-4666 | Las Vegas, NV 89117 |

☑ New distribution

☐ Change to an existing distribution

**1.    Advisor or Consultant Information (Consultant does not give investment advice)**

**Michael Flatley**                                                                 mflatley@forefrontgroup.com

Name (state whether Advisor or Consultant)          Telephone Number          E-mail address

Note: Advisors and Consultants may receive compensation from Summit Trust Company. Advisors and Consultants may also be compensated by clients. Consultants do not give investment advice but may consult for Summit Trust Company and receive consultation and/or referral fees.

**2.    Investor Information**

**Port Royal N Carolina Mutual Reassu**

Investor's Name          Investor's Social Security Number or Tax ID          Daytime Phone Number

**3.    Payment Information**

I direct Summit Trust Company to Distribute from the above account. Please see Section 4 for distribution due to divorce.

A.    Amount to withdraw from the Account: $327,070.71 (Minimum of $500)

B.    Frequency: (Select one)  Note: If Frequency section is left blank, a one time distribution will be processed.

☒ One Time    ☐ Monthly    ☐ Quarterly    ☐ Semi-Annually    ☐ Annual    ☐ Account Closing

Start Date: 10/16/15 (Month / Day / Year)

Note: If no start date is indicated, the initial distribution will occur on the second business day following the date of receipt, per our standard procedures; subsequent distributions will recur on that day of the month. If account is not funded as of the start date of a recurring distribution the initial distribution will default to the next scheduled date.

 **SUMMIT** TRUST COMPANY

**Distribution Form (Non-IRA)**

(04162014)

8861 West Sahara Ave. Suite 215
LasVegas, NV 89117
Ph: 877.268.9115

2

C.   Remove the above distribution amount from:   Note:  If Instructions are not provided in this section, Summit Trust Company will sell proportionally across all mutual funds.

☐ Current Allocation  OR  ☐ Money Market

Please select one of the following to establish the continuation of the Dollar Cost Averaging ("DCA"). Adjust the DCA by:

☐ Pro-Rata Across All Mutual Funds (For Non-Asset Allocation portfolio Accounts Only)

☐ Fund / Security Redemption (For Non-Asset Allocation Portfolio Accounts Only)

Please provide Fund Number and Name of mutual fund to sell to cover the distribution. If there is a sufficient balance in money market to cover the redemption, no fund needs to be provided.

_____                    _____
Redeem Fund # / Cusip # / Stock Symbol                                         Fund / Security Name

D.   ☐   Indicate here if you wish to pay out all cash dividends / income on a recurring basis only.  (One Time not available. Dollar amount will vary depending upon dividends/ interest paid). Note:  Capital gains cannot be automatically paid out.  Asset Allocation Accounts:  Capital gains will rebalance from your Asset Allocation portfolio money market during the next automatic rebalancing.  Funds Only Accounts: Capital gains will be invested into your money market.

E.   ☐   Indicate here if you wish to transfer cash dividends/income to the Money Market.  (One Time not available. Dollar amount will vary depending upon dividends/interest paid). Note:  Capital gains cannot be automatically paid out.  Asset allocation Accounts: Capital gains will rebalance from your Asset Allocation portfolio money market during the next automatic rebalancing.  Funds Only Accounts:  Capital gains will be invested into your money market.

F.   ☐   Transfer the above dollar amount to my Money Market.  (Supply account number if different from above)

_____
Summit Trust Company Account Number

## 4.   Divorce Decree

If this distribution is due to a divorce proceeding, please provide the following information:

1.   Amount of Distribution _____ dollar  OR  _____ %

2.   Effective Date: _____ (Month / Day / Year)

## 5.   Distribution Via Check

Note: Fax form and retain original for your files.  If neither box is selected, a check will be sent to the address of record.
Please see separate TRANSACTION FEE SCHEDULE for applicable Transaction Fees.

☐   Address of record (Sent via first class mail)  OR

☐   Third Party Payee information (See above notes) (If the check is payable to a financial institution for the benefit of a third party, provide the third party's address in section 8 as required by the Travel Rule, a Bank Secrecy Act requirement.)

Payable to Mailing Address:

_____
Payee

_____        _____
Address                                                              City, State / Zip Code



**SUMMIT**
TRUST COMPANY

**Distribution Form (Non-IRA)**

(04162014)

8861 West Sahara Ave. Suite 215
Las Vegas, NV 89117
Ph: 877.268.9115

3

Special Instructions:

☐ **Overnight Delivery** (Check here)
Please see separate TRANSACTION FEE SCHEDULE for applicable Transaction Fees.
Overnight carrier requires a signature upon delivery, and cannot deliver to a Post Office Box.

## 6. Distribution via Wire or ACH

Note: Fax Form and retain original for your files.

**ACH Note:** Please attach an unsigned voided Check for ACH distributions to checking accounts, or bank provided routing instructions for ACH distributions to savings accounts; failure to provide may result in processing delays. Please see separate TRANSACTION FEE SCHEDULE for applicable Transaction Fees.

For Further Credit destinations are **not accepted** on ACH transfers. ACH can only be sent to the registered account owner's bank account: checking or savings. Funds will be directly deposited to the account specified two business days after the expected start date (Section 3B)

A. *Type of Distribution: (select one)* Note: If type of distribution is not selected, a wire will be sent and the account will be charged a wire fee.

☒ Wire OR ☐ ACH

B. Type of Account: (select one)

☒ Checking OR ☐ Savings

**Account Information:**

ACH or Wire can not be completed unless all information is provided.

MECHANICS & FARMERS BANK
Bank Name

DURHAM, NC
Bank City, State

▮▮▮▮▮▮▮▮
ABA Routing Number

NORTH CAROLINA ▨▨▨▨ MUTUAL LIFE INSURANCE COMPANY
Account Name (If wire distribution, provide third party recipient address     Account Number
in Section 8 as required by the Travel Rule, a Bank Secrecy Act requirement)     ▮▮▮▮▮▮▮▮

For further Credit Account Name (Wire only, not available for ACH) (Provide third party recipient address in Section 8 as required by the Travel Rule, a Bank Secrecy Act requirement)

For further Credit Account Number (Wire only, not available for ACH)

**Wire or ACH Fee:** Please see separate TRANSACTION FEE SCHEDULE for applicable Transaction Fees.



**SUMMIT**
TRUST COMPANY

**Distribution Form (Non-IRA)**

(04162014)

8861 West Sahara Ave. Suite 215
Las Vegas, NV 89117
Ph: 877.268.9115                    4

## 7.    Liquidation / Distribution to Another Summit Trust Company Account

Liquidate and Transfer to:

_____
Summit Trust Company Account Number

## 8.    Third Party Recipient Address Information

For third party wires, or checks payable to a financial institution for the benefit of a third party, provide recipient's street address, city, state, and zip code. If recipient's information is not provided, wire or check may be rejected by receiving institution.

_____          _____
Street Address                                            City, State / Zip Code

## 9.    Signatures

I certify that the information I have provided is accurate and hereby authorize Summit Trust Company, upon receipt of this request, to initiate a distribution from my account as instructed on this form. I further agree that Summit Trust Company, its parent and affiliates, will not be liable for any loss, liability, cost, or expense for acting as directed in this request.

Note: See instructions in Section 5 or 6 for signature requirements.

_____          10 | 16 | 15
Investor's Signature                                      Date

X
_____
Name of Joint Owner (if applicable)

Acknowledged By:

_____          _____
Advisor's / Consultant's Signature                         Date



### LIFE INSURANCE COMPANY

411 West Chapel Hill Street ■ Durham, North Carolina 27701
www.ncmutuallife.com

## Wire Transfer / EFT Instructions
### Effective January 1, 2009

Please provide your financial institution with the following information when making a
wire transfer or ACH/EFT to North Carolina Mutual Life Insurance Company.

**NC Mutual Life Insurance Company Bank:**
Mechanics & Farmers Bank
2634 Durham-Chapel-Hill Blvd
Durham, NC 27707

**Account Name:**
NC Mutual Life Insurance Company
General Account
411 W. Chapel Hill St
Durham, NC 27701

**Account Number:**

**Routing/Transit Number:**

**The Port Royal North Carolina Mutual Reassurance Trust**

**Maintained at Summit Trust Company**

**As of August 15, 2016**

| 8/15/2016 Ending Investment | Maturity Date | Collateral | Name in Trust |
|---|---|---|---|
| $ 1,000,000 | 7/31/2016 | Receivables | Tata Communications - Note 1 |
| 1,000,000 | 7/31/2016 | Receivables | Verizon UK - Note 2 |
| 1,000,000 | 8/18/2016 | Real Estate | Coconut Beach LLC |
| 1,000,000 | 8/31/2016 | Real Estate | Wabash LLC |
| 1,000,000 | 8/31/2016 | Receivables | France Telecom Espana, S.A.U. - Note 3 |
| 1,000,000 | 8/31/2016 | Receivables | Telecom Italia SPA - Note 8 |
| 1,000,000 | 8/31/2016 | Receivables | Orange Espagne SA - Note 9 |
| 1,000,000 | 9/1/2016 | Real Estate | East 14th Investor LLC |
| 1,000,000 | 9/1/2016 | Real Estate | We Member LLC |
| 1,000,000 | 9/1/2016 | Real Estate | We Work, LLC |
| 1,000,000 | 9/8/2016 | Receivables | Verizon - Madrid Espana - Note 4 |
| 500,000 | 9/8/2016 | Receivables | British Telecom - Note 4A |
| 1,000,000 | 9/11/2016 | Receivables | KDDI Europe - Note 5 |
| 500,000 | 9/11/2016 | Receivables | Verizon Netherlands - Note 5A |
| 300,000 | 9/18/2016 | Receivables | Vodaphone UK - Note 6 |
| 1,000,000 | 9/26/2016 | Real Estate | Syracuse Property Holdings LLC |
| 1,000,000 | 9/26/2016 | Real Estate | 103-113 3rd St. LA LLC |
| 450,000 | 9/29/2016 | Receivables | SRL-COLT(Italy) - Note 7 |
| 1,000,000 | 10/6/2016 | Equiptment | Delta |
| 1,000,000 | 10/30/2016 | Real Estate | Spring Bridge 182, LLC |
| 1,000,000 | 10/30/2016 | Real Estate | JS Berry Street LLC |
| 1,000,000 | 10/30/2016 | Real Estate | WB 41 Mercer LLC |
| 1,000,000 | 10/30/2016 | Real Estate | Halabridge 154 Spring LLC |
| 1,000,000 | 10/31/2016 | Real Estate | West 25th St. LLC |
| 1,000,000 | 10/31/2016 | Real Estate | Park Ave Park Ave LLC |
| 1,000,000 | 10/31/2016 | Real Estate | Hilton Tower LLC |
| 1,000,000 | 11/30/2016 | Real Estate | WBSH Met Tower LLC |
| 1,000,000 | 11/30/2016 | Real Estate | 2307 Broadway LLC |
| 1,000,000 | 11/30/2016 | Real Estate | 801 South Broadway LLC |
| 500,000 | 4/11/2017 | Balance Sheets | Sully Partners, LLC |
| 1,000,000 | 7/1/2017 | Various Assets | Banjo |
| 500,000 | 8/17/2017 | Auto loans | Auto Funding Group, LLC |
| 500,000 | 8/17/2017 | Auto oans | Auto Funding Group, LLC |
| 1,000,000 | 10/13/2017 | Equipment | Sprintship |
| 1,000,000 | OPEN | CLO- Preferred | Petra/Bank America |
| 1,000,000 | OPEN | CLO- Preferred | Jazz/Credit Suisse |
| 500,000 | OPEN | CLO- Preferred | Jeffries/Petra |
| 700,000 | OPEN | Receivables | Talking Capital LLC - Surplus Account Fu |
| 1,099,954 | | Cash | Cash |
| $ 34,549,954 | | | |